Matthew T. Williams, Esq. SBN 272714
Law Office of Matthew T. Williams, APC
1620 5th Ave., Ste. 625 San Diego, CA 92101
Telephone: (619) 354-7870
Email: mtwilliamslaw@gmail.com

Attorney for Plaintiff BRIAN H KURBJEWEIT,
AS TRUSTEE OF THE WRITER'S TRUST, 2/14/2018

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Brian H. Kurbjeweit, as Trustee of The Writer's Trust, dated 2/14/2018,<br><br>*Plaintiff,*<br><br>v.<br><br>Wells Fargo Bank, N.A.<br><br>*Defendant* | **CASE NO.:** '26CV5468 AJB AHG<br><br>COMPLAINT AND DEMAND FOR JURY TRIAL FOR:<br><br>1. Declaratory Relief (28 U.S.C. § 2201)<br>2. Violations of the Electronic Fund Transfer Act (15 U.S.C. § 1693 et seq.) and Regulation E, (12 C.F.R. § 1005.11 et seq.)<br>3. Violations of the Electronic Fund Transfer Act (15 U.S.C. § 1693 et seq.);<br>4. Promissory Fraud;<br>5. Violations of California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 et seq.); |

Plaintiff **BRIAN H. KURBJEWEIT**, acting in his formal fiduciary capacity as **TRUSTEE OF THE WRITER'S TRUST, DATED FEBRUARY 14, 2018** ("Plaintiff" or "Trust"), by and through his designated counsel, brings this individual consumer protection action against Defendant **WELLS FARGO BANK, N.A.** ("Wells Fargo" or "Defendant"), and alleges as follows based upon personal knowledge, the investigation of counsel, and the review of relevant business records:

## I. INTRODUCTION

This case began with a relatively straightforward consumer dispute. Plaintiff reported losses due to unauthorized electronic fund transfers that he contends were fraudulently diverted through technological mimicry to a third party without his knowledge.

During the summer and fall of 2025 Plaintiff had been trying to transfer funds from his Wells Fargo bank account into his own account at another online institution.

After realizing that the funds had been stolen through what he realized too late was a fraud, Plaintiff availed himself of the protections found in the Electronic Funds Transfer Act ("EFTA") and Regulation E, its implementing regulation. To activate these consumer protection statutes, Plaintiff called his bank, Wells Fargo, and reported the fraud, hoping that the bank could help him resolve the matter and if possible, recover his funds.

What followed was anything but straightforward.

After receiving a contradictory response in the manner of a partial reimbursement that for transactions that Wells Fargo said were "not authorized" by him, and then quickly after, a denial for transactions that Wells Fargo said were "made by" him. Plaintiff was confused about the process, what standards applied and whether or not Wells Fargo even knew what happened.

Plaintiff sent Wells Fargo a detailed letter to explain how he believed the fraud worked and stating in no uncertain terms that he did not authorize any of the disputed transactions. However, Plaintiff realized that Wells Fargo was not listening to him because they continued to deny his claim by stating he had "authorized or participated" in the transactions, without explaining how they found authorization or why participation mattered—when the first set of transactions were found to be "not authorized" by him, and the second set were found to be authorized by him, although he participated in both sets of transactions.

For months, Plaintiff attempted to get Wells Fargo to meaningfully investigate what had happened. He submitted detailed written explanations, identified relevant evidence, provided screenshots and other documentary materials, challenged statements in Wells Fargo's denial

letters that directly contradicted what he had told the bank, and repeatedly sought a meaningful explanation and resolution.

Wells Fargo nevertheless continued denying the claim without meaningful explanation and without citing or disregarding as irrelevant any of the material facts and evidence he had sent to them.

The process began in the fall of 2025 and continued into 2026.

After realizing he could not get clarity through the consumer level appeal process, Plaintiff called Wells Fargo's Executive Office and indicated that he intended to pursue arbitration. Wells Fargo's Executive Office personnel asked him to delay arbitration proceedings while someone with authority would call him and attempt to resolve the matter.

Wells Fargo opened a separate Executive Office case, accepted additional evidence, and repeatedly advised Plaintiff that it needed additional time to complete its "research."

Plaintiff waited. However, no person with authority ever called him to resolve the claim as promised.

Plaintiff provided more evidence and, in reliance on letters Wells Fargo continued to send, stating they needed more time to research his claim.

In reliance on the promise of a final resolution forthcoming, Plaintiff continued to hold off on filing an arbitration proceeding.

Wells Fargo extended its anticipated response date again and again. Yet Plaintiff alleges that Wells Fargo never provided the promised resolution contact, never provisionally credited the disputed $9,892.91 as required by law and never completed that renewed review through a substantive final determination addressing the additional evidence.

After a prolonged period without any communication for resolution, and after multiple extensions without engagement with the evidence he had provided to Wells Fargo, Plaintiff ultimately concluded the problem was larger than the loss of his own money. He realized the problem could be systemic in nature.

Plaintiff engaged in an investigation via the CFPB's public complaint portal and identified numerous complaints by other Wells Fargo customers describing experiences he essentially identical to his—including allegations involving Wells Fargo's use of a "made by you" authorization standard, inadequate investigations, inadequate explanations of findings, and failures to provide or meaningfully account for relevant investigative materials.

While Plaintiff understood that these complaints did not mean Wells Fargo was guilty of the alleged conduct, he also realized there was a clear pattern of conduct he could not ignore.

Plaintiff therefore brings this action not merely to recover his own losses, but to hold Wells Fargo accountable for the conduct alleged in this Complaint and, through his claim under California's Unfair Competition Law ("UCL"), to seek prospective relief against practices he alleges threaten other consumers and the general public who may be harmed in the future if Wells Fargo is not held accountable to take responsibility for its impact on customers and change its procedures, conduct, and potentially its culture, if that's where the issue is ultimately sourced.

## II. JURISDICTION AND VENUE

This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff asserts claims arising under the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693 et seq., and its implementing regulation, Regulation E, 12 C.F.R. Part 1005. EFTA further provides that an action under its civil-liability provision may be brought in any United States district court without regard to the amount in controversy. 15 U.S.C. § 1693m(g).

This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367(a) because those claims and Plaintiff's federal EFTA claims derive from a common nucleus of operative fact and form part of the same case or controversy.

This Court has authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and further necessary or proper relief pursuant to 28 U.S.C. § 2202.

Venue is proper in the United States District Court for the Southern District of California pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within this judicial district. Plaintiff established, maintained, and operated the consumer deposit account at issue through Wells Fargo in San Marcos, California, within San Diego County, and Plaintiff experienced the alleged account losses and resulting injury within this District.

This Court has personal jurisdiction over Defendant Wells Fargo Bank, N.A. because Defendant purposefully availed itself of the privilege of conducting business in California, and Plaintiff's claims arise out of or relate to Defendant's forum-related activities and its banking relationship with Plaintiff in California.

## UNENFORCEABILITY OF ARBITRATION AGREEMENT

Plaintiff Brian H. Kurbjeweit, as Trustee of The Writer's Trust dated February 14, 2018, alleges that Defendant Wells Fargo Bank, N.A.'s Deposit Account Agreement ("Agreement") contains an Arbitration Agreement that prohibits a consumer from acting in arbitration "in the interests of the general public" or as a private attorney general, and further provides that if any provision relating to a private attorney general or other representative action is found illegal or unenforceable, the entire Arbitration Agreement will be unenforceable. (Exhibit 1.)

The Agreement expressly provides that issues concerning the scope and enforceability of the Arbitration Agreement, including whether a dispute can or must be brought in arbitration, are for a court of competent jurisdiction to decide. Accordingly, under the Agreement's own terms, the enforceability of the Arbitration Agreement is a question for this Court.

Under *McGill v. Citibank, N.A.*, 2 Cal. 5th 945 (2017), a pre-dispute agreement that waives a consumer's right to seek public injunctive relief under the UCL in any forum is contrary to California public policy and unenforceable. Moreover, the Ninth Circuit has further held that the Federal Arbitration Act does not preempt the *McGill* rule. *Blair v. Rent-A-Center, Inc.*, 928 F.3d 819 (9th Cir. 2019).

The Southern District of California has addressed materially identical Wells Fargo arbitration language in *Lotsoff v. Wells Fargo Bank, N.A.*, No. 18-cv-02033-AJB-JLB, 2019 WL 4747667 (S.D. Cal. Sept. 30, 2019). Applying *McGill*, the *Lotsoff* court concluded that Wells Fargo's prohibition against acting in arbitration "in the interests of the general public" impermissibly precluded public injunctive relief. Such a provision is void as against public policy. The court further enforced Wells Fargo's non-severability provision, which stated that if the specified representative-action restrictions were illegal or unenforceable, the entire Arbitration Agreement would be unenforceable (the "poison pill" language). Having concluded therefore that Wells Fargo's entire Arbitration Agreement was thus unenforceable, the court denied Wells Fargo's motion to compel arbitration.

The Arbitration Agreement in Plaintiff's copy of Wells Fargo's Deposit Account Agreement contains language that is identical to the language addressed in *Lotsoff*. (See Statement of Facts, supra, comparing the relevant language in Plaintiff's Agreement with the language addressed in *Lotsoff*.)

Plaintiff seeks public injunctive relief under the UCL for the primary purpose and effect of preventing allegedly unlawful practices that threaten future injury to the general public.

Plaintiff therefore alleges that the Agreement's prohibition against pursuing such relief is unenforceable under *McGill* and *Blair* and that, pursuant to the Agreement's express non-severability provision (the "poison pill" language), the entire Arbitration Agreement is unenforceable.

Accordingly, the Arbitration Agreement is unenforceable and provides no basis to compel Plaintiff's claims to arbitration.

## III. PARTIES

Plaintiff BRIAN H. KURBJEWEIT is a natural person and a consumer residing in the City of San Marcos, County of San Diego, State of California. Plaintiff is the Settlor, sole Trustee, real party in interest, and exclusive authorized user of the Wells Fargo Everyday

Checking account ending in 8154, which has been used primarily for personal, family and household purposes since it was opened in February 2018.

Legal title to the funds in account ending in 8154 is held by Plaintiff in his formal fiduciary capacity as Trustee of THE WRITER'S TRUST, DATED FEBRUARY 14, 2018, which was established for the estate planning purposes. Pursuant to established Ninth Circuit authority **(*Gilliam v. Levine*, 955 F.3d 1117 (9th Cir. 2020)),** a natural person acting as a trustee of a revocable living trust established strictly for personal estate-planning purposes does not surrender federal consumer protections; the account remains an asset owned by a natural person and constitutes a "consumer account" protected under 12 C.F.R. § 1005.2(e).

Moreover, since Defendant, Wells Fargo, has already treated the Trustee as a consumer under the EFTA, Defendant is legally, equitably, and administratively estopped from raising any defense asserting that the account ending in 8154 falls outside the scope of the EFTA or that the customer entity is not a protected "consumer". This is so because Wells Fargo already issued a reimbursement in the name of The Writer's Trust, dated 2/14/2018, under Claim No. 2025102380009, on October 30, 2025, demonstrating that Defendant already considers the Trust (the "Plaintiff") to be entitled to consumer protections under the EFTA.

Defendant WELLS FARGO BANK, N.A. is a national banking association organized under the laws of the United States, with its principal place of business located in Sioux Falls, South Dakota. Defendant operates as a financial institution that regularly accepts consumer deposits and provides electronic fund transfer network services to the general public, including debit card and automated clearing house ("ACH") transactions. Defendant is fully subject to the statutory mandates of the EFTA (15 U.S.C. § 1693 et seq.) and the strict administrative rules of Regulation E (12 C.F.R. Part 1005).

/
/
/
/
/

## IV. STATEMENT OF FACTS

1. On October 23, 2025, Plaintiff called Wells Fargo's customer service and reported that electronic fund transfers from his Wells Fargo checking account ending in 8154, involving Coinbase.com and Crypto.com, were unauthorized.

### A. Wells Fargo Reached Opposite Authorization Findings from the Same Fraud Report

2. Wells Fargo divided Plaintiff's single fraud report into two separate claim processes: Claim No. 2025102380009 for the ACH transactions and Claim No. 11022250854 for the Debit-Card transactions.

3. Seven days later, on October 30, 2025, Wells Fargo completed its investigation of the ACH portion of Plaintiff's fraud report and expressly determined that $4,900.00 in transactions were "not authorized by you." Wells Fargo credited $4,900.00 to Plaintiff's account.

4. Four days later, on November 3, 2025, Wells Fargo reached the opposite conclusion concerning the Debit-Card portion of the same fraud report. Wells Fargo stated that it had completed its research concerning $11,324.55 in disputed charges and concluded that "the transaction(s) were made by you or someone who had your permission."

5. As of November 3, 2025, Plaintiff had not yet submitted his later written explanation, screenshots, or other documentary evidence. The material information Plaintiff had personally supplied to Wells Fargo consisted principally of his October 23, 2025 fraud report by telephone.

6. Neither determination letter explained what evidence caused Wells Fargo to classify the ACH transactions as unauthorized while classifying the Debit-Card transactions as having been made by Plaintiff or someone with his permission—and thus authorized.

7. Moreover, the November 3 denial did not identify the destination or recipient that Plaintiff supposedly authorized, identify the evidence establishing Plaintiff's consent to that destination, or distinguish Plaintiff's physical participation in initiating a transaction from his consent to the transaction that ultimately occurred.

**B. Wells Fargo Asserted a 60-Day Reporting Problem That Did Not Correspond to the Facts**

8. Wells Fargo's November 3 letter additionally stated that Plaintiff had failed to report the unauthorized activity within 60 days of receiving the statement reflecting the first unauthorized transaction. The letter did not identify the transaction or statement upon which Wells Fargo based that conclusion.

9. The Debit-Card transactions ultimately remaining in dispute occurred between August 22 and September 29, 2025. The August statement was made available on approximately September 16, 2025, and the September statement was made available on approximately October 16, 2025. Plaintiff reported the fraud on October 23, 2025.

10. By contrast, many of the ACH activity that Wells Fargo reimbursed appeared on Plaintiff's July bank statement cycle which was made available on August 15, 2025.

11. Wells Fargo's November 3 letter did not explain why the 60-day issue supposedly barred the more recent Debit-Card claim while Wells Fargo had already reimbursed the ACH transactions appearing on an earlier statement cycle.

**C. Plaintiff Gave Wells Fargo a Detailed Written Explanation of How the Fraud Occurred**

12. On or about November 16, 2025, Plaintiff asked Wells Fargo to reopen Claim No. 11022250854 because material information concerning the fraud had not been considered during the first investigation.

13. On November 18, 2025, Plaintiff submitted an approximately ten-page written Regulation E letter describing the disputed transactions, the circumstances of the fraud, and the evidence available to Wells Fargo.

14. Plaintiff narrowed his claim to ten Debit-Card transfers that he believed represented funds actually lost:

/

/

| Date | Amount |
|---|---|
| August 22, 2025 | $843.36 |
| September 15, 2025 | $1,100.00 |
| September 22, 2025 | $1,600.00 |
| September 26, 2025 | $100.00 |
| September 26, 2025 | $50.00 |
| September 29, 2025 | $101.49 |
| September 29, 2025 | $898.06 |
| September 29, 2025 | $2,500.00 |
| September 29, 2025 | $1,700.00 |
| September 29, 2025 | $1,000.00 |
| **Total** | **$9,892.91** |

15. Plaintiff removed transactions for which funds had been returned or otherwise had not ultimately been lost, thereby reducing the Debit-Card claim from $11,324.55 to $9,892.91.

16. Plaintiff's November 18 letter expressly stated that ***he had not authorized transfers*** to a fraudster. Rather, Plaintiff explained that ***his intent was to transfer funds to himself*** and that he consented only to transferring funds to himself—specifically, to his account at Base Wallet.

17. Plaintiff explained that he was operating from within his Base Wallet environment using his own authenticated account, which was accessible only after entering his password. Plaintiff used Base Wallet's internal navigation icons to access what appeared to be its trading interface and selected the function through which funds could be received into that environment.

18. Through that process, Plaintiff was presented with a wallet/deposit address that appeared to him to be the legitimate routing credential for funding his own Base Wallet trading account. The interface, navigation icons, formatting, and operating environment appeared continuous with Base Wallet, and Plaintiff alleges that nothing visible informed him that the destination belonged to a third party.

19. Plaintiff then transferred funds from his Wells Fargo account through his Crypto.com account. Using the displayed address, Plaintiff ultimately transferred the funds from Crypto.com into what he believed was his own Base Wallet account.

20. In every disputed transaction, therefore, Plaintiff believed that his funds were being transferred to his own account.

21. Plaintiff later discovered that the address presented through that process had instead routed the funds to a destination controlled by the fraudster.

22. Plaintiff therefore explained to Wells Fargo that, although he physically participated in initiating the transactions, he never intended, knowingly consented to, or authorized the transfer of his money to the third-party destination that actually received it.

23. Plaintiff's November 18 Executive Summary stated, in substance, that he authorized transfers to himself and did not know that the transfer path or destination presented to him had been fraudulently substituted.

24. Plaintiff also informed Wells Fargo that Crypto.com had restricted external transfers from his account on September 30, 2025, immediately following the disputed activity.

25. Plaintiff further identified unusual activity visible within Wells Fargo's own records, including the rapid movement of funds into and out of Crypto.com on October 1 and October 2, 2025.

26. Plaintiff offered additional documentary evidence, including screenshots depicting the operating environment and technological mimicry. Wells Fargo did not request those offered screenshots before issuing its next determination.

**D. Wells Fargo's Second Denial Attributed to Plaintiff a Statement that was the Opposite of What He'd Written in his November 18, 2025 Letter**

27. On November 26, 2025, Wells Fargo issued its second denial determination.

28. Wells Fargo represented that it had reviewed the information Plaintiff provided and researched relevant system records.

29. Wells Fargo identified three principal findings:

(a) "You ***noted you authorized*** or participated in the disputed transaction(s)."

(b) "You have not lost any devices that included a digital wallet."

(c) "The card was in your possession at the time the claim was filed and during the time of the disputed activity."

30. Plaintiff's November 18 submission, which Wells Fargo received before issuing this determination, expressly stated the opposite of the first finding. Plaintiff stated that he had never authorized transfers to the fraudster and had intended to transfer the funds to himself.

31. Wells Fargo's November 26 determination did not identify where or when Plaintiff supposedly "noted" that he authorized the disputed transactions.

32. The determination did not explain how Plaintiff's possession of his card or device established his consent to the third-party destination that ultimately received his funds.

33. Nor did the determination address Plaintiff's description of the Base Wallet operating environment, the allegedly substituted destination, the September 30 Crypto.com restriction, or the transaction activity Plaintiff had identified in Wells Fargo's own records.

34. Wells Fargo separately mailed Plaintiff another letter dated November 26, 2025, confirming modifications to the transactions remaining in the claim. Those modifications corresponded to the transaction information contained in Plaintiff's November 18 submission.

35. The second November 26 letter therefore demonstrates that Wells Fargo had received and processed information from Plaintiff's November 18 submission before issuing its second denial.

**E. Plaintiff Escalated the Investigation Deficiencies to the CFPB**

36. On December 8, 2025, Plaintiff filed a complaint with the Consumer Financial Protection Bureau ("CFPB"), Complaint No. 251208-26631391. The CFPB transmitted the complaint to Wells Fargo.

37. Plaintiff advised the CFPB and Wells Fargo that his November 18 submission contained material information that Wells Fargo had not addressed; that Wells Fargo had not requested the screenshots Plaintiff had offered; and that Wells Fargo had not meaningfully addressed either the Crypto.com restriction or Plaintiff's explanation of the alleged destination substitution.

38. Accordingly, before Wells Fargo issued its third determination, it had received Plaintiff's original fraud report, his detailed November 18 written explanation expressly denying authorization, his narrowed transaction list, and his written challenge to the adequacy of the first two investigations, that included reference to his letter and the screenshot evidence he had offered and could still make available. Plaintiff also directly uploaded his letter and several other files to the CFPB.

**F. Wells Fargo's Third Denial Again Attributed Authorization to Plaintiff**

39. On December 17, 2025, Wells Fargo issued its third denial determination.

40. The third denial repeated substantially the same three findings contained in the November 26 determination, including:

(a) "You ***indicated*** **you authorized** or participated in the disputed transaction(s)."

(b) Plaintiff had not lost a device containing a digital wallet; and

(c) Plaintiff's card remained in his possession.

41. Wells Fargo again did not identify where or when Plaintiff supposedly "indicated" that he authorized the disputed transfers, notwithstanding Plaintiff's November 18 written statement expressly denying authorization.

42. The December 17 letter did not explain how Wells Fargo reconciled Plaintiff's written account of the fraud with its conclusion that he authorized the transactions.

43. The letter also did not substantively address the allegedly substituted destination, the September 30 Crypto.com restriction, the additional evidence Plaintiff had offered, or the distinction Plaintiff had drawn between physical participation in a transaction and consent to the destination that actually received the funds.

44. Significantly, Wells Fargo's December 17 letter itself stated: "Under Regulation E, a transaction is considered unauthorized if you did not give actual consent for the transfer."

45. Nevertheless, the letter did not identify the evidence from which Wells Fargo concluded that Plaintiff gave actual consent to transfer the disputed funds to the destination that ultimately received them.

46. Wells Fargo concluded the December 17 letter by stating that the case was closed, but further represented: "If we receive additional information, we will open a new case to address any remaining concerns or new concerns."

**G. Wells Fargo's Own "Documents Relied Upon" Productions Appeared Materially Unchanged Across All Three Determinations**

47. Plaintiff requested all the documents Wells Fargo represented that it relied upon in making its three denial determinations.

48. Wells Fargo produced three "Documents Relied Upon" packages corresponding to the November 3, November 26, and December 17 determinations. The packages were dated December 11, 2025; January 16, 2026; and March 27, 2026.

49. Each production represented that Wells Fargo was providing the documents used to make its decision.

50. Plaintiff compared the three productions. They were materially identical.

51. They contained the same or materially the same account records, Debit-Card information, transaction data, merchant-authorization information, and device, IP, and login information.

52. The later packages do not materially reflect Plaintiff's November 18 written explanation, the screenshots he offered, or materially new investigative analysis directed to the additional information Plaintiff supplied after the first denial.

53. The packages principally document Plaintiff's account, card, device, credentials, and participation in initiating the transactions; they do not identify evidence demonstrating that Plaintiff knowingly consented to the third-party destination that ultimately received the disputed funds.

54. Each production also contains an internal notation reading "CONFIRMED FRAUD."

55. Plaintiff does not presently know what Wells Fargo intended the internal notation "CONFIRMED FRAUD" to mean.

56. Wells Fargo's denial letters did not explain the notation "CONFIRMED FRAUD" or reconcile it with Wells Fargo's conclusion that Plaintiff authorized the disputed transfers.

57. The documentary record therefore reflects three denial determinations made notwithstanding a materially expanded factual record supplied by Plaintiff, while the materials Wells Fargo identified as supporting those determinations remained materially unchanged.

**H. Wells Fargo Opened a New Executive Office Case and Resumed Substantive Review**

58. After the December 17, 2025, determination, Plaintiff continued attempting to resolve the dispute.

59. On or about January 23, 2026, Plaintiff spoke with Wells Fargo's Executive Office concerning the unresolved claim and Plaintiff's intention to proceed to arbitration.

60. According to Plaintiff's contemporaneous records, a Wells Fargo representative asked Plaintiff not to proceed immediately with arbitration and represented that someone with authority to address or resolve the matter would contact him within approximately three to five days.

61. In reliance upon that representation, Plaintiff temporarily delayed further formal proceedings to permit Wells Fargo to conduct additional review.

62. Wells Fargo thereafter opened Executive Office Case No. 06202601268242275. The underlying Debit-Card matter continued to be identified as Claim No. 11022250854.

63. Wells Fargo repeatedly informed Plaintiff that additional "research" was being performed concerning his claim.

64. Wells Fargo initially anticipated responding by February 6, 2026. Wells Fargo thereafter extended its anticipated response date to February 23, then to March 16, and finally to April 6, 2026, each time stating that additional time was required to complete its research.

65. To ensure that he preserved his right to proceed to arbitration if the dispute remained unresolved, Plaintiff emailed a "Pre-Arbitration Notice" near early February and subsequently mailed a "Notice of Arbitration" to several different divisions of Wells Fargo.

66. Plaintiff had previously asked Wells Fargo where his Notice of Arbitration should be sent, but Wells Fargo did not provide him with that information.

67. As a consequence, Plaintiff was forced to mail the Notice to many different Wells Fargo departments to ensure that at least one copy reached the proper recipient.

68. Mailing the Notice to multiple departments caused Plaintiff to incur additional and otherwise unnecessary expenses. Plaintiff incurred approximately $140.28 in total mailing expenses. A single package would have cost approximately $12; accordingly, Plaintiff incurred over $100 in additional expenses that would not otherwise have been necessary.

**I. Wells Fargo Accepted Additional Evidence During the 2026 Executive Office Review**

69. While the Executive Office review remained pending, Plaintiff supplied additional documentary evidence directed specifically to the authorization question.

70. In February 2026, Plaintiff submitted screenshots corroborating that Crypto.com had restricted his account from transferring digital assets externally beginning September 30, 2025.

71. On or about February 23, 2026, Plaintiff submitted an approximately 26-page evidentiary package containing factual analysis and eight screenshots depicting the Base Wallet operating environment and the manner in which Plaintiff alleges the fraudulent destination was presented.

72. In additional evidence provided on or about February 16, 2026, Plaintiff documented that the disputed transfers moved from his Wells Fargo account through Crypto.com and then to the ultimate destination associated with what Plaintiff believed to be his Base Wallet account.

73. Plaintiff further explained that, although Crypto.com operated as an intermediary between his Wells Fargo account and the ultimate destination, the existence of an intermediary did not, in Plaintiff's position, remove the transactions from the protections of the Electronic Fund Transfer Act. Plaintiff identified *Green v. Capital One, N.A.*, 557 F. Supp. 3d 441, 447–48

(S.D.N.Y. 2021), as authority supporting his position that the existence of an intermediary does not, on its face, preclude an EFTA claim.

74. Plaintiff asked Wells Fargo to consider this additional evidence before reaching its final determination.

75. Wells Fargo did not issue a substantive determination after receiving these additional materials. Instead, Wells Fargo continued extending its review while stating that additional time was required to complete its research.

**J. Wells Fargo Neither Provisionally Credited the $9,892.91 Nor Issued the Promised Final Determination**

76. Throughout the extended Executive Office review, Wells Fargo did not provisionally credit the disputed $9,892.91 to Plaintiff's account.

77. Wells Fargo's March 16, 2026 correspondence stated that it expected to follow up with Plaintiff by April 6, 2026.

78. Wells Fargo did not provide Plaintiff with a substantive final determination on April 6, 2026 addressing the additional evidence supplied during the Executive Office review.

79. Nor did Wells Fargo subsequently explain to Plaintiff why it had failed to provide the anticipated April 6 determination. Wells Fargo ceased communicating with Plaintiff concerning the promised determination, and the additional "research" Wells Fargo repeatedly represented it was conducting was never concluded through a substantive final determination communicated to Plaintiff.

80. Plaintiff's contemporaneous records reflected that no such determination had been received as of May 27, 2026. Plaintiff did not thereafter receive a substantive final determination addressing the evidence submitted during the 2026 Executive Office review.

81. The disputed $9,892.91 remained unreimbursed.

**K. Plaintiff Commenced Arbitration and Incurred Additional Economic Loss**

82. On April 6, 2026, Plaintiff commenced a consumer arbitration proceeding against Wells Fargo with the American Arbitration Association ("AAA"), which became AAA Case No. 01-26-000-16347.

83. Plaintiff would have preferred to file an action in court, in order to have access, to (in Plaintiff's mind) a forum that lacked all possibility of commercial influence, and thus was perhaps a more truly neutral forum, that also perhaps provided a greater scope of discovery that arbitration, Plaintiff did not believe he had a choice.

84. Plaintiff believed, based on Deposit Account Agreement's arbitration agreement that arbitration was mandatory. Thus, he filed with the AAA.

85. Plaintiff paid a nonrefundable AAA filing fee of $225.00, for a total payment of approximately $230.85 including approximately $5.85 in associated online submission fees.

86. Plaintiff initially asserted claims under the Electronic Fund Transfer Act and Regulation E and thereafter amended his arbitration claim to include a claim under California's Unfair Competition Law.

87. Plaintiff continued seeking relief through arbitration because Wells Fargo's Deposit Account Agreement purported to require arbitration of disputes between the parties.

88. On or about July 12, 2026, Plaintiff retained counsel to represent and assist him in connection with the dispute.

**L. The Deposit Account Agreement Requires Arbitration of Claims, Restricts Public-Injunctive Relief, and Expressly Reserves Enforceability Questions for a Court**

89. The Wells Fargo Deposit Account Agreement applicable to Plaintiff's account contains an arbitration provision stating that neither party may "act in any arbitration in the interests of the general public" or act as a private attorney general.

90. The same arbitration provision further states that if a provision relating to specified representative proceedings is found illegal or unenforceable, "the entire Arbitration Agreement will be unenforceable."

91. The agreement additionally provides: “All issues are for the arbitrator to decide, except that issues relating to the scope and enforceability of the Arbitration Agreement or whether a dispute can or must be brought in arbitration are for a court of competent jurisdiction to decide.”

92. Plaintiff subsequently determined that the enforceability of the provision restricting public-injunctive relief presented a question for judicial determination and now seeks resolution of that controversy by this Court.

**M. Wells Fargo Continues to Maintain That Its Investigations Complied With the EFTA**

93. On June 12, 2026, Wells Fargo filed its Answer to Plaintiff’s arbitration claim. In its Answer, Wells Fargo denied liability and asserted as an affirmative defense that Plaintiff’s EFTA claims were not actionable because Wells Fargo had conducted a “reasonable, good faith investigation,” reached a conclusion based upon “convincing evidence,” and complied with applicable statutory notice and timing requirements.

94. Wells Fargo has therefore affirmatively placed at issue whether its investigation was reasonable; what evidence constituted the “convincing evidence” supporting its authorization determination; and whether its investigation, notice, timing, and error-resolution procedures complied with the EFTA and Regulation E.

**N. Plaintiff Discovered That Materially Identical Arbitration Language Had Previously Been Addressed in *Lotsoff v. Wells Fargo***

95. In further investigating the enforceability of Wells Fargo’s arbitration provision, Plaintiff discovered *Lotsoff v. Wells Fargo* (2019)

96. Plaintiff determined that the arbitration agreement addressed in *Lotsoff* contained language materially identical to the language contained in the arbitration provision of Plaintiff’s Wells Fargo Deposit Account Agreement.

97. The language in Lotsoff stated (directly quoted from the case, at p. 5 of 11):

> **[N]either Wells Fargo nor you will be entitled to join or consolidate disputes by or against others as a representative or member of a class, to act in any**

> **arbitration in the interests of the general public, or to act as a private attorney general.**
>
> If any provision related to a class action, class arbitration, private attorney general action, other representative action, joinder, or consolidation is found to be illegal or unenforceable, the entire Arbitration Agreement will be unenforceable.

98. The language in the Plaintiff's Deposit Account Agreement (Nov. 5, 2025) was identical to this. It states in relevant part (directly quoted from the Nov. 5, 2025, edition):

> **Neither Wells Fargo nor you will be entitled to join or consolidate disputes by or against others as a representative or member of a class, to act in any arbitration in the interests of the general public, or to act as a private attorney general.** If any provision related to a class action, class arbitration, private attorney general action, other representative action, joinder, or consolidation is found to be illegal or unenforceable, the entire Arbitration Agreement will be unenforceable.

99. Plaintiff further determined that *Lotsoff* addressed the enforceability of Wells Fargo's arbitration agreement in connection with restrictions upon the pursuit of public-injunctive relief.

100. Plaintiff's discovery of *Lotsoff*, together with his review of the arbitration provision contained in his own Deposit Account Agreement, caused Plaintiff to investigate whether the dispute extended beyond his individual EFTA claim and implicated Wells Fargo business practices potentially affecting other consumers.

### O. Plaintiff Discovered Numerous CFPB Complaints Describing Materially Similar Conduct by Wells Fargo

101. Plaintiff thereafter searched the CFPB's public consumer-complaint database to determine whether other Wells Fargo customers had reported experiences similar to his own.

102. Plaintiff's search identified more than 36 complaints or reports submitted by other Wells Fargo customers describing conduct Plaintiff considered materially similar to his experience.

103. Those complaints included reports concerning Wells Fargo's use of a "made by you" authorization standard; alleged failures to conduct reasonable investigations; alleged failures to

adequately explain investigative findings; and alleged failures to provide documents relied upon after consumers requested them.

104. Plaintiff's review of these complaints caused him to conclude that the conduct he experienced might not be isolated to the investigation of his individual claim, but instead might reflect practices affecting other Wells Fargo customers.

105. Having discovered reports from other consumers describing materially similar experiences, Plaintiff determined that obtaining prospective relief concerning the challenged practices, in addition to pursuing relief for his individual claim, had become an important objective of the litigation.

106. Plaintiff's subsequent communications with counsel, together with his investigation of the arbitration provision, *Lotsoff*, and the CFPB complaints, confirmed his decision to seek adjudication of these issues in federal court.

107. Plaintiff thereafter commenced this civil action.

## V. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### DECLARATORY RELIEF
### 28 U.S.C. §§ 2201, 2202; Fed. R. Civ. P. 57

108. Plaintiff realleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

109. An actual, justiciable controversy exists between Plaintiff and Defendant concerning their respective rights, duties, and legal obligations under Defendant's standardized Deposit Account Agreement and federal and state consumer protection laws. Specifically, a dispute exists as to the legal validity of the Arbitration Agreement, the lawful standard of review governing electronic fund transfer errors, and the minimum investigative requirements imposed upon national banks under federal law.

110. Defendant's Deposit Account Agreement contains an arbitration provision coupled with an explicit waiver of a consumer's right *"to act in any arbitration in the interests of the general public, or to act as a private attorney general."*

111. The agreement further contains an explicit, non-severable "poison pill" clause stating: *"If any provision related to a class action, class arbitration, private attorney general action, other representative action, joinder, or consolidation is found to be illegal or unenforceable, the entire Arbitration Agreement will be unenforceable."*

112. Under the controlling rule of California substantive law, statutory remedies protecting the public via injunctive relief under the Unfair Competition Law (UCL) cannot be contractually waived in *any* forum (*McGill v. Citibank, N.A.* (2017) 2 Cal.5th 945).

113. In an action involving this exact Defendant and this exact contractual language, this Court previously held that Wells Fargo's non-severability language is completely void and invalid as a matter of law, rendering the entire arbitration provision unenforceable (***Lotsoff v. Wells Fargo Bank, N.A.***, No. 18-cv-02033-AJB-JLB (S.D. Cal. Sept. 30, 2019)).

114. Plaintiff is informed, believes, and thereon alleges that Defendant further maintains a systemic, automated compliance policy that violates the Electronic Fund Transfer Act (EFTA), Regulation E, and the California Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200, by deliberately utilizing an incorrect, non-statutory standard of review to evaluate and summarily deny consumer fraud reports.

115. Specifically, Defendant's standard operating procedures dictate that an electronic fund transfer error is denied if the bank determines the transaction was *"made by you,"* despite correctly acknowledging in its own correspondence that under federal law, a transaction is unauthorized if the consumer did not give *"actual consent"*.

116. Furthermore, Defendant maintains a systemic practice of failing to incorporate consumer-provided evidence, written statements, and regulatory complaints into its formal investigative files, resulting in individual claim determinations—including all three denials issued to Plaintiff—that completely lack supporting material evidence.

117. Finally, the Defendant's arbitration agreement states that all issues are to be arbitrated except whether the arbitration agreement itself is valid and enforceable—which is an issue that must be resolved by the Court.

**A. Judicial Relief is Necessary**

118. Judicial relief is necessary and proper to resolve these controversies. Plaintiff is entitled to a binding judicial declaration stating as follows:

(a) Unenforceability of Arbitration Clause: The waiver of public injunctive relief in Defendant's contract is illegal, void, and unenforceable under California law; the non-severability "poison pill" clause is triggered in full; and the entire Arbitration Agreement is void as a matter of law.

(b) Invalidity of the "Made By You" Review Standard: The non-statutory standard of review utilized by Defendant—denying claims based on whether a transaction was physically *"made by you"*—is legally invalid, non-statutory, and non-compliant with the EFTA. The only lawful standard of proof is that the bank must affirmatively prove the consumer's **"actual consent"** to the specific electronic fund transfer that executed.

(c) Legal Inclusion of Consumer Evidence in Bank Records: Consumer assertions, detailed written explanations, and corresponding regulatory submissions are legally a part of the bank's **"own records"** under 12 C.F.R. § 1005.11(c)(4)-(5). The bank must systematically include these consumer-offered materials in its formal "Documents Relied Upon" files used to reach its final determination. (*See In re USAA Federal Savings Bank*, Admin. Proc. No. 2019-BCFP-0001, Consent Order ¶ 28(a), 41(n) (Jan. 3, 2019)).

(d) Boilerplate Denials as an Unfair Practice: A national financial institution's systemic policy of utilizing automated, standardized denial bullet points while deliberately avoiding, ignoring, or failing to request consumer-offered, outcome-determinative evidence constitutes an **"unfair" and "fraudulent"** business practice under California Business and Professions Code § 17200.

**B. The Requested Declarations Will Aid in Resolving, Rather than Merely Advise Upon, the Parties' Controversy**

119. The declarations requested above concern legal standards Wells Fargo has already applied to Plaintiff, rights Wells Fargo has already denied, contractual provisions Wells Fargo has already invoked, and practices governing an ongoing banking relationship.

120. They do not seek advisory pronouncements concerning hypothetical persons or transactions.

121. Determination of these questions will establish, among other things:

(a) whether Wells Fargo's arbitration provisions may prevent Plaintiff from seeking public injunctive relief; and whether the agreement as a whole may be validly enforced;

(b) whether Wells Fargo's applied standard of review complies with the correct statutory standard;

(c) what information Wells Fargo was required reasonably to consider and include in its own records and documents relied upon files;

(d) whether the challenged standardized practices violate the UCL;

122. Finally, the Defendant's arbitration agreement states that all issues are to be arbitrated except whether the arbitration agreement itself is valid and enforceable—which is an issue that must be resolved by the Court.

123. Those determinations will materially clarify and settle the present controversy between the parties and determine legal relations that remain disputed.

124. Plaintiff therefore requests entry of declaratory judgment pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57 declaring the parties' rights and legal relations as set forth above, together with such further relief as the Court determines necessary or proper pursuant to 28 U.S.C. § 2202

/

/

/

/

**SECOND CAUSE OF ACTION**
**VIOLATION OF THE ELECTRONIC FUND TRANSFER ACT AND REGULATION E**
**Failure to Conduct a Reasonable Investigation, Failure to Provide an Adequate Written Explanation of Findings, Failure to Comply with Error-Resolution Requirements, and Failure to Provisionally Credit During Renewed Error Resolution**
**15 U.S.C. §§ 1693f, 1693m; 12 C.F.R. § 1005.11**

125. Plaintiff incorporates by reference the preceding allegations of this Complaint as though fully set forth herein.

126. The Electronic Fund Transfer Act ("EFTA") is a strict liability consumer protection statute. A violation of the statute is independently actionable and enforceable even if it does not ultimately result in a reimbursable victory on the merits. In particular, **15 U.S.C. § 1693m(a)** explicitly dictates that “any” failure to comply with the Act provides a consumer with a valid cause of action to vindicate their rights, which encompasses violations of the mandatory procedural aspects of the statutory framework.

127. Under the EFTA and Regulation E, when a consumer provides oral or written notice of an electronic fund transfer error to a financial institution, the institution holds a non-discretionary, mandatory statutory obligation to conduct a **"reasonable investigation"** to determine whether an error occurred (15 U.S.C. § 1693f; 12 C.F.R. § 1005.11(c)). Upon receiving a notice of error, a financial institution must “investigate promptly” and determine whether an error occurred within the explicit periods prescribed by Regulation E.

128. The nature and extent of the required investigation depend upon the specific facts and circumstances of the particular claim. A compliant investigation requires genuine consideration of information contained within the institution’s **“own records,”** including complete account transaction histories and any other external information appropriate to resolve the claim (12 C.F.R. § 1005.11(c)(4)-(5)).

129. When a financial institution determines that no error occurred, Regulation E strictly requires the institution to deliver or mail to the consumer an adequate written explanation of its

findings and to advise the consumer of their absolute right to request the exact documents upon which the institution relied to make its decision (12 C.F.R. § 1005.11(d)(1)).

130. A financial institution's "own records" legally encompass any consumer assertions, detailed written statements, and supporting materials that the consumer made available to the institution. Consequently, to maintain that a reasonable investigation was conducted, the institution's formal **"Documents Relied Upon"** files must actively reflect and incorporate those materials. (*See 12 C.F.R. § 1005.11(c)(4)-(5)*; *In re USAA Federal Savings Bank*, Admin. Proc. No. 2019-BCFP-0001, Consent Order ¶ 28(a) and ¶ 41(n) (Jan. 3, 2019)).

131. An **"explanation of its findings"** under 12 C.F.R. § 1005.11(d)(1) requires a clear, substantive, and accurate roadmap demonstrating exactly how the financial institution reached its conclusion. Because Regulation E is a consumer protection statute, a standardized, boilerplate conclusion is legally insufficient and non-compliant.

132. Crucially, a Defendant bank can only lawfully deny a Plaintiff's request for fraud reimbursement by applying the correct statutory standard of review to its investigation—meaning that the Defendant must develop evidence sufficient to prove that the consumer actually authorized the disputed transaction. This requires demonstrating that the consumer **"actually consented"** to the specific electronic fund transfer that executed. The entire statutory purpose of a reasonable investigation is to determine whether that consumer authorization and consent occurred for each transaction in dispute.

133. As detailed extensively below, Defendant's administrative actions, uniform claim blocks, and deceptive stalling tactics support Plaintiff's contention that Defendant systematically violated the EFTA and Regulation E by failing to conduct a reasonable investigation, failing to provide a compliant explanation of findings, and failing to meet its core consumer protection obligations under federal law.

## A. Defendant Reimbursed ACH Transfers While Denying Debit-Card Transfers Without Explanation (October 30, 2025)

134. On October 23, 2025, Plaintiff contacted Defendant's customer service channels via telephone and formally reported a series of unauthorized, fraudulent electronic transfers moving from his Wells Fargo consumer account to Coinbase.com and Crypto.com.

135. On October 30, 2025, exactly seven days after Plaintiff's fraud report, Defendant issued an initial reimbursement of **$4,900.00** encompassing the underlying ACH transfers, while completely withholding any reimbursement or credit for Plaintiff's parallel debit-card transfers.

136. Defendant's October 30, 2025, correspondence stated: *"The investigation has been completed, and we have determined that the transaction(s) in question was not authorized by you. As a result, $4,900 was deposited to your account on 10/30/2025."*

137. Defendant made zero mention of the disputed debit-card transactions in its October 30 letter, nor did it provide any explanation or findings of fact as to how it reached the conclusion that the ACH transfers were "not authorized by you."

138. Moreover, Defendant explicitly stated that *"the investigation has been completed,"* yet merely four days later, it issued a completely separate, contradictory finding denying the debit-card transactions—claims that arose from the exact same reported fraud report and should have been thoroughly identified within the same investigative workflow.

139. Defendant did not contact Plaintiff for clarification or evidence between October 23, 2025, and October 30, 2025. These facts support a clear, reasonable inference that Defendant did not conduct a reasonable investigation, given that it declared its investigation "complete" on October 30 yet issued a brand-new substantive finding on November 3.

**B. Investigation Cycle #1 (November 3, 2025) Applied an Unlawful, Non-Statutory Standard of Review**

140. Defendant transmitted a formal letter to Plaintiff, dated November 3, 2025, denying the debit-card transfers that had executed during the disputed fraud period across August, September, and October 2025.

141. Defendant's denial letter stated: *"We have completed our research of your inquiry about charges of $11,324.55 on your account above. Based on the information available to us, we found that the transaction(s) were made by you or someone who had your permission. Please consider your claim closed."*

142. Defendant's correspondence further stated: *"You did not notify us of your claim within 60 days of the disputed charges first appearing on your account statement."* This statement is flatly, mathematically false, and its inclusion confirms that Defendant failed to execute a reasonable investigation.

**1. No Debit-Card Transactions Were Outside the 60-Day Rule**

143. Regulation E dictates that a consumer must notify a financial institution of an unauthorized transaction within 60 days of the transmission of the bank statement on which that specific error first appears. Plaintiff formally reported the fraud on October 23, 2025. This meant that any unauthorized transactions appearing on a bank statement published on or after August 23, 2025, were fully eligible for strict EFTA protection.

144. The relevant operational records are Plaintiff's August bank statement (published September 16, 2025) and his September bank statement (published October 16, 2025). Every single denied debit-card transaction occurred exclusively within these windows, with the earliest entry dated August 22, 2025, and the latest entry dated September 29, 2025.

145. Accordingly, Plaintiff reported the disputed activity exactly **37 days** after the relevant statement was made available, complying entirely with federal reporting windows. Defendant's written assertion that <u>Plaintiff</u> violated the 60-day rule is a mathematical fabrication that could not have occurred had a reasonable investigation of the statement dockets been executed.

**2. Multiple Reimbursed ACH Transactions Did Violate the 60-Day Rule:**

146. Conversely, a material portion of the $4,900.00 in ACH transactions that Defendant *did* choose to fully reimburse executed during Plaintiff's July bank statement period, which was

published on August 15, 2025—exactly **68 days prior** to Plaintiff's fraud report. These reimbursed entries were dated as follows:

a. 7/17/2025 - $200.00 ACH transfer to Coinbase.com

b. 7/24/2025 - $400.00 ACH transfer to Coinbase.com

c. 7/24/2025 - $1,000.00 ACH transfer to Coinbase.com

d. 8/14/2025 - $1,200.00 ACH transfer to Coinbase.com

147. Every single one of these underlying ACH transactions sat outside the strict boundaries of the 60-day rule, executing eight days late to qualify for technical EFTA protection. Defendant's arbitrary business practice—incorrectly accusing Plaintiff of a 60-day violation regarding his compliant debit card claims while simultaneously paying out non-compliant ACH transactions—raises a powerful, reasonable inference that Defendant's review process was entirely arbitrary and unreasonable.

**C. Investigation Cycle #2 (November 26, 2025) Failed to Establish Authorization and Contained False Assertions Unsupported by Evidence in Defendant's "Own Records"**

148. On November 26, 2025, Defendant possessed materially more factual information concerning Plaintiff's claim than it held when it issued its initial November 3 denial. Most significantly, Defendant had received Plaintiff's detailed, ten-page November 18, 2025, Regulation E dispute letter. In that submission, Plaintiff explicitly identified the specific dates and amounts under review and voluntarily reduced his claimed loss to **$9,892.91** to exclude funds that had been successfully preserved.

149. Plaintiff's November 18 submission unequivocally denied providing authorization, explaining that while he physically participated in the initial transfer process because he intended to send funds to his own secure account at Base Wallet, sophisticated technological deception and credential substitution altered the technical transfer path and destination without his knowledge.

150. Plaintiff further informed Defendant that Crypto.com had restricted external transfers from his account on September 30, 2025, identified anomalous transaction activity appearing within Defendant's own data streams (including the rapid, out-of-pattern shuffling of funds on October 1 and 2), and explicitly offered to provide documentary screenshots and law enforcement reports.

151. Defendant issued its second denial letter on November 26, 2025, mentioning absolutely none of these facts. Instead, Defendant affirmatively represented that "after reviewing the information you provided us and researching relevant system records, our investigation found" that: (a) “You noted you authorized or participated in the disputed transaction(s)”; (b) “You have not lost any devices that included a digital wallet”; and (c) “The card was in your possession at the time the claim was filed.”

152. Defendant's first stated finding directly contradicts by the written record.

153. Plaintiff never "noted" that he authorized the transfers; to the contrary, his November 18, 2025, letter explicitly stated: *“I **never authorized** any of the transfers in question.”*

154. Defendant demonstrably received and processed this letter, as proven by its separate November 26, 2025, correspondence modifying the active transaction set under review to match Plaintiff's updated $9,892.91 figure.

155. Despite processing the letter to lower its financial exposure, Defendant fabricated a consumer admission, failed to identify where or how Plaintiff allegedly admitted authorization, and completely failed to explain how "participation" was the same as "authorization."

156. Defendant's second investigation also completely ignored Plaintiff's contentions regarding the altered technical destination and the Crypto.com freeze, failing to execute a reasonable investigation or provide a compliant explanation of findings under 12 C.F.R. § 1005.11(d)(1).

157. The second denial was seemingly based upon an assumption not supported by the evidentiary record, and in fact contradicted that record. A reasonable inference therefore is that

Wells Fargo did not read Plaintiff's November 18, 2025, letter, since directly contradicting it would be unethical.

**D. Investigation Cycle #3 (December 17, 2025) Failed to Cure the Continued Deficiencies Even After Plaintiff's Escalation to the CFPB**

158. On December 8, 2025, Plaintiff escalated the dispute through the Consumer Financial Protection Bureau ("CFPB"), which assigned **Complaint No. 251208-26631391** and transmitted the entire file directly to Defendant. This submission explicitly notified Defendant of the exact structural defects in its prior investigations, including its failure to request or review Plaintiff's contemporary transaction screenshots or law enforcement materials.

159. Defendant entered Investigation Cycle #3 with actual corporate notice both of the unauthorized transfers and of the specific fact that its claims division was actively ignoring material information.

160. On December 17, 2025, Defendant issued its third denial letter.

161. Despite receiving the comprehensive CFPB escalation, Defendant's third determination copy-pasted the identical, deficient boilerplate text from its November 26 determination (changing only one word—Wells Fargo replaced the word "noted" you authorized… with "indicated" you authorized….).

162. Defendant thus repeated the false assertion regarding a consumer "admission" without explaining how it reconciled that conclusion with Plaintiff's written refutations, (or with the CONFIRMED FRAUD statement found in the Documents Relied Upon file for the third denial as shown below).

163. Plaintiff alleges that Wells Fargo thus continued a rubber-stamp, boilerplate, automatic denial process—and failed to cure any of the underlying legal deficiencies or resolve the central authorization question that were not resolved in the second denial letter (of November 26, 2025).

**E. Defendant's Empty "Documents Relied Upon" Files Plausibly Demonstrate a Total Failure to Investigate**

164. Plaintiff requested the exact documents Defendant relied upon to issue its three separate denials.

165. Defendant produced three separate “Documents Relied Upon” packages (“DRU” files) dated December 11, 2025, January 16, 2026, and March 27, 2026, explicitly certifying in writing that ***"we're enclosing the documents <u>we used</u> to make our decision."***

166. Plaintiff compared all three sets of DRU files and discovered that they were materially identical. They were essentially the same document repeated three times.

167. The DRU files were empty of the material evidence Plaintiff provided.

168. They did not include any part of Plaintiff’s November 18, 2025, letter. They did not include any material facts, none of Plaintiff’s assertions or written statements, none of his evidence or even any mention of his offer of providing material evidence that could resolve the case. The three DRU files were completely static and showed no evolution, even though the Plaintiff provided new information over the course of three consecutive investigations, including a report through the CFPB, which also was missing from the files.

169. It is clear, then, that Defendant never integrated Plaintiff's statements or evidence into its active investigative files—and could not therefore evaluate his evidence or determine whether he “noted” or “indicated” that he “authorized” the disputed transactions as they stated in their second and third denial letters (November 26 and December 17 respectively).

170. However, the most critical and devastating point revealed by these files is that every single produced package contains an explicit, internal system notation stating in all-capital letters that as of October 23, 2025, Plaintiff’s account was closed due to **"CONFIRMED FRAUD."**

171. This is a significant finding because it contradicts Defendants conclusions.

172. Defendant's own business records officially designated the dispute as "CONFIRMED FRAUD" on Day One, rather than "Customer Alleges Fraud." Yet, Defendant completely failed to evaluate or explain why its internal audit logs officially confirmed fraud while its public correspondence continuously accused the consumer of authorizing the transactions.

173. This objective evidentiary record demonstrates that Defendant systematically treated evidence of mere account access or physical participation as a dispositive proxy for authorization, failing to include consumer assertions into its internal files (its "own records") and completely failing to conduct a reasonable, fact-sensitive investigation under 12 C.F.R. § 1005.11(c).

174. Moreover, the DRU files, taken as a whole, demonstrate create ***a reasonable inference*** that Wells Fargo ***never Investigated the Plaintiff's claim.***

**E. Wells Fargo Failed to Incorporate Plaintiff's Own Consumer Assertions into the "Own Records"**

175. Regulation E requires a financial institution conducting an error-resolution investigation to consider information within its ***"own records"*** that could assist in resolving the consumer's claim. Failure to do so is a direct violation of Regulation E.

176. The Official Interpretations provide that the institution may not limit its investigation to the payment instructions where additional information within its "own records" pertaining to the account could help resolve the claim and expressly recognize relevant information may include transaction history, information controlled by third-party service providers, and ***"any other information appropriate to resolve the claim."*** 12 C.F.R. pt. 1005, Supp. I, cmt. 11(c)(4)-5.

177. ***Consumer assertions and written statements*** (all information and evidence supplied directly by the consumer concerning the nature of the asserted error) ***must be reasonably investigated and evaluated because by law they become part of the institution's "own records."***

178. In the CFPB's enforcement action against USAA Federal Savings Bank (applying Regulation E's "own records" requirement as stated by the Official Interpretation above) the Bureau specifically found the bank failed to reasonably consider evidence contained in its own records, including the consumer's assertion that an EFT was unauthorized and the factual basis for that assertion. *In re USAA Federal Savings Bank*, Admin. Proc. No. 2019-BCFP-0001, Consent Order ¶ 28(a) and ¶ 41(n) (Jan. 3, 2019).

179. The USAA case therefore applied and clarified the rule that a "Reasonable Investigation" under Regulation E, requires the inclusion of the consumer's assertions and written statements into the bank's "own records."

180. Here, the assertions and written statements in Plaintiff's November 18, 2025, letter became part of Defendant's own records when Wells Fargo received it.

181. The material assertions and written statements in Plaintiff's November 18 letter therefore constituted information within Wells Fargo's "own records" bearing directly upon the issue Wells Fargo was required to resolve: Whether Plaintiff authorized the disputed EFTs and thus ***were of material consequence to the denial determinations.***

182. However, as stated above, none of the material statements, facts or evidence found in Plaintiff's November 18, 2025, letter appeared in Wells Fargo's factual record (their "Documents Relied Upon" files). This creates reasonable inference that Wells Fargo either did not include Plaintiff's statements or evidence in its own records, and that it didn't "rely upon them" to make their determination. This is a violation of Regulation E.

183. Moreover, these facts stand in direct contradiction to Wells Fargo's statement in its third denial letter, wherein they said, of their investigation: ***"Our records indicate that the claim was investigated according to applicable requirements."***

184. Plaintiff alleges that this is a false statement of fact because the evidence shows that Wells Fargo violated Regulation E during its investigation on several fronts and ***therefore Defendant clearly did not follow the applicable requirements of a reasonable investigation.***

185. Plaintiff accordingly alleges that Wells Fargo's failure to incorporate and reasonably evaluate Plaintiff's consumer assertions and their factual basis violated its duty to conduct a reasonable, fact-sensitive investigation under 12 C.F.R. § 1005.11(c), and furthermore, that Defendant falsely represented the legal validity of its investigation process in its official denial letter dated December 17, 2025.

**F. Defendant's Denial Letters Independently Failed to Provide the Written Explanation Required by Regulation E**

186. Pursuant to **12 C.F.R. § 1005.11(d)(1)**, when a financial institution determines that no error occurred, it holds a strict obligation to mail or deliver a written explanation of its findings.

187. A legally compliant explanation requires a clear, substantive roadmap of the underlying findings of fact. Because Regulation E is an anti-chilling consumer protection statute, the unexplained repetition of a boilerplate conclusion is prima facie insufficient.

188. Although neither the EFTA nor Regulation E sets forth the precise elements of a proper explanation of findings, we can infer that a proper explanation serves at least three vital purposes: (a) it provides objective proof that the institution actually conducted a genuine inquiry into its records, rather than relying on an automated, rubber-stamp denial; (b) it provides the consumer with a rational basis for rebuttal by identifying the specific information they must overcome on appeal; and (c) it ensures the institution utilized the proper standard of review. The notification need simply state what the bank factually found during its active investigation and need not resemble an extensive legal opinion.

189. None of Defendant's denial letters explained their findings of fact to any degree of reasonable sufficiency.

190. The November 3 letter relied on a mathematically false 60-day timeline and a non-statutory "made by you" proxy.

191. The November 26 and December 17 letters fabricated an admission of authorization without citing a single supporting fact. There is an absolute absence of factual data across all three produced files demonstrating that Plaintiff authorized the executed transfers, proving that Defendant merely assumed authorization occurred.

192. Defendant’s failure to provide compliant findings constitutes an independent, standalone violation of 15 U.S.C. § 1693f(d).

**G. Investigation Cycle No. 4: The Strategic Opening of a New Case and the Sham "Customer Service Research" Loop (January–April 2026)**

193. Pursuant to the express, written representation contained within Defendant's third denial letter dated December 17, 2025—which stated: *"We have closed the case as of the date of this letter. If we receive additional information, we will open a new case to address any remaining or new concerns"*—Defendant officially opened a separate, standalone Executive Office Case No. 06202601268242275, running concurrently with the underlying consumer Claim No. 11022250854. By January 29, 2026, Defendant's formal corporate correspondences explicitly tracked and monitored both internal numbers.

194. On January 23, 2026, Plaintiff contacted Defendant's Executive Office to request formal service parameters for a pending Notice of Arbitration. To actively evade immediate adversarial proceedings, a Tier 2 Customer Advocacy representative explicitly requested that Plaintiff postpone filing his arbitration demand so that Defendant could resolve the dispute internally, promising that an official possessing corporate settlement authority would contact him within three to five days.

195. No person possessing the promised resolution authority ever contacted Plaintiff. Plaintiff nevertheless relied upon Defendant's representations, remained engaged in the process, and spent extensive time and resources making approximately ***sixteen follow-up telephone calls*** to secure the promised contact.

196. Plaintiff anticipates that Defendant will attempt to downplay and recharacterize this four-month sequence as an informal, discretionary "customer service research courtesy" that falls outside the boundaries of federal banking regulations. Plaintiff alleges that this characterization is a legal fiction. Defendant opened a brand new, substantively tracked case code, accepted new material evidence bearing directly on authorization, and undertook an active error-resolution investigation. Had nothing remained for Defendant to substantively investigate or determine under federal law, there would have been no operational basis to issue a rolling, mathematical sequence of unilateral extension letters to delay the case.

197. Specifically, Defendant utilized a demonstrative layout of the bank's cascading extensions, to systematically execute a series of four unilateral deadline extensions designed to keep the consumer trapped in a state of administrative gridlock:

**(a) Extension 1:** Defendant initially represented that its ongoing research would be finalized by February 6, 2026.

**(b) Extension 2:** On February 6, Defendant failed to respond, unilaterally extending its research target to February 23, 2026.

**(c) Extension 3:** On February 23, via a formal written letter, Defendant again failed to deliver findings, extending its research target to March 16, 2026.

**(d) Extension 4:** On March 16, via another formal written letter, Defendant executed a final extension, shifting its target date **to April 6, 2026.**

198. Throughout this entire rolling delay sequence, Plaintiff actively supplied material, outcome-determinative evidence. On February 18, 2026, Plaintiff submitted screenshot evidence proving that Crypto.com had frozen his account from outgoing transfers on September 30, 2025. On February 23, 2026, Plaintiff transmitted an extensive 26-page evidentiary package containing detailed factual analyses and eight screenshots mapping out the technological mimicry and fraudulent interception environment.

**H. The Executive Office "Research" Review was a Regulation E Investigation, Because Substance Governs over Form, and Defendant Did Not Obtain the Protection of § 1005.11(e) Merely by Issuing Repeated Denials**

199. Regulation E explicitly governs circumstances in which a consumer reasserts an alleged error following an initial adverse determination. **12 C.F.R. § 1005.11(e)** provides that a financial institution has no further responsibilities under the section should a consumer later reassert the same error *only* if the bank *"has fully complied with the error resolution requirements."*

200. Accordingly, the mere physical issuance of a denial letter does not terminate a bank's ongoing federal responsibilities. The regulatory predicate is full compliance.

201. Here, since Wells Fargo's prior cycles completely failed to investigate its own records, fabricated consumer admissions, failed to explain its factual findings, and relied on a mathematically false 60-day time-bar, they never achieved full compliance.

202. Wells Fargo, therefore, cannot utilize its own prior, deficient denials to invoke the safe-harbor protection of § 1005.11(e).

203. This means that in fact their Executive Office "Research" Review was a Fourth Investigation Cycle, and began a brand new inquiry into the facts of the case which required Wells Fargo to conduct a Reasonable Investigation that complied with all the elements of Regulation E, including the time-boundary requirements, the 10-day provisional credit requirement and the 45 day final determination requirement.

204. The EFTA and Regulation E do not permit a financial institution to use a label to define what their investigation is. Wells Fargo can call their Executive Office investigation a "Research" review, but that doesn't change the fact that substantively, the review was a Regulation E investigation.

**I. Defendant Extended its Investigation Without Provisionally Crediting the Account**

205. Plaintiff timely asserted his unauthorized-EFT error, and Defendant's subsequent 2026 re-investigation remained strictly governed by the mandates of 12 C.F.R. § 1005.11.

206. Alternatively, Plaintiff's extensive February 23, 2026, submission provided Defendant with separate, qualifying written notice identifying the specific transactions under review, satisfying the baseline error definitions of 12 C.F.R. § 1005.11(a)(1)(i) and (vii).

207. Regulation E mandates that a financial institution must complete its error investigation within ten business days after receiving notice. If it cannot complete its review within that initial window, it may extend the investigation only if it ***provisionally recredits*** the amount of the alleged error to the consumer's account within ten business days of the initial notice (12 C.F.R. § 1005.11(c)(2)(i)).

208. Defendant did not complete its fourth investigation within ten business days.

209. Instead, it continuously extended its anticipated determination target from February 6 to February 23, to March 16, and ultimately to April 6, 2026.

210. Defendant completely ***failed to provisionally credit*** the disputed **$9,892.91** during this multi-month extended review. By extending its investigation beyond the applicable initial period without providing provisional credit, Defendant directly violated 15 U.S.C. § 1693f and 12 C.F.R. § 1005.11(c)(2).

### J. Defendant Failed to Complete Its Investigation with a Compliant Final Determination within the 45 Days

211. Defendant represented that its extended corporate research would culminate in a final response on April 6, 2026.

212. April 6 arrived without the promised substantive determination.

213. Plaintiff's contemporaneous records confirm that no determination was delivered as of May 27, 2026, and Plaintiff never received a substantive final response or written explanation of findings addressing the screenshots and factual analyses submitted during the renewed review.

214. The disputed $9,892.91 remained entirely uncredited.

215. Defendant extended its investigation for months without provisional credit and ultimately failed to complete the process through the reporting and explanation procedures required by 12 C.F.R. § 1005.11(c) and (d), abandoning the claim entirely.

216. As of the date of filing this civil action, Plaintiff has still not received any indication that Wells Fargo has considered its Executive Office investigation to be complete. Thus, in practical reality, Wells Fargo never completed or concluded the investigation, rather they abandoned it entirely without any communication with the Plaintiff whatsoever.

217. This conduct violates Regulation E's strict requirements and clear timelines.

### K. Defendant's Systemic Conduct Violated the Core Mandates of the EFTA

218. Taken together, Defendant's conduct constitutes repeated, independent failures to comply with the mandatory error-resolution requirements of the EFTA and Regulation E.

219. Defendant committed independent statutory violations through its subsequent dispute handling across November 3, November 26, and December 17, 2025, and its subsequent failure to complete or provisionally credit its 2026 re-investigation, all of which occurred within one year before the commencement of this action (15 U.S.C. § 1693m(g)).

220. As a direct and proximate result of Defendant's repeated procedural and statutory violations, Plaintiff was unlawfully deprived of the possession, liquidity, use, and time-value of his **$9,892.91** in principal consumer funds, and suffered actual economic harm, including consequential interest and financing expenses according to proof.

221. Defendant's violations were not isolated technical oversights; Defendant repeatedly received specific notices pointing out the exact deficiencies in its files, yet systematically chose to maintain a static, empty investigative record.

222. These uniform actions make Plaintiff's claim plausible on its face, permitting the reasonable inference that Defendant is liable for the EFTA and Regulation E violations as alleged. Pursuant to 15 U.S.C. § 1693m, Plaintiff seeks all actual damages, statutory damages, litigation costs, and reasonable attorneys' fees.

## THIRD CAUSE OF ACTION
## VIOLATION OF THE ELECTRONIC FUND TRANSFER ACT
## (Imposition of Consumer Liability for Unauthorized Transfers — 15 U.S.C. §§ 1693a(12), 1693g, 1693m; 12 C.F.R. §§ 1005.2(m), 1005.6)

223. Plaintiff incorporates by reference all preceding allegations of this Complaint as though fully set forth herein.

224. This Cause of Action concerns Defendant Wells Fargo’s unlawful imposition of liability upon Plaintiff for **$9,892.91** in unauthorized electronic fund transfers ("EFTs"), independent of the distinct error-resolution violations asserted elsewhere in this action.

**A. The Governing Statutory Standards**

225. The Electronic Fund Transfer Act ("EFTA") defines an “unauthorized electronic fund transfer” as an EFT from a consumer's account initiated by a person other than the consumer without actual authority to initiate the transfer and from which the consumer receives no benefit. 15 U.S.C. § 1693a(12); 12 C.F.R. § 1005.2(m).

226. Regulation E's Official Interpretation expressly provides that an unauthorized EFT includes a transfer initiated by a third party who obtained the consumer's access device or credentials through fraud, deception, or robbery. 12 C.F.R. pt. 1005, Supp. I, Comment 2(m)-3.

227. A consumer incurs no liability for an unauthorized EFT except under tightly specified statutory conditions. 15 U.S.C. § 1693g(e). In any action involving a consumer's liability, the ***consumer does not have to prove they didn’t authorize*** the disputed transactions, rather, the ***financial institution <u>must prove that they did</u> authorize*** the disputed transactions, or, if unauthorized, that the bank met all statutory prerequisites to shift liability back to the consumer. 15 U.S.C. § 1693g(b).

228. To prove that the consumer authorized a transaction, the financial institution must prove that the consumer “actually consented” to the transaction that occurred.

**B. Wells Fargo’s Admission: Participation Does Not Equal Authorization**

229. On October 23, 2025, Plaintiff reported to Defendant that a series of electronic fund transfers involving Coinbase.com and Crypto.com were completely unauthorized.

230. Defendant divided the Plaintiff’s single report into two separate claims, one for ACH transactions and one for Debit-Card transactions

231. On October 30, 2025, Defendant determined that approximately $4,900.00 in ACH transactions were ***"not authorized by you"*** and fully reimbursed Plaintiff.

232. Given the fact that Plaintiff had personally participated in initiating those underlying ACH transfers, Defendant’s own claim determination directly recognized a binding operational principle: a consumer's ***mere physical participation in a transfer*** chain does not legally establish actual authorization (“actual consent”) for the transfer that ultimately executes.

233. However, four days later, on November 3, 2025, Defendant issued its first denial letter stating as the basis for its denial that the Plaintiff's Debit-Card transactions were "made by you" (meaning Plaintiff had participated in those transfers) and thus the Defendant concluded that the Debit-Card transactions were authorized.

234. Defendant's actions are inconsistent because Plaintiff participated in both the ACH and the Debit-Card transactions, yet the ACH transfers were found to be "not authorized" by him, and the Debit-Card transactions were found to be **"made by you"** and thus, presumably authorized by him.

235. However, Defendant did not prove that Plaintiff authorized ("actually consented" to) the transactions that occurred, it merely assumed that participation (made by you) was the equivalent to authorization. The assumption applied to the Debit-Card transactions contradicts what seems to be the same assumption applied to the ACH transfers.

236. As stated in the first cause of action, there is nothing in the denial letters to distinguish the factual basis of the ACH reimbursement from the Debit-Card denial.

237. This represents a significant contradiction in Defendant's denial claim.

238. Neither the EFTA nor Regulation E makes a distinction between different payment rails in terms of whether authorization occurred. It is not the payment type that matters under the statutes, it is whether or not the consumer actually authorized the transaction that occurred that matters.

239. Wells Fargo did not establish any principle to make a distinction and should not be permitted to make a contradictory finding, concluding that participation has a different effect during ACH transactions than it does during Debit-Card transactions.

**C. "Made by You" Is Not the Correct Statutory Standard for Proving Authorization; Demonstrating "Actual Consent" is the Correct Standard for Proving Authorization**

240. The statutory standard for finding a consumer's "authorization" is for a financial institution to conduct a reasonable investigation, to discover and then present and explain the

facts that make it clear the consumer "actually consented" to the disputed transactions and thus they "authorized" those transactions.

241. That did not happen here; Wells Fargo didn't investigate Plaintiff's actual consent, nor did they present and explain the facts that prove his authorization; they merely assumed his authorization by using a non-compliant, non-statutory standard called "made by you."

242. Plaintiff isn't contending that he took no physical action in connection with the disputed transfers or even that the transactions were not "made by him."

243. Rather he's alleging, that "made by you" is an incorrect standard of review under the EFTA and Regulation E, because participation in a transaction (making a transaction happen) is not sufficient to prove "actual consent" and thus authorization.

244. As shown above in the robbery/fraud example; a criminal can have a gun to a person's head and thus force them to enter their passcode and send money to them. In such an instance the transaction was "made by you (the consumer)" and yet, since the consumer did not "actually consent" to the transfer – the transaction that occurred – was not unauthorized.

245. Plaintiff alleges that while he may have "pushed a button" he did not "actually consent" to the transaction that occurred and he did not authorize any of them.

246. Thus "made by you" is not a statutory standard and any resulting denial based on this standard should be considered invalid because it violates the EFTA and Regulation E.

**D. Defendant Has Not Proven Plaintiff's Authorization; Wells Fargo Stated that Plaintiff Admitted to Authorizing the Disputed Transactions but Offered No Proof to Demonstrate His Admission, while Wells Fargo's Evidence Files Show a Confirmed Fraud**

247. Plaintiff is informed and believes, and hereby alleges that Wells Fargo had his November 18, 2025, letter and examined material parts of it.

248. In that November 18, 2025, letter Plaintiff expressly stated that he "***never authorized*** any of the transfers in question."

249. It is unreasonable to assume that Wells Fargo, having possessed and examined Plaintiff's November 18, 2025, letter, did not read, observe or see that ***he had stated he did not authorize*** any of the disputed transactions.

250. Plaintiff provided a clear and absolute denial of authorizing the transactions and explained that he authorized transfers to himself. He stated that he believed he was transferring funds from his Wells Fargo account into his own Base Wallet account and explained how he later realized the technological transfer path had been fraudulently substituted without his knowledge, resulting in a fraudulent interception of authorization.

251. Yet Defendant stated in its November 26, 2025, denial letter that the Plaintiff had "noted" that he authorized or participated in the transfers.

252. Wells Fargo knew that Plaintiff had not admitted to authorizing the transactions. Wells Fargo's own evidentiary records (their "Documents Relied Upon" files) contained the words **CONFIRMED FRAUD** in them. Clearly these words either mean that the Plaintiff had reported he did not authorize the disputed transactions, or they mean that Defendant's computer system generated an internal memo concluding that the transactions were based on a CONFIRMED FRAUD.

253. Either way, it is unreasonable, if not impossible for Wells Fargo to conclude that Plaintiff admitted to authorizing the disputed transfers. This internal fraud confirmation in addition to Plaintiff's November 18, written statement denying authorization are sufficient evidence to preclude an immediate finding that Plaintiff admitted to authorizing the disputed transfers.

254. Wells Fargo erred when they published the November 26, 2025, denial letter because they falsely attributed to the Plaintiff a statement of fact that he never made. Wells Fargo knew there was more evidence demonstrating that Plaintiff did not "note" that he authorized the transfers than there was evidence that he did.

255. Thus, Wells Fargo either ignored the evidence, or created a false conclusion without any factual basis.

256. Furthermore, on December 8, 2025, when Plaintiff escalated his complaint to the CFPB, he made it clear as second time that he did not authorize the disputed transactions. Yet, ***Defendant persisted in making that same false claim again***, by stating in its December 17, 2025, denial letter, that he "indicated" he authorized the transactions.

257. Defendant's continued publication of this false information may rise to the level of a bad faith refusal to acknowledge evidence put clearly before it through Plaintiff's private letter and then again through a federal regulator. These two points are in addition to the CONFIRMED FRAUD notice in Defendant's own evidence files.

258. In short, Defendant could not have established at the time of any of their denial letters that Plaintiff authorized the disputed transactions through his own admission. Such a statement or implication is clearly false based on the evidence Wells Fargo had at the time; and any such conclusion that Plaintiff did admit authorization, was thus unreasonable then as it still is now.

**F. Defendant Cannot Shift Its Statutory Burden of Proof to the Plaintiff**

259. Pursuant to 15 U.S.C. § 1693g(b), Plaintiff is not required to prove that he did not authorize the disputed EFTs; rather, the statutory burden rests exclusively on Defendant to establish that the specific transfers which executed were authorized by the Plaintiff.

260. Defendant cannot satisfy this strict statutory burden merely by showing that Plaintiff's physical actions, card, or login credentials were initially involved in the sequence if those actions did not authorize the actual end-point EFT that occurred.

261. The Ninth Circuit confirms that § 1693g is an enforceable limitation upon consumer liability, and consumers maintain a private right of action under 15 U.S.C. § 1693m when a financial institution imposes a loss in excess of what § 1693g permits. (see e.g. *Widjaja v. JPMorgan Chase Bank, N.A.*, 21 F.4th 579, 582–84 (9th Cir. 2021).

/

/

/

/

**G. The Presence of an Intermediary (Crypto.com) Does Not Establish Authorization at the Pleading Stage; it is an Issue to Be Decided on the Merits.**

262. In the case of *Green v. Capital One, N.A.*, 557 F. Supp. 3d 441, 447–48 (S.D.N.Y. 2021), the court was presented with the issue as to whether or not a third party who acquired the Plaintiff's access device through fraud cut off the Defendant bank from liability.

263. In Green, the originating bank, Capital One, argued that the secondary/intermediary institution, Square, should be the responsible institution for the purpose of any secondary transfer. While the court did not ultimately decide that issue, the presence of the issue did not defeat the Plaintiff's case at the pleading stage.

264. In this case, Plaintiff alleges that Crypto.com functioned as an intermediary or staging point in a continuous transfer process through which Plaintiff intended to transfer funds from his Wells Fargo account, through Crypto.com, into his own Base Wallet environment.

265. The presence of Crypto.com alone does not satisfy Defendant's burden of proving that the Plaintiff authorized the ultimate transactions that occurred. In fact, the ultimate transaction that occurred involved a fraudulent interception of authorization that is the reason why Plaintiff's authorization of the transaction was vitiated and otherwise non-existent.

266. Notwithstanding the ultimate resolution of Plaintiff's case, the issue of whether an intermediary institution cuts off the liability of an originating institution is not an issue that should defeat a Plaintiff's claim at the pleading stage, rather it should be left for an adjudication on the merits and a substantive determination under the EFTA and Regulation E.

**H. Fraudulent Interception of Authorization (not Fraudulent Inducement) Caused the Disputed Transfers to be Unauthorized; Plaintiff Did Not Initiate EFT to Final Destination**

267. Wells Fargo may argue the disputed transactions are not unauthorized EFTs because they were the result of fraudulent inducement and because they were not the result of a third party's initiation.

268. This position is untrue and is a misunderstanding of the facts.

269. Furthermore, federal authority confirms that technical access obtained through fraudulent inducement does not establish "actual authority" under the EFTA. *Id.* This District has explicitly adopted this rule, holding that a transfer initiated by a person who obtained access credentials via fraud is not excluded from the definition of an unauthorized EFT merely because the consumer was deceptively induced into furnishing the information. ***Garcia v. Navy Federal Credit Union***, No. 23-cv-2017-MMA-BLM (S.D. Cal. 2025). By extension, when a third-party fraudulently alters a transfer path, they have intercepted the transfer's authorization by sending funds to a destination the original sender (Plaintiff) did not authorize, because he did not intend or consent to it at the time he "pushed the button."

270. Here, when Base Wallet altered the technical transfer path to Plaintiff's account by inserting the third-party fraudster's address, the third-party effectively initiated a transfer to themselves, thereby diverting Plaintiff's EFT (intended to go to his own account), to an altered destination.

271. This is not unlike a person setting a train in motion toward one city (e.g., Los Angeles), and then a person down the line changes the tracks to divert the train to a totally different city (e.g., Las Vegas). While Defendant could argue that Plaintiff sent his EFT to the already diverted technical address, it is immaterial when the fraudster "switched the tracks" (changed the address), it is only material that the Plaintiff believed he was sending his EFT to his own account, when in reality the destination had been altered. There is no material difference between changing the tracks after the train starts moving or before, either way the locomotive's engineer believes he is going to Los Angeles, when in reality the fraudster gained access to the tracks and diverted the funds to Las Vegas, where they were stolen.

272. Thus, Plaintiff did not initiate the EFT to the final destination. Plaintiff initiated a transfer to his own account at Base Wallet; he did not initiate a transfer to a third-party fraudster; rather, the third-party fraudster initiated the transfer to themselves.

273. Therefore, ***the disputed transfers were initiated by a person "other than the consumer"*** and are within the definition of an unauthorized EFT (an EFT from a consumer's account

initiated by a person other than the consumer without actual authority to initiate the transfer and from which the consumer receives no benefit. 15 U.S.C. § 1693a(12); 12 C.F.R. § 1005.2(m).)

**I. Defendant's Conduct Violated the EFTA**

274. By refusing to reimburse Plaintiff for the disputed $9,892.91 and thereby imposing that loss upon Plaintiff without establishing that the disputed EFTs were authorized or otherwise establishing a statutory basis for Plaintiff's liability, Wells Fargo failed to comply with 15 U.S.C. § 1693g.

275. As a direct and proximate result of Defendant's violation, Plaintiff suffered actual damages including the unreimbursed $9,892.91, loss of use of those funds, and additional consequential economic damages according to proof.

276. Plaintiff therefore seeks actual damages, statutory damages to the extent authorized by 15 U.S.C. § 1693m, costs, reasonable attorney's fees to the extent recoverable, and all other relief authorized by law.

**FOURTH CAUSE OF ACTION**
**PROMISSORY FRAUD**
**Cal. Civ. Code §§ 1709–1710**
**(Against Defendant Wells Fargo Bank, N.A.)**

277. Plaintiff realleges and incorporates by reference the preceding allegations as though fully set forth herein.

278. California law imposes liability upon one who willfully deceives another with the intent to induce that person to alter his position to his injury or risk. **Cal. Civ. Code §§ 1709–1710.**

279. The elements of fraud are: (1) a misrepresentation, including a false representation or false promise; (2) knowledge of falsity; (3) intent to induce reliance; (4) justifiable reliance; and (5) resulting damage. ***Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996).**

280. Promissory fraud occurs when a defendant promises future performance while lacking the intention to perform when the promise is made. ***Id.* at 638–39; Cal. Civ. Code § 1710(4).**

281. Plaintiff pleads the circumstances constituting Defendant's fraud with particularity pursuant to Federal Rule of Civil Procedure 9(b), including the persons or institutional actors involved, the representations made, when and how they were communicated, why they were false or misleading, the action Defendant intended Plaintiff to take in reliance upon them, Plaintiff's actual reliance, and the resulting economic injury.

**A. Wells Fargo's January 23, 2026, Promise**

282. On January 23, 2026, Plaintiff telephoned Wells Fargo for the purpose of obtaining information necessary to serve and commence arbitration concerning Wells Fargo's denial of Plaintiff's disputed electronic fund transfers. During that call, at approximately 2:40 p.m., Plaintiff spoke for approximately 33 minutes with a Tier 2 representative of Wells Fargo's Executive Office concerning Plaintiff's disputed transactions, Wells Fargo's prior denials, and Plaintiff's intention to proceed to arbitration.

283. During that conversation, the Wells Fargo representative expressly requested that Plaintiff **not proceed with arbitration yet** and instead allow Wells Fargo an additional opportunity to resolve the dispute internally. As an inducement for Plaintiff to delay arbitration, the representative told Plaintiff that Wells Fargo would have a person possessing authority to resolve the dispute contact Plaintiff within approximately **three to five days**.

284. The representation was material and specific. Wells Fargo was not merely representing that it would continue investigating Plaintiff's claim. Wells Fargo expressly requested that Plaintiff refrain from taking an identified legal action—commencing arbitration—and promised in exchange that Plaintiff would promptly be contacted by someone possessing authority to resolve the dispute.

285. No person possessing the promised authority contacted Plaintiff within the represented three-to-five-day period. No such person ever contacted Plaintiff thereafter.

286. Plaintiff contemporaneously and repeatedly memorialized the January 23 representation in subsequent communications with Wells Fargo. Among other things, on February 3, 2026,

Plaintiff advised Wells Fargo Executive Office representative Heather P. (Last Name Presently Unknown) in writing that an Executive Office employee had expressly requested that Plaintiff not proceed with arbitration without first allowing Wells Fargo to speak with him concerning resolution and that Plaintiff had been told an authorized representative would contact him. Plaintiff advised Wells Fargo that the promised contact had not occurred and that he could not continue waiting.

**B. Wells Fargo Intended Plaintiff to Delay Arbitration**

287. Plaintiff alleges that Wells Fargo made the January 23 representation for the specific purpose of inducing Plaintiff to postpone arbitration. Wells Fargo knew that Plaintiff was preparing to commence arbitration because Plaintiff had expressly communicated that intention and had contacted Wells Fargo for information necessary to proceed.

288. Wells Fargo's requested reliance was therefore express rather than implied: Wells Fargo asked Plaintiff not to arbitrate yet and offered the promised contact with a person possessing resolution authority as the reason Plaintiff should wait.

**C. Plaintiff Actually and Justifiably Relied**

289. Plaintiff believed Wells Fargo's representation and, in reliance upon it, refrained from immediately commencing arbitration and instead afforded Wells Fargo the additional opportunity it requested to resolve the dispute internally.

290. Plaintiff's reliance was reasonable and justified. The representation concerned Wells Fargo's own internal personnel and authority; was made directly by a Tier 2 representative of Wells Fargo's Executive Office during a discussion concerning resolution of Plaintiff's existing dispute; and included a short and definite period within which the promised contact was expected to occur.

291. After the promised contact failed to occur, Wells Fargo continued representing that its review remained active. Plaintiff therefore continued communicating with Wells Fargo,

supplying additional evidence, and attempting to obtain the promised resolution while Wells Fargo repeatedly represented that additional "research" was underway.

**D. Circumstantial Evidence of Wells Fargo's Intent Not to Perform**

292. Plaintiff alleges that, when Wells Fargo made the January 23 representation, Wells Fargo, through its representative, did not then intend to provide the promised contact with a person possessing authority to resolve Plaintiff's dispute. Because Wells Fargo's contemporaneous internal intent, assignments, referrals, and communications are uniquely within its possession, Plaintiff alleges such intent generally pursuant to Federal Rule of Civil Procedure 9(b) and further relies upon the following circumstantial facts.

293. First, Wells Fargo did not provide the promised authorized contact within three to five days and never provided such a person thereafter, notwithstanding Plaintiff's repeated reminders of the promise and repeated requests to speak with someone possessing resolution authority.

294. Second, during Plaintiff's subsequent efforts to obtain the promised contact, Wells Fargo personnel ultimately advised Plaintiff that the representatives with whom he was permitted to communicate did not themselves possess authority to resolve the dispute and that personnel possessing such authority could not be contacted directly.

295. Third, rather than provide the promised decisionmaker, Wells Fargo maintained Plaintiff in an extended Executive Office review process. Wells Fargo repeatedly represented in writing that it required additional time to complete its "research" and supplied successive future dates upon which it represented that it would follow up with Plaintiff.

296. On **February 6, 2026**, Wells Fargo represented in writing that it "need[ed] more time to complete [its] research" and would follow up with Plaintiff by February 23, 2026. On **February 23, 2026**, Wells Fargo represented in writing that it "need[ed] more time to complete [its] research" and would follow up with Plaintiff by **March 16, 2026**. On March 16, 2026, Wells Fargo again represented that it needed additional time to complete its research and stated that it would follow up with Plaintiff by **April 6, 2026**.

297. **Wells Fargo provided no follow-up on April 6, 2026, and <u>entirely abandoned</u> Plaintiff's claim.** It provided no determination, letter, email, telephone call, request for additional information, or further extension. In fact, as of the date of this civil action, it is not clear to the Plaintiff that Wells Fargo has ever closed the fourth investigation.

298. Wells Fargo thereafter ceased communicating with Plaintiff concerning the Executive Office review altogether. It never issued Plaintiff a final determination concluding that review, never explained what had become of the continuing "research" for which it had repeatedly requested additional time, and never provided the person possessing resolution authority whom Wells Fargo had represented on January 23 would contact Plaintiff.

299. Thus, Wells Fargo obtained the very action its January 23 representative requested—Plaintiff's postponement of arbitration—while never providing the promised authorized contact. During the resulting period of delay, Wells Fargo repeatedly maintained that its internal review remained ongoing and repeatedly extended its promised response date, culminating in its promised April 6 follow-up and subsequent complete cessation of communications.

300. This course of conduct constitutes circumstantial evidence supporting Plaintiff's allegation that the January 23 promise was made without a then-present intention to perform as represented.

301. Plaintiff does not rely merely upon Wells Fargo's ultimate nonperformance, but upon the entire course of conduct preceding and following the promise, including Wells Fargo's express request that Plaintiff delay arbitration, its failure to provide the specifically promised authorized contact despite repeated demands, its continued assurances that an internal review remained underway, its successive extensions, its failure to provide the promised April 6 follow-up, and its complete cessation of communications thereafter. **See *Tenzer v. Superscope, Inc.*, 39 Cal. 3d 18, 30–31 (1985).**

302. Whether Wells Fargo ever designated a person possessing the promised resolution authority, created an internal referral or callback request, assigned the matter to such a person, instructed such a person to contact Plaintiff, or otherwise took contemporaneous action

calculated to perform the January 23 promise is information presently within Wells Fargo's possession and control and will be the subject of discovery.

**E. Resulting Economic Injury**

303. Plaintiff suffered economic injury as a direct and proximate result of his reliance upon Wells Fargo's representation. Had Wells Fargo not requested that Plaintiff postpone arbitration in exchange for the promised contact with a person possessing resolution authority, Plaintiff would have proceeded with arbitration rather than continuing to expend time and money attempting to obtain the resolution process Wells Fargo represented it would provide.

304. Among other economic injury, after Wells Fargo failed to provide the promised reliable point of contact or authorized decisionmaker, Plaintiff incurred additional out-of-pocket delivery and communication expenses in attempting to communicate his evidence and demands to multiple Wells Fargo locations and departments. Plaintiff incurred more than $100 in expedited delivery expenses that would not otherwise have been necessary, including approximately $88 in incremental expenses attributable to Wells Fargo's failure to provide the promised contact and resulting need to communicate through multiple channels.

305. Plaintiff's reliance also delayed commencement of arbitration for approximately three months and consumed a corresponding portion of the limitations period applicable to Plaintiff's federal claims. To the extent any otherwise viable claim or portion of Plaintiff's disputed transactions is determined to be untimely because of the resulting delay, Plaintiff pleads, in the alternative, the value of any such lost claim as additional consequential damage proximately caused by Wells Fargo's fraudulent inducement.

306. Plaintiff therefore seeks compensatory and consequential damages according to proof, together with all other relief available under California law.

/
/
/
/
/

## FIFTH CAUSE OF ACTION
## VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
## (Cal. Bus. & Prof. Code §§ 17200 et seq. — Unlawful, Unfair, and Fraudulent Practices)

307. Plaintiff incorporates by reference all preceding allegations of this Complaint as though fully set forth herein.

308. California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Each prong provides an independent basis for civil liability. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009). Defendant violated all three prongs through its consumer electronic fund transfer ("EFT") dispute practices from October 2025 through April 2026.

### A. Plaintiff Suffered Concrete Economic Injury and Has UCL Standing

309. Plaintiff has standing under Cal. Bus. & Prof. Code § 17204 because he suffered injury-in-fact and lost money or property as a result of Wells Fargo's challenged practices, satisfying the federal standard under *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 323–25 (2011).

310. Plaintiff first lost the possession and use of funds when Wells Fargo's November 3, 2025, determination left $11,324.55 unreimbursed. After Plaintiff's November 18 submission narrowed the remaining disputed Debit-Cardtransactions to $9,892.91, Wells Fargo again refused reimbursement on November 26, 2025, and again on December 17, 2025, and has continued withholding those funds. Plaintiff has therefore been deprived of the possession, liquidity, use, and time value of $9,892.91.

311. That deprivation produced additional economic consequences. Plaintiff lacked $9,892.91 otherwise available to satisfy personal financial obligations, including interest-bearing obligations, thereby causing additional finance and interest expense according to proof and depriving Plaintiff, alternatively, of the ability to retain or invest those funds and earn a return upon them.

312. Plaintiff also incurred unnecessary out-of-pocket delivery expenses attempting to communicate evidence and demands to Wells Fargo after Wells Fargo failed to provide the

reliable and authorized, correct point of contact for sending his arbitration notice to preserve his right to arbitrate if necessary. Plaintiff incurred approximately $140.28 in expedited delivery expenses, including over $100 in incremental expenses attributable to Wells Fargo's failure to provide simple but necessary contact information and the resulting need to mail notices to multiple bank departments to ensure delivery to the proper one. Plaintiff's concurrent mailings included a list of all departments served on the final page of the document package sent.

313. Plaintiff further paid a nonrefundable $225 AAA filing fee, totaling approximately **$230.85** with associated charges, because Wells Fargo's Deposit Account Agreement represented that covered disputes were subject to mandatory arbitration. Plaintiff thereafter discovered that materially identical Wells Fargo arbitration language had previously been adjudicated in *Lotsoff v. Wells Fargo Bank, N.A.*, No. 18-cv-02033-AJB-JLB, 2019 WL 4747667 (S.D. Cal. Sept. 30, 2019), where the court applied *McGill v. Citibank, N.A.*, 2 Cal. 5th 945 (2017), together with Wells Fargo's non-severability provision, and held the arbitration agreement before it unenforceable. Plaintiff alleges below that the materially identical provisions in his agreement likewise cannot require arbitration of his claims. Had Wells Fargo's standardized agreement not represented arbitration as mandatory, Plaintiff would not have incurred the AAA filing expense in attempting to pursue the forum Wells Fargo represented was contractually required. He would have proceeded directly the federal court.

314. Finally, as a direct and proximate result of Defendant's deceptive administrative stalling tactics between January 23, 2026, and April 6, 2026, Plaintiff was induced to postpone formal civil litigation, causing the strict one-year statute of limitations ("SOL") under the EFTA to expire on multiple underlying unauthorized transactions. This induced delay resulted in the direct, unmitigated loss of $1,943.36 in consumer capital, comprised of the **August 22, 2025, transaction** for $843.36 and the **September 15, 2025, transaction** for $1,100.00 (both of which are now void under the one-year SOL). Had Defendant not actively engineered a prolonged administrative delay; Plaintiff would have initiated a timely civil action to fully recover these principal funds.

315. These constitute concrete losses of money or property. The UCL requires no minimum amount of economic loss; an identifiable economic injury is sufficient. *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 323–25 (2011).

316. Plaintiff remains a Wells Fargo customer, continues to maintain a consumer banking relationship with Wells Fargo, continues to use electronic-fund-transfer services, recently engaged in both ACH and Debit-Card transactions and intends to continue doing so. Wells Fargo's challenged claim-handling standards, consumer communications, Executive Office procedures, and Deposit Account Agreement are alleged to be standardized practices and provisions rather than conduct unique to a single completed interaction with Plaintiff.

317. Plaintiff cannot know in advance whether or when another unauthorized or erroneous EFT will occur. If another EFT dispute does arise while Plaintiff remains a Wells Fargo customer, however, Plaintiff will again be subjected to the same allegedly unlawful, unfair, and deceptive dispute-resolution practices unless they are prospectively corrected. Plaintiff therefore seeks relief directed toward Wells Fargo's continuing practices affecting Plaintiff and California consumers generally.

318. Because Plaintiff possesses no adequate remedy at law to arrest Defendant's prospective, systemic corporate behavior, Plaintiff is entitled to individual restitution and prospective public injunctive relief pursuant to Cal. Bus. & Prof. Code § 17203 and the controlling framework of ***McGill v. Citibank, N.A. (2017) 2 Cal.5th 945*** to protect the general consuming public throughout the State of California.

**1. The Unlawful Prong**

319. The unlawful prong of the UCL independently prohibits any business practice made unlawful by other federal, state, or local statutory or regulatory law. Cal. Bus. & Prof. Code § 17200. Defendant's centralized electronic fund transfer ("EFT") handling protocols implemented against Plaintiff from October 23, 2025, through April 6, 2026, directly violated multiple, distinct provisions of the Electronic Fund Transfer Act (EFTA), 15 U.S.C. §§ 1693 et seq., and

its implementing regulation, Regulation E, 12 C.F.R. Part 1005, thereby constituting a per se violation of the UCL.

320. Specifically, Defendant's uniform business operations and administrative dispute mechanisms implemented within this judicial district are unlawful in the following specific respects:

**(a) Unlawful Failure to Conduct a Reasonable Investigation Using the Bank's "Own Records"** (15 U.S.C. § 1693f; 12 C.F.R. § 1005.11(c)): Defendant systematically violates its strict error-resolution obligations by failing to conduct a reasonable, fact-sensitive investigation using information within its "own records" that could assist in resolving consumer claims.

*(i) The Regulatory Mandate:* Regulation E's Official Interpretations dictate that an institution cannot limit its investigation strictly to payment instructions where additional information within its "own records" pertaining to the account could help resolve the claim, explicitly clarifying that relevant data includes transaction history, information controlled by third-party service providers, and *"any other information appropriate to resolve the claim."* 12 C.F.R. pt. 1005, Supp. I, cmt. 11(c)(4)-5. All consumer assertions and written statements supplied directly by a consumer concerning the nature of an error legally become part of the institution's "own records" upon receipt. The Consumer Financial Protection Bureau (CFPB) has explicitly enforced this mandate, determining that a national bank's failure to reasonably consider evidence contained in its own records—specifically including the consumer's assertion that an EFT was unauthorized and the underlying factual basis for that assertion—constitutes an actionable violation of Regulation E's reasonable-investigation requirements. *In re USAA Federal Savings Bank*, Admin. Proc. No. 2019-BCFP-0001, Consent Order ¶¶ 28–32 (Jan. 3, 2019).

*(ii) Defendant's Specific Violation:* Plaintiff timely reported his unauthorized Debit-Card dispute on October 23, 2025, which Defendant opened as **Claim No. 11022250854**. On November 18, 2025, Plaintiff transmitted a comprehensive written submission that legally became part of Defendant's "own records" upon delivery. In that submission, Plaintiff explicitly stated: *"I never authorized any of the transfers in question,"* detailed the technological

interception and substitution of routing credentials, separated physical participation from actual consent, and narrowed the remaining disputed loss to $9,892.91. Defendant demonstrably received and processed this submission because it utilized Plaintiff's data to modify and narrow the active transaction set under review. Yet, Defendant completely omitted Plaintiff's statements, facts, and evidence from its formal decisional record, as proven by Defendant's three subsequent, recycled "Documents Relied Upon" productions, which remained completely static and identical, containing zero references to Plaintiff's extensive letters, screenshots, or account-freeze evidence. This complete omission creates an unassailable statutory inference: Defendant either systematically refused to incorporate Plaintiff's evidence into its internal records, or deliberately failed to conduct a reasonable investigation under 12 C.F.R. § 1005.11(c), rendering its conduct per se unlawful.

**(b) Unlawful Imposition of Consumer Liability via a Non-Statutory Proxy** (15 U.S.C. § 1693g): Defendant systematically forces consumers to bear the entire financial loss of unauthorized, intercepted transfers without meeting its strict statutory burden of proof to establish actual authorization or consent. Pursuant to 15 U.S.C. § 1693g(b), the financial institution bears the absolute burden of proving that an EFT was authorized. Defendant unlawfully imposes the $9,892.91 Debit-Card loss upon Plaintiff based materially upon the non-statutory propositions that the transactions were *"made by"* him or that he *"authorized or participated"* in them, substituting a consumer's mechanical participation in a compromised chain as a proxy for proving legal authorization. Defendant's own handling of Plaintiff's October 23 fraud report exposes this illegality: on October 30, 2025, Defendant determined that approximately $4,900.00 in ACH transactions were *"not authorized by you"* and fully reimbursed Plaintiff, despite the fact that Plaintiff had personally participated in initiating those identical transfer paths. Imposing liability for the remaining $9,892.91 Debit-Card transactions based on the exact same participation framework violates 15 U.S.C. § 1693g.

**(c) Unlawful Failure to Provide an Adequate Written Explanation of Findings** (15 U.S.C. § 1693f(d); 12 C.F.R. § 1005.11(d)(1)): Defendant systematically fails to provide

consumers with an adequate, accurate written explanation of its factual findings upon a determination of no error. In its second denial letter issued on November 26, 2025, Defendant's explanation stated: *"You noted you authorized or participated in the disputed transaction(s)."* This written finding directly violates 12 C.F.R. § 1005.11(d)(1) because it is flatly untruthful: Plaintiff had explicitly stated the exact opposite in writing eight days prior.

Defendant identified zero statements where Plaintiff admitted authorization, failed to explain how it reconciled its finding with Plaintiff's express written denial, and failed to explain the material inconsistency between its ACH reimbursement and its Debit-Card denials, in direct violation of 15 U.S.C. § 1693f(d).

Moreover, a fact of material consequence exists inside the "Documents Relied Upon" files wherein an internal note stated that the Plaintiff's matter involved a **CONFIRMED FRAUD**. This internal note was not merely implying that the Plaintiff had suggested there was a fraud, which could have been noted with the language "consumer alleges fraud" or "consumer alleges non-authorization." That is not what the records show. The banks own internal records show their system spit out the words **CONFIRMED FRAUD**. Wells Fargo had a duty to explain that finding to the Plaintiff in its denial letters. It is not reasonable for Wells Fargo to state in an official investigatory correspondence that Plaintiff "noted" or "indicated" that he "authorized or participated" in the transactions—when there is a glaring internal notice stating—**CONFIRMED FRAUD**. By concluding that Plaintiff authorized the transfers while the internal files stated this contradictory fact in such a clear manner, the Defendant violated its statutory duties.

**(d) Unlawful Withholding of Provisional Credit and Impermissible Extension of Deadlines** (15 U.S.C. § 1693f; 12 C.F.R. § 1005.11(c)(2)): Defendant systematically utilizes its internal review apparatus to keep unresolved consumer claims active for months without provisionally crediting the disputed funds. In its December 17, 2025, denial, Defendant's Enterprise Complaints Management Office explicitly represented: *"If we receive additional information, we will open a new case to address any remaining or new concerns."*

Plaintiff supplied additional evidence, and Defendant opened Executive Office **Case No. 06202601268242275**. On January 23, 2026, a Tier 2 Executive Office representative explicitly requested that Plaintiff delay his impending AAA arbitration so the bank could resolve the dispute internally, promising an authorized contact within three to five days. No authorized decisionmaker ever contacted Plaintiff, forcing Plaintiff to make approximately sixteen follow-up telephone calls. Defendant continued this reopened error-resolution process for months, successively extending its internal deadlines from February 6 to February 23, to March 16, and ultimately to April 6, 2026, while completely withholding mandatory provisional credit of the disputed $9,892.91 in direct violation of 12 C.F.R. § 1005.11(c)(2).

**(e) Unlawful Failure to Complete or Report the Results of a Reopened Error Investigation** (15 U.S.C. § 1693f; 12 C.F.R. § 1005.11): Defendant systematically fails to complete and report the findings of reopened error investigations within applicable regulatory periods. Plaintiff cooperated with the Executive Office review, voluntarily transmitting an extensive factual submission and eight supporting screenshots detailing the technological mimicry environment in February 2026. Defendant successively extended its research targets to March 16 and April 6, 2026, explicitly promising a substantive response. April 6 arrived without the promised substantive determination. Defendant failed to issue a final determination addressing the additional evidence, failed to provide a written explanation of its findings concerning the screenshots, and completely ceased all communications with Plaintiff regarding the Executive Office review, violating the strict completion and reporting mandates of 15 U.S.C. § 1693f and 12 C.F.R. § 1005.11.

**(f) Unlawful Distribution of Contractual Provisions Waiving Non-Waivable Public Remedies:** Defendant systematically distributes a standardized consumer Deposit Account Agreement containing a non-severable arbitration clause that purports to strip California consumers of their non-waivable statutory right to seek public injunctive relief in any forum, directly violating established California substantive policy (*McGill v. Citibank, N.A. (2017) 2 Cal.5th 945*). Defendant maintained this clause despite holding active, institutional notice that a

federal court in this exact District had already adjudicated this identical contract language as completely void and unenforceable in an action where Defendant was the direct litigating party (*Lotsoff v. Wells Fargo Bank, N.A.*, No. 18-cv-02033-AJB-JLB (S.D. Cal. Sept. 30, 2019)).

**2. The Unfair Prong**

321. The unfair prong of the UCL independently prohibits any business practice that offends established public policy, or is immoral, unethical, oppressive, or substantially injurious to consumers. Cal. Bus. & Prof. Code § 17200. Defendant’s centralized dispute framework directly violates, frustrates, and subverts the fundamental consumer-protection policies embodied in the EFTA and Regulation E—including the strict mandate for prompt, reasonable investigations, meaningful consideration of consumer records, and accurate written explanations. Regulation E explicitly cautions against error-resolution practices that produce a *"chilling effect on the good-faith assertion of errors."* 12 C.F.R. pt. 1005, Supp. I, cmt. 11(c)-3. Defendant’s practices inflict severe economic and procedural harm that ordinary consumers cannot reasonably avoid, while yielding zero countervailing consumer or competitive benefit.

322. Specifically, Defendant’s uniform administrative dispute-resolution procedures are unfair in the following specific respects:

**(a) Arbitrary Claim Splitting and the Substitution of "Participation" for Consent:** Defendant systematically splits unified consumer fraud reports into fractured internal claims based purely on automated transaction types. Defendant opened Plaintiff's October 23, 2025, fraud report as **Claim No. 11022250854**, and utilized this operational fragmentation to reach entirely opposite, irreconcilable authorization determinations regarding the exact same reported fraud episode. On October 30, 2025, Defendant reimbursed approximately $4,900.00 in ACH transactions Plaintiff personally initiated, determining they were *"not authorized by you."*

Four days later, on November 3, 2025, Defendant denied Plaintiff's parallel Debit-Card claims because they were mechanically *"made by you."* Defendant has failed to provide any rational factual explanation why Plaintiff's physical participation was compatible with non-

authorization for ACH transfers, but supposedly established conclusive authorization for Debit-Card transfers.

*The Train-Tracks Analogy Applied:* This practice completely ignores the ***"fraudulent interception"*** mechanics of modern technological fraud. It is analogous to a locomotive engineer setting a train in motion toward a specific destination (e.g., Los Angeles), only for a bad actor down the line to manipulate the switching mechanisms and divert the train onto separate tracks to an entirely unauthorized destination (e.g., Las Vegas). While Defendant deceptively treats Plaintiff's physical initiation as dispositive proof of authorization, it is legally immaterial *when* the fraudster "switched the tracks." It is only material that Plaintiff intended and believed he was sending his EFT to his own secure account, when in reality, the hidden destination credentials had been compromised. Substituting a consumer's mechanical participation for a true inquiry into **"actual consent"** creates an oppressive corporate loop that strips consumers of statutory protection simply because they physically interacted with their own devices.

**(b) Selective Data Extraction and Fabricated Consumer Admissions:** Defendant routinely processes consumer dispute submissions solely for the purpose of identifying information that reduces the bank's financial exposure, while systematically failing to input, log, or evaluate the accompanying evidence supporting the consumer's claim. On November 26, 2025, Defendant processed Plaintiff's November 18 written submission sufficiently to narrow the disputed transaction set and lower its financial exposure to **$9,892.91**, proving the bank received and utilized the file. Yet, in its denial issued the exact same day, Defendant completely ignored Plaintiff's explicit text stating *"I never authorized any of the transfers in question,"* and instead untruthfully represented: *"You noted you authorized or participated in the disputed transaction(s)."* It is independently unfair to deny a consumer claim by joining the factually distinct terms "authorized" and "participated" with a disjunctive "or" to attribute to a consumer the exact opposite of what they stated in writing, placing the consumer at an unavoidable informational and procedural disadvantage.

**(c) Invoking Unfounded Procedural Bars Out of Thin Air (the 60-Day Rule):** Defendant systematically invokes dispositive federal reporting deadlines against consumers without identifying any factual basis in the account history. In its November 3, 2025, letter, Defendant informed Plaintiff that his claim was barred because he failed to notify the bank within 60 days of the charges first appearing on his statement. In reality, the first disputed debit transaction occurred on August 22, 2025, appeared on a statement made available on September 16, 2025, and was reported to the bank on October 23, 2025—exactly **37 days later**, well inside the statutory window. Defendant possessed all account and statement records necessary to calculate this period accurately, yet deliberately manufactured a false deadline defense, creating an artificial, deceptive barrier designed to convince a reasonable consumer that further pursuit of a viable claim is futile.

**(d) Predatory Administrative Stalling, Bait-and-Switch Tactics, and Total Abandonment:** Defendant's review process constitutes a systemic mechanism to trap consumers in a state of futile administrative reliance. On January 23, 2026, when Plaintiff was preparing to initiate AAA arbitration, Defendant's Tier 2 Executive Office representative explicitly requested that Plaintiff postpone formal proceedings so the bank could resolve the dispute internally, opening **Executive Office Case No. 06202601268242275** and promising an authorized contact within three to five days. Defendant completely breached this promise; no person with authority ever called, forcing Plaintiff to make sixteen follow-up phone calls. Instead of engaging with the evidence, Defendant continuously pushed back its internal deadlines from February 6, to February 23, to March 16, and ultimately to April 6, 2026, while completely withholding mandatory provisional credit and retaining exclusive possession of the disputed $9,892.91. After inducing Plaintiff to delay his legal remedies and accepting his comprehensive factual submissions and screenshots, Defendant completely abandoned the process on April 6, terminating all communications without ever delivering its promised final determination, placing the entire burden of institutional delay on the consumer.

**(e) Systemic Distribution of Void "Poison Pill" Arbitration Clauses:** Defendant requires California consumers to proceed under a standardized Deposit Account Agreement that purports to strip them of their non-waivable statutory right to seek public injunctive relief in any forum, directly defying the rule established in *Public Injunctive Relief under McGill v. Citibank, N.A.* (2017) 2 Cal.5th 945. Defendant has actual, historical notice that this exact clause is dead; it was the direct defendant in *Lotsoff v. Wells Fargo Bank, N.A.*, No. 18-cv-02033-AJB-JLB (S.D. Cal. Sept. 30, 2019), where this Court applied *McGill* and struck down this identical arbitration provision in its entirety. Forcing consumers to sign and navigate a dispute mechanism that the bank knows has been adjudicated as void and unenforceable is independently unfair because it exploits a massive informational disadvantage, leveraging an illegal contract clause to actively discourage consumers from pursuing remedies that California law strictly protects.

323. There is also public evidence that Wells Fargo treats other consumer claims in a similar manner to the way it handled Plaintiff's claims. In fact, the public evidence available gives rise to ***a reasonable inference*** that Wells Fargo is engaged in ***a systemic corporate pattern of uniform consumer deception.***

324. Plaintiff is informed, believes, and thereon alleges that the unlawful, unfair, and fraudulent business practices deployed against him are not isolated, administrative anomalies or customer-service errors. To the contrary, Defendant maintains a centralized, institutionalized framework designed to systematically convert valid Regulation E consumer fraud claims into unresolvable customer liability traps.

325. Publicly compiled regulatory data confirmed via the *Consumer Financial Protection Bureau (CFPB) Complaint Database* establishes an unyielding, pattern-based approach by Defendant to evade the strict mandates of the EFTA and Regulation E. Specifically, an empirical audit across a consolidated cohort pool of ***36 distinct consumer complaint records*** involving electronic transaction failures at Wells Fargo establishes that:

**(a) Aggregated Financial Harm:** Defendant has placed a gross aggregated sum of **$41,620.00** in consumer capital directly in hazard through uniform, non-compliant dispute processing.

**(b) Uniform Deflection Tactics:** Over **44% of the analyzed cohort pool** (16 distinct consumer complaints) report that Defendant summarily denied their valid unauthorized-EFT claims by deploying the identical, non-statutory defense mechanism used against Plaintiff—deflecting bank liability by falsely claiming a transaction was "authorized" based solely on mechanical credential usage or device possession.

**(c) Systematic Documents-Withholding Policy:** Over **14% of consumers** (5 distinct complaints) explicitly report that when Defendant rejects an error dispute, it flatly refuses to disclose its investigative logs, system chip files, or text-validation source files, even upon formal demand citing federal disclosure rights under 12 C.F.R. § 1005.11(d).

**(d) Deliberate Administrative Misfiling:** A material share of consumers report that Defendant's customer service channels systematically mischaracterize acute fraud notices into administrative categories to shift the burden of proof onto the consumer and deliberately stall workflows past statutory limits.

326. As documented via public regulatory tracking—including CFPB ID: 10144873, ID: 7656533, and ID: 14587009—consumers uniformly report receiving ***the exact same copy-pasted denial form letters,*** the ***same refusal to review consumer-offered evidence,*** and the same bad-faith assertions that electronic scams carry no consumer dispute rights..

327. This empirical record establishes a clear, plausible inference under the *Twombly/Iqbal* framework that Defendant utilizes automated, rubber-stamp denial processes as a standardized matter of centralized corporate policy to exploit its superior informational advantage over the public.

328. The Cumulative Effect: The foregoing practices must be considered collectively rather than artificially isolated from one another. Their cumulative effect is to construct a predatory claim-resolution machine that systematically shifts the entire risk and cost of third-party

electronic fraud onto the consumer. Once a dispute is submitted, the consumer faces a structural wall where their data is selectively ignored, admissions are fabricated, false reporting timelines are manufactured, and legal actions are delayed through administrative bait-and-switch tactics—all backed by a void arbitration clause. This uniform corporate policy inflicts substantial, unavoidable economic injury, serves no legitimate competitive purpose, and violates the core public policies of the EFTA. Defendant's acts and practices therefore independently constitute unfair business practices under Cal. Bus. & Prof. Code § 17200.

### 3. The Fraudulent Prong

329. The fraudulent prong of the UCL independently prohibits any business practice or consumer communication that is **likely to deceive** a reasonable consumer. Cal. Bus. & Prof. Code § 17200. To the extent the allegations supporting this prong sound in fraud, Plaintiff pleads the underlying circumstances with meticulous, unassailable particularity pursuant to the heightened requirements of Federal Rule of Civil Procedure 9(b).

330. Specifically, Defendant's uniform consumer-facing communications and administrative representations are fraudulent and deceptive in the following specific respects (argued each in turn as "Fraud Blocks" containing the heightened pleading particularities of Who, What, When, Where, How):

### <u>FRAUD BLOCK 1</u>: FABRICATION OF MATERIAL CONSUMER ADMISSIONS

331. The Particulars of the Misrepresentation (FRCP 9(b) Identity):

**(a) Who Made the Statement:** Defendant Wells Fargo Bank, N.A., acting through its Claims Assistance Center and ATM/Debit Card Claims departments.

**(b) What Was Stated:** Defendant affirmatively represented in writing: *"You noted you authorized or participated in the disputed transaction(s)."*

**(c) When It Was Made:** November 26, 2025, and repeated on December 17, 2025.

**(d) Where It Was Directed:** Transmitted via formal corporate mail channels directly to Plaintiff's residence in San Marcos, California.

**(e) The Material Falsity of the Statement:** These representations were patently and demonstrably false. Plaintiff never "noted," "indicated," or otherwise asserted that he authorized or participated in the fraud. To the contrary, Defendant was in actual physical possession of Plaintiff's explicit, written refutations transmitted eight days prior on November 18, 2025, which stated in plain terms: ***"I never authorized any of the transfers in question."*** Defendant combined the legally distinct terms "authorized" and "participated" with a disjunctive "or" to craft a fabricated consumer admission to clear its backlogs.

**(f) The Deceptive Effect and Injury:** A reasonable consumer receiving an authoritative written determination from a national bank claiming they formally admitted to authorizing a fraud would be misled into believing the bank possessed an ironclad, documented waiver of their rights. This deceptive formulation is highly likely to cause reasonable consumers to mistakenly believe that merely touching a transaction process eliminates Regulation E protection, inducing them to abandon valid statutory claims. ***Wells Fargo's false statements are egregious*** when coupled with the fact that ***they knew their internal evidence*** files concluded Plaintiff's case involved a "**<u>CONFIRMED FRAUD</u>**." It is deceptive for Wells Fargo to manufacture a false "admission of authorization" by the Plaintiff while ***hiding the fact that its own internal records made an entirely different finding***.

**<u>FRAUD BLOCK 2</u>: FABRICATION OF PROCEDURAL TIME-BAR DEADLINES**

332. The Particulars of the Misrepresentation (FRCP 9(b) Identity):

**(a) Who Made the Statement:** Defendant Wells Fargo Bank, N.A., acting through its centralized ATM/Debit Card Claims division.

**(b) What Was Stated:** Defendant affirmatively represented in writing: *"You did not notify us of your claim within 60 days of the disputed charges first appearing on your account statement."*

**(c) When It Was Made:** November 3, 2025.

**(d) Where It Was Directed:** Transmitted via formal corporate mail channels directly to Plaintiff's residence.

**(e) The Material Falsity of the Statement:** This representation was an absolute mathematical fabrication. Defendant was in exclusive possession of the account statements necessary to calculate this timeline accurately. The first disputed debit transaction occurred on August 22, 2025, appeared on a statement made available on September 16, 2025, and was formally reported to the bank on October 23, 2025—exactly **37 days later**, leaving a wide, 23-day statutory safety margin. Defendant manufactured a false 60-day violation out of thin air.

**(f) The Deceptive Effect and Injury:** A reasonable consumer receiving an official notice from their bank stating their statutory reporting window has expired will naturally accept that representation as true, rely on the bank's superior compliance resources, conclude their claim is legally dead, and forfeit their right to reimbursement.

**<u>FRAUD BLOCK 3</u>: THE SHAM RE-INVESTIGATION AND ADMINISTRATIVE STALL**

333. The Particulars of the Misrepresentation (FRCP 9(b) Identity):

**(a) Who Made the Statement:** Defendant Wells Fargo Bank, N.A., acting through its Enterprise Complaints Management Office and Executive Office representative Heather P. (Last Name Presently Unknown).

**(b) What Was Stated:** Defendant represented in writing and verbally that it would *"open a new case to address remaining concerns"* and required successive extensions of time to conduct active, substantive *"research"*(Executive Office Case No. 06202601268242275).

**(c) When It Was Made:** Continually re-asserted between December 17, 2025, and March 16, 2026.

**(d) Where It Was Directed:** Executed via recorded telephone channels and formal letters sent to Plaintiff's residence.

**(e) The Material Falsity of the Statement:** These representations were a structural sham. While Defendant represented to the consumer that it was dynamically reviewing new facts and evidence, its internal record was entirely static. Defendant's three produced "Documents Relied Upon" packages were identical, containing zero references to Plaintiff's extensive letters, screenshots, or account-freeze evidence. The bank was not performing research; it was letting the clock run.

**(f) The Deceptive Effect and Injury:** These statements are highly likely to deceive a reasonable consumer into continuing to cooperate, make phone calls, and postpone adversarial remedies because they believe the bank is working toward a resolution. Plaintiff relied directly on this deception by postponing immediate arbitration on January 23, 2026, making sixteen follow-up phone calls, and leaving **$9,892.91** in the bank's exclusive possession for months, only for the bank to completely abandon the communications loop on April 6, 2026.

**FRAUD BLOCK 4: CONCEALMENT OF CONTRACTUAL ARBITRATION INVALIDITY**

334. The Particulars of the Misrepresentation (FRCP 9(b) Identity):

**(a) Who Made the Statement:** Defendant Wells Fargo Bank, N.A., through its uniform corporate account disclosure division.

**(b) What Was Stated:** Defendant represents via its uniform consumer Deposit Account Agreement that private arbitration is a consumer's exclusive legal remedy for covered disputes and that consumers are barred from acting in arbitration "in the interests of the general public."

**(c) When It Was Made:** Continually maintained as an active operational requirement throughout 2025 and 2026.

**(d) Where It Was Directed:** Maintained within the standardized, printed disclosures governing all California retail deposit accounts.

**(e) The Material Falsity of the Statement:** This contractual representation is a complete legal fiction. Defendant possessed direct institutional knowledge that this exact contract clause was stripped of all legal effect. Defendant itself litigated this identical language in ***Lotsoff v.***

***Wells Fargo Bank, N.A.***, No. 18-cv-02033-AJB-JLB (S.D. Cal. Sept. 30, 2019), where this Court applied *McGill v. Citibank, N.A.* and held Wells Fargo's non-severable public injunction waiver completely unenforceable. Presenting a void "poison pill" clause as a mandatory, binding hurdle is an active material omission.

**(f) The Deceptive Effect and Injury:** Presenting a void clause to California consumers without disclosing the landmark local holding in *Lotsoff* is highly likely to deceive reasonable consumers into believing they have legally waived their right to seek public injunctive relief in an Article III court. Plaintiff relied directly on this deceptive contract representation by initiating AAA proceedings and paying a nonrefundable **$225.00** AAA filing fee (totaling $230.85 with administrative taxes) before discovering that the clause had already been declared dead by this Court.

**4. Causation, Justifiable Reliance, and Equitable Estoppel**

335. Defendant's deceptive representations and unfair practices proximately caused Plaintiff acute, ongoing economic injury. Plaintiff reasonably and justifiably relied upon Defendant's formal claims determinations, deceptive Executive Office updates, and standardized dispute disclosures, which were issued directly by a fiduciary financial institution possessing superior information, legal compliance tracking, and technical expertise.

336. Plaintiff's reliance on Defendant's good-faith representations was material, concrete, and highly detrimental. On January 23, 2026, when Plaintiff was prepared to bypass internal channels and immediately initiate formal adversarial proceedings, Defendant's Tier 2 Executive Office representative actively intervened. Defendant explicitly requested that Plaintiff postpone filing formal legal actions so the bank could resolve the dispute internally, promising that an authorized official with corporate settlement authority would contact him within three to five days.

337. Defendant completely breached this promise, forcing Plaintiff to make sixteen frantic follow-up telephone calls while the bank held out false promises of an active re-investigation.

Defendant continuously pushed back its internal deadlines from February 6, to February 23, to March 16, and ultimately to April 6, 2026, on the false representation that it was conducting substantive *"research,"* while completely withholding mandatory provisional credit and retaining exclusive possession of Plaintiff's funds.

338. Defendant's multi-month administrative bait-and-switch loop directly delayed Plaintiff's ability to file a timely federal lawsuit and materially degraded his statutory position. By actively inducing Plaintiff to remain trapped in a state of futile internal reliance until Defendant abruptly abandoned all communications on April 6, 2026, Defendant caused the strict one-year statute of limitations to expire on two vital consumer protection claims: the **August 22, 2025, transaction for $843.36** and the **September 15, 2025, transaction for $1,100.00**.

339. Because Defendant's bad-faith corporate stalling directly cost Plaintiff **$1,943.00** in otherwise recoverable statutory damages, Defendant is **equitably estopped** from asserting any statute of limitations defense against these transactions. Defendant cannot systematically utilize deceptive internal delays to run the clock out on a consumer, retain the disputed funds throughout that period, and subsequently exploit that engineered expiration as a shield against federal civil liability.

**5. Continuing Threat and Entitlement to Public Injunctive Relief**

340. Plaintiff continues to maintain an active consumer banking relationship with Defendant, has recently used, currently utilizes, and intends to continue utilizing its electronic fund transfer networks, including both ACH and Debit-Card transactions.

341. Since Defendant's internal compliance infrastructure, automated denial protocols, and deceptive standard operating procedures remain active and structurally non-compliant with federal law, Plaintiff faces a concrete, imminent, and ongoing threat of future individual injury if another electronic fund transfer error occurs.

342. Because Defendant's unlawful, unfair, and fraudulent business practices are executed systematically against millions of retail banking depositors across the State of California via

centralized corporate policy—as mathematically demonstrated by the public regulatory data compiled within the Consumer Financial Protection Bureau (CFPB) Consumer Complaint Database—the ongoing threat of injury extends directly to the general consuming public. This empirical public record documents ***36 consolidated consumer complaints detailing identical Regulation E investigative failures by Defendant***, placing $41,620.00 in public capital directly in hazard. Individual consumers cannot reasonably avoid these practices once an EFT dispute is submitted, and monetary damages alone are completely inadequate to arrest Defendant's standardized corporate behavior.

343. Accordingly, pursuant to Cal. Bus. & Prof. Code § 17203 and the controlling framework of ***Public Injunctive Relief under McGill v. Citibank, N.A. (2017) 2 Cal.5th 945***, Plaintiff is entitled to an equitable order compelling Defendant to fundamentally reform its Regulation E standards, employee retraining protocols, fact-specific explanation disclosures, and public notification metrics, as detailed extensively in the **Prayer for Relief** hereinbelow.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Brian H. Kurbjeweit, as Trustee of The Writer's Trust, dated February 14, 2018, respectfully prays for judgment against Defendant Wells Fargo Bank, N.A., as follows:

**I. Individual Monetary and Statutory Relief**

344. For actual damages in the principal sum of $9,892.91, representing the unreimbursed funds unlawfully withheld by Defendant in violation of the Electronic Fund Transfer Act and Regulation E;

345. For mandatory treble damages in the amount of $29,678.73 pursuant to 15 U.S.C. § 1693f(e)(2), based on Defendant's knowing and willful conclusion that Plaintiff's account was not in error when such a conclusion could not reasonably be drawn from the evidence available to Defendant at the time of its investigation;

346. For statutory damages in the maximum legal amount of $1,000.00 pursuant to 15 U.S.C. § 1693m(a)(2)(A);

347. For punitive and exemplary damages pursuant to California Civil Code § 3294 in an amount to be determined at trial, sufficient to punish Defendant for its oppressive, malicious, and fraudulent common-law misrepresentations and to deter such institutional misconduct in the future;

348. For an award of reasonable attorneys' fees and all costs of suit incurred herein, pursuant to 15 U.S.C. § 1693m(a)(3) and applicable state statutory provisions; and

349. For pre-judgment and post-judgment interest at the maximum legal rate from October 23, 2025, until the date judgment is entered.

**II. Public Injunctive Relief (Pursuant to Cal. Bus. & Prof. Code § 17200)**

1. For permanent, wide-reaching public injunctive relief under the California Unfair Competition Law (UCL), which carries the primary purpose and effect of prohibiting and restraining Defendant's systemic, unlawful, unfair, and fraudulent practices that threaten ongoing harm to the general consuming public.

2. Specifically, Plaintiff prays that this Court issue a permanent injunction ordering Defendant Wells Fargo Bank, N.A., and its corporate officers, agents, and employees, to immediately implement the following corrective measures:

**(a) Mandate Correct Legal Standard of Review for EFTA Claims:** Prohibit Defendant from utilizing the non-statutory, unlawful and unfair ***"made by you"*** standard of proof to deny consumer fraud claims, and affirmatively require Defendant's claims division to evaluate all Regulation E disputes under the correct statutory baseline of whether the consumer provided "actual consent" to the specific electronic fund transfer that executed;

**(b) Enforce Inclusion of Consumer Assertions in "Own Records":** Order Defendant to cease its practice of omitting consumer-provided information from its official investigative dockets, and legally mandate that all consumer assertions, written statements, explanatory dispute letters, evidentiary screenshots, and regulatory complaints transmitted to the bank or through the CFPB network be integrated directly into the bank's *"own records"* and preserved inside the ***"Documents Relied Upon"*** file under 12 C.F.R. § 1005.11(c)(4)-(5);

**(c) Enjoin Deceptive Boilerplate and Establish Fact-Specific "Explanation of Findings":** Enjoin Defendant from issuing standardized, automated, or pre-printed denial form letters that merely restate boilerplate conclusions. Instead, Defendant is legally ordered to provide a fact-specific "Explanation of Findings" that explicitly states the ***specific underlying facts*** that support the bank's determination.

To prevent a rubber-stamp denial process, such an explanation is legally sufficient only if it satisfies the following public safety triggers:

*(i) Proof of True Inquiry:* It provides the consumer with clear, written confirmation that the institution actually conducted a genuine inquiry into its own internal records, including an active, documented review of the consumer's assertions, statements, and submitted evidence;

*(ii) Rational Basis for Rebuttal:* It identifies the material facts, relevant evidence, consumer assertions, written statements or other information, data logs, or merchant records relied upon by the bank, thereby notifying the consumer of the specific points they must address or rebut if they intend to pursue a subsequent appeal; and

*(iii) Verification of Standard:* It clearly demonstrates on its face that the institution utilized the proper "actual consent" standard of review rather than an unlawful "made by you" proxy.

*(iv) Procedural Construction:* To ensure the efficiency of consumer dispute resolutions, the required notification need simply be sufficient to constitute a plain-language explanation of what the institution ***factually found*** during its active investigation and explicitly need not be an extensive legal discussion or resemble a formal judicial opinion.

**(d) Compel Mandatory Employee Retraining:** Order Defendant to immediately design, implement, and compel the completion of a comprehensive retraining program for all corporate employees, investigators, and managers handling consumer Regulation E claims. This training mandate must explicitly require that:

*(i) Proper Standard of Review:* All personnel are instructed that transaction authentication, device possession, or credential usage do not establish legal authorization, and

that the exclusive, lawful standard of review is whether the consumer's ***"actual consent"*** to the specific transactions that occurred exists;

*(ii) Proper Regulation E Processing:* All personnel are instructed that consumer assertions and written statements are legally a part of the bank's ***"own records"*** and **must** be actively incorporated into the bank's formal ***"Documents Relied Upon"*** files used to make a claim determination; and

*(iii) Compliance of All Educational Materials:* All corporate training manuals, PowerPoint presentations, teaching notes, internal policy directives, and operational scripts comply in full with these federal legal requirements;

(e) Appoint Independent Compliance Monitor: Direct Defendant to retain, at its sole corporate expense, an independent, third-party compliance monitor approved by this Court for a period of ***three (3) consecutive years to audit*** Defendant's systemic compliance with these corrective measures, review all updated training materials and manuals, and file regular, unredacted verification reports onto this Court's public docket.

**III. General Relief**

1. For a formal judicial declaration pursuant to 28 U.S.C. § 2201 that Defendant's arbitration agreement is void and unenforceable in its entirety under the holding of *Lotsoff v. Wells Fargo Bank, N.A.*, No. 18-cv-02033-AJB-JLB (S.D. Cal. Sept. 30, 2019); and

2. For such other, further, or alternative relief as this Court deems just, equitable, and proper.

Respectfully Submitted,

Dated: September 22, 2026

By: ___/s/ Matthew T. Willaims_____
Matthew T. Williams, Esq.
Attorney for Brian H. Kurbjeweit, as Trustee of The Writer's Trust, dated 2/14/2028

EXHIBIT 1

WELLS FARGO

Effective November 4, 2025

# Deposit Account Agreement

Important legal information and disclosures

# Thank you for doing business with us

This Deposit Account Agreement applies to consumer and business accounts and, together with the following documents, is your contract with Wells Fargo and constitutes the “Agreement” that governs your account with Wells Fargo:

- The Consumer Account Fee and Information Schedule (“Consumer Schedule”) or the Business Account Fee and Information Schedule (“Business Schedule”),
- Our interest rate sheet for interest-bearing accounts,
- Our privacy notice, and
- Any additional disclosures, amendments, or addenda we provide to you.

In this Agreement, when we say “Wells Fargo,” “Bank,” “we,” “us,” and “our,” we are talking about Wells Fargo Bank, N.A. “You” and “your” means each account owner, authorized signer, or any other person authorized to operate your account. When we say “We may” or “Wells Fargo may” do something, that means you authorize us and agree to such action.

**This Agreement is applicable to new and existing accounts and replaces all prior agreements regarding your account,** including any verbal or written statements or representations. When you sign an account application or use your account, including any account service, you and anyone else identified as an owner or authorized signer on your account consent to the terms of this Agreement. We regularly update this Agreement. You are responsible for ensuring that any authorized signer is familiar with this Agreement. If you keep your account open after we change this Agreement or end a fee waiver, you agree to the changes.

**This Agreement contains dispute resolution provisions — including an arbitration agreement, class action waiver, and jury trial waiver — that affect your legal rights. In arbitration, there may be less discovery and appellate review than in court. Please review these provisions carefully.**

We recommend you keep a copy of this Agreement — and any changes we provide to this Agreement — for as long as your Wells Fargo accounts are open. You can get a copy of the current Agreement at wellsfargo.com, or by visiting your local branch, or by phone at the numbers below.

This document contains various defined terms with specific meanings. Some terms are defined within the section in which they are used. More frequently used terms are defined in the Glossary at the end of the document. As you review this Agreement, be sure to check the Glossary for those definitions.

### Class Action Waiver and Jury Trial Waiver

You and we each agree that any proceeding, whether in arbitration or in court, will be conducted only on an individual basis and not in a class, collective, consolidated, private attorney general, or representative action. You and we agree to waive any right to bring or to participate in such an action in arbitration or in court to the fullest extent permitted by applicable law. Notwithstanding the foregoing, the parties retain the right to participate in a class-wide settlement.

### Jurisdiction

If the Arbitration Agreement is ever deemed unenforceable or void, or a dispute between the parties is not subject to arbitration, or for any actions to enforce the Arbitration Agreement or seek entry of judgment on any arbitration award, then, except for disputes brought in small claims court, the parties irrevocably consent to the exclusive jurisdiction of the state or federal courts in the state whose laws govern your account, without regard to conflict of laws principles.

# Table of Contents


**Account Basics** .......... **4**

**Statements and Notices** .......... **5**

**Interest** .......... **7**

**Depositing Funds** .......... **8**

**Availability of Funds Policy** .......... **11**

**Available Balance, Posting Transactions, and Overdraft** .......... **13**

- Available balance .......... **13**
- How we process and post transactions to your account .......... **13**
- Standard overdraft coverage .......... **14**
- Debit Card Overdraft Service .......... **15**
- Overdraft Protection .......... **15**
- Extra Day Grace Period .......... **16**
- Returning your account to a positive balance .......... **16**

**Debit Cards and ATM Cards** .......... **17**

**Fund Transfer Disclosures — General** .......... **22**

**Electronic Fund Transfer Services (Consumer accounts only)** .......... **24**

**Other Account Services and Restrictions** .......... **27**

**Time Accounts (CDs)** .......... **29**

**Protecting Your Account and Your Information** .......... **31**

**Closing Accounts** .......... **33**

**Resolving Disputes Through Arbitration** .......... **35**

- Consumer Accounts Only: Resolving Disputes Through Arbitration .......... **35**
- Business Accounts Only: Resolving Disputes Through Arbitration .......... **37**

**Additional Terms and Services** .......... **39**

**Glossary** .......... **43**


# Questions? We're here for you

| | | |
|---|---|---|
| Online | Visit wellsfargo.com or wellsfargo.com/biz | |
| Phone | Consumer Banking<br>**1-800-869-3557** | Business Banking<br>**1-800-225-5935** |
| Deaf or hard of hearing customers | We accept all relay calls, including 711. | |
| Mail | Wells Fargo, Customer Correspondence<br>PO Box 6995<br>Portland, OR 97228-6995 | |

# Account Basics

This section applies to consumer accounts only unless otherwise noted.

## Account Ownership

**Forms of account ownership:** You can open an account that you own alone, or with more than one person. If the account is owned with more than one person, it's considered a joint account.

**For joint accounts**, we treat all owners, who are referred to in this Agreement as "co-owners," as joint tenants with right of survivorship (described below), unless:

- Applicable state laws require other treatment, or
- We agree with you in writing that the account is owned in some other way.

Regardless of how your account is owned, we don't keep a separate record of each co-owner's interest in the account. We act on instructions from any co-owner (or a co-owner's authorized representative) without obtaining other co-owner's consent, including withdrawing or transferring funds, making payments, or closing the account.

Each co-owner has complete control over all of the funds in the account. We may pay out money from the account upon the request or direction of any co-owner (or a co-owner's authorized representative), regardless of their contributions to the account, and whether any other co-owner is incapacitated or deceased, or whether the account includes a right of survivorship. However, if one of the joint account co-owners is a minor, we may permit the adult account co-owner to restrict the minor's use of certain payment services.

Each joint owner is individually and jointly responsible for any overdraft on your account, regardless of who caused or benefited from the overdraft. If there's a setoff, an enforcement of our security interest in your account, or legal action (such as a third party garnishment, seizure, forfeiture, or tax levy) affecting any co-owner, we may treat all funds in the account as belonging to the customer against whom the setoff, enforcement of the security interest, or other legal action is directed. If your account is closed for unsatisfactory handling, we may report all joint owners to the consumer reporting agencies.

**Joint tenants with right of survivorship:** means that when one person dies, the account is owned by and payable to the surviving co-owners.

## Pay On Death (POD) account

A POD account is payable to the surviving beneficiaries you designated on your account when we receive proof of your death or the death of the last surviving co-owner. An account titled "in trust for (ITF)," "transfer on death (TOD)," or similar language is treated as a POD account.

You and any co-owner may change beneficiaries anytime by notifying us in writing. Generally, the beneficiary(ies) must survive all owners in order to receive funds.

## Accounts established for minors

**Uniform Transfers/Gifts to Minors Act account.** An account established under a state's Uniform Transfers/Gifts to Minors Act that is controlled by a custodian (an adult who holds the minor's funds in the account for safekeeping). We may disclose account information to the minor or their authorized representative. When the minor reaches the age established by the UTMA/UGMA laws in your state, we may pay the funds in the account to the minor without waiting for instructions from the custodian.

**Minor by account.** One or more adults may open an account, as custodian (an adult who holds the minor's funds in the account for safekeeping) in the name of a minor. The minor owns the funds in the account. The adult, as the custodian, has exclusive control of the account and the minor cannot make deposits, withdrawals or transact on the account. If there's more than one adult as the custodian on the account, each may act independently. We're not obligated to inquire about the use of the funds. When the minor reaches the age of majority, they still will not be able to make deposits, withdrawals or transact on the account except to close the account. If the adult as the custodian (or the last of the adults as the custodian to survive) dies before the minor reaches the age of majority, we may transfer the funds to a successor custodian according to the applicable Uniform Transfers/Gifts to Minors Act.

### Transfer of account ownership

If you want to transfer account ownership to another person, we must consent and note it in our records before the transfer is valid and binding on us; however, we're not responsible for determining whether such transfer is legally valid. Assignment of your account is subject to our setoff rights (see Setoff and security interest in the "Additional Terms and Services" section). This Agreement is binding on your personal representatives, executors, administrators, and successors, as well as our successors and assigns.

### When an owner does not sign account documentation

**Applies to both Consumer and Business Accounts:** If a customer identified in our records as an owner or a co-owner of an account does not sign account-related documentation (including the account application), we still may treat them as an owner or a co-owner of that account, in our sole discretion; we're not liable to anyone as a result.

### Death or legal incompetence of an authorized signer or account owner

Please notify us promptly if you learn or suspect an account owner or signer has been declared incompetent by a court or other legal authority, or has died. When we receive proper notice, we may:

- Freeze the account until we receive documents verifying the incapacity or death and instructions regarding the funds remaining in the account,
- Pay (without inquiring) any item authorized by the account owner before being declared legally incompetent or deceased,
- Return or reverse deposits, and
- Apply funds in the account to any debt the account owner owes us before recognizing the rights of a surviving joint owner or other person to any remaining funds.

If we release funds after the account owner's death and have to pay tax or reclamation claims to a government agency as a result, the account owner's estate is responsible for reimbursing us.

**Consumers and Sole Proprietors Only:** If an account owner dies or is declared legally incompetent, we may comply with court orders and legal documents, and take direction from affiants, court-appointed representatives, guardians, or conservators from your state of residence, even if different than where the account was opened except as otherwise required by applicable law or court order. We may require additional documentation be provided to us before complying with the directives. We may require U.S. court documents for customers residing outside of the U.S. at the time of incompetence or death.

**For Business Account Owners:** Businesses must provide us documentation of any change in ownership or control of a business upon the death or legal incompetence of a business owner.

## Statements and Notices

### Statement delivery

We'll make available to you a statement of your account activity for each statement period, using the postal or email address associated with your account. We'll do the same with notices. If your delivery preference is electronic, we'll notify you by email that your statement or notice is available online. You must be at least 13 years old to receive online statements.

We'll send statements and notices to one owner of a jointly owned account, and you agree that owner is responsible for sharing copies of the information with all other owners. If you request that we send notices to an authorized signer, the authorized signer has the same responsibility. Online statements are available to each joint owner.

Your statement is considered received by you on the second business day after we mail it to you or, if your delivery preference is electronic, when it's available through online banking. You agree to this timing even if the postal or email address you provided us is invalid.

Checking accounts get a monthly account statement. Savings accounts generally get a quarterly account statement, but will get a monthly statement if you set up automatic transfers into your savings account, have electronic fund transfer activity in the account, or have a combined statement for your checking and savings accounts.

### Combined statements

We may combine statements for accounts with at least one common owner, in which case we consider the first account listed on your statement as your primary account. We'll make available your account statement through the address listed for your primary account. Statements for accounts in a combined statement will be delivered according to the delivery preference of the primary account.

Any person with online access to the primary account will also have online viewing capability to all the information on the combined statement.

If you prefer that we not combine your statements, let us know and we'll keep them separate. This will apply to subsequent statements only, and this option isn't available for Prime Checking and Premier Checking accounts.

## Changing statement period and fee period for checking and non-IRA savings accounts

We may change the statement period and fee period assigned to your account without advance notice. If your account is interest-bearing, these changes won't affect interest calculations, but they may affect the date we post interest to your account.

For all accounts except analyzed business accounts, if the first new fee period created by our change is fewer than 25 days, the Bank will automatically waive the monthly service fee for that period.

## Check safekeeping and check image service

**We don't return your physical paid checks in your statements.** Instead, we make copies of your paid checks available online, by calling us, or at our branches. If for any reason we can't provide a copy of your check, we aren't liable for more than the face amount of the check.

**You can enroll in our check image service.** With this service, you'll receive images of your paid checks on your statement. See the "Service Fees" section of the Consumer Schedule or Business Schedule for specific applicable fees and additional details. This service isn't available with consumer savings accounts or Clear Access Banking.

If you have a combined statement, only the primary account is eligible for the monthly check image service.

When we provide a statement, we have made the check image available to you, even if we don't send originals or images with the statement. We'll destroy original checks after a reasonable period of time we determine. If for any reason we can't provide a copy of your check, we won't be liable for more than the face amount of the check. We cannot provide originals or images of checks that are sent to us as electronic transfers. Additionally, other banks may send us electronic images instead of original checks. In that case, we may provide a copy of the image, but not the original check.

## Account statements or notices returned or undeliverable

Your account statements or notices will be considered unclaimed or undeliverable if

- Two or more account statements or notices are returned to us through the mail because of an incorrect address; or
- We notify you electronically that your account statement is available for online viewing, and we receive email notifications that our message is undeliverable.

In either event, we may

- Discontinue sending account statements and notices, and
- Destroy account statements and notices returned to us as undeliverable.

We won't attempt to re-deliver account statements and notices to you until you provide us with a valid postal or electronic address.

## Change of address

You agree to promptly notify us of any change to your postal or email address. We'll change your postal or email address within a reasonable time after you request it. If you have a combined statement, any owner of the primary account can change the address of all accounts included in the combined statement. Unless you instruct otherwise, we may change the postal or electronic address only for the account(s) you specify or for all or some of your other account(s) with us.

We may update your address in our records without a request from you if (1) we identify a need to rely on another address you have provided us; or (2) we receive an address change notice from the U.S. Postal Service or information from another party in the business of providing correct address details that does not match the address in our records for your account or card.

## Your responsibility to review account statements and notices and notify us of errors

You are obligated to:

- Examine your account statement promptly and carefully, including as applicable, paid check images, which you may separately choose to review (see "Check safekeeping and check image service" section of this Agreement)
- Notify us promptly of any errors.
- Unless a shorter time period is defined in this Agreement, notify us within 30 days after we have made your account statement available to you of any unauthorized transaction on your account. Note: If the same person has made two or more unauthorized transactions and you fail to notify us of the first one within this 30-day period, we won't be responsible for unauthorized transactions made by the same wrongdoer.
- Notify us within six months after we have made your account statement available to you of any unauthorized, missing, or altered endorsements on your items (such as, but not limited to, an unauthorized or altered signature on the back of a check).

For specific information on unauthorized card transactions, see "Zero Liability protection" in the "Debit Cards and ATM Cards" section of this Agreement.

**Consumer accounts only:** Electronic fund transfers are subject to different time periods for notification of errors, as described in the "Electronic Fund Transfer Services" section of this Agreement. Common examples of electronic fund transfers are ATM, debit card, and Bill Pay transactions.

### Responsibility to notify us of errors

If you fail to notify us of any unauthorized transaction, error, or claim for a credit or refund within the time frames specified in this Agreement, your account statement will be considered correct and we won't be responsible for any unauthorized transaction, error, or claim for transactions included in the applicable statement.

### Unauthorized transactions

A transaction is an unauthorized transaction when it's
- Missing a required signature or other evidence showing you have authorized it, or
- Altered (for example, the amount of a check or the payee's name is changed).

You can notify us of errors on your account statements by promptly
- Calling the telephone number listed on your account statement or in a notice, or
- Submitting a written report (if instructed by us) as soon as possible, but in any event within the specified time frames.

Actions we take when you report an unauthorized transaction: We investigate any reports of unauthorized activity on your account. After you submit a claim, we may require you to:
- Complete and return the claim form and any other documents we require,
- Notify law enforcement, and
- Cooperate fully with us in our investigation.

We can reverse any credit made to your account resulting from a claim of unauthorized transaction or error if you don't cooperate fully with us in our investigation or recovery efforts, or we determine the transaction was authorized.

For specific information on unauthorized card transactions, see "Zero Liability protection" in the "Debit Cards and ATM Cards" section of this Agreement.

**Consumer accounts only:** For specific information on unauthorized electronic fund transfers, see the "Electronic Fund Transfer Services" section of this Agreement.

# Interest

**Calculating the applicable interest rate:** When you open an interest-bearing account, we provide a rate sheet listing the current interest rate and Annual Percentage Yield (APY) for your account. Interest-bearing accounts earn interest at a variable rate, except CDs. The interest rate may be as low as 0.00%, and we may change the interest rate for variable-rate accounts at any time. The interest rate may vary depending on your daily balances (tiered-rate account). We may pay the same interest rate on more than one tier. The tiers and corresponding interest rates are disclosed in the rate sheet.

We calculate interest using the daily collected balance method, applying a daily periodic rate to the collected balance in your account each day. Interest is calculated using a 365-day year, unless otherwise noted for business accounts in the Business Schedule. Interest compounds daily. For interest-bearing checking and savings accounts, it will be credited monthly.

Cash deposits begin accruing interest the same business day the deposit is credited to your account. If you deposit an item such as a check, interest begins accruing on the business day we receive credit for the item. For time accounts, interest begins to accrue on the business day you deposit non-cash items, such as checks.

**Annual Percentage Yield (APY) and Annual Percentage Yield Earned (APYE):** The Annual Percentage Yield (APY) is a percentage rate reflecting the total amount of interest paid on an account based on the interest rate and the frequency of compounding for a 365-day period. The Annual Percentage Yield Earned (APYE) is an annualized rate that reflects the relationship between the amount of interest actually earned on your account during the statement period and the average daily balance in the account for the statement period.

We calculate both your APY and APYE according to formulas established by federal regulations. The APYE appears on your account statement.

**The right to require notice of withdrawal from your savings account:** We may require seven days written notice before you withdraw money from your savings account.

# Depositing Funds

**There are many ways for you to deposit funds into your account: at branches, ATMs, via Bank by Mail, and through the Wells Fargo Mobile® app. You should be aware of your responsibilities when you make deposits.** We exercise ordinary care when collecting a deposited item but are not responsible for any other bank's treatment or loss of the item. If a deposited item is lost or destroyed during processing or collection, you agree to provide all reasonable assistance to help us reconstruct the item.

## Deposit accuracy

**It's your responsibility, not ours, to confirm the accuracy of the amount you deposit.** If we identify a discrepancy between the amount you declared and the actual amount received, we may adjust your account by debiting or crediting the difference. We may also notify you of any such adjustments.

**Notify us of a discrepancy.** You must notify us of any discrepancies within the applicable timeframe outlined below. Failure to do so may result in the deposit being considered accurate as presented.

| | |
|---|---|
| **Consumer accounts** | within 1 year after we have made your account statement available to you |
| **Business accounts** | within 30 days after we have made your account statement available to you |

**If you don't notify us promptly:** If the actual deposit is less than the amount shown on your statement, the difference remains your responsibility.

If the actual deposit is more, the excess amount is the property of the Bank.

## Verifying transactions

While we don't verify every transaction, we reserve the right to verify any transaction, including those for which a receipt has been issued. We may reverse or adjust, at any time without prior notice to you, any credit or debit we believe we have made to your account in error.

**Analyzed business accounts:** You may request that the Bank adjust any deposit discrepancies identified during verification.

## Sending an item for collection

We may, upon notice to you, send an item for collection instead of treating it as a deposit. This means we send it to the issuer's bank for payment, and your account won't be credited for the item until we receive payment. Our availability of funds policy does not apply to an item we send for collection.

## Our right to decline deposits

**We may decline all or part of a deposit, including cash, for any reason.** This could happen, for example, if a payee isn't a co-owner, authorized signer, or authorized representative on your account, we can't verify an endorsement, the check was issued from a credit account, the dollar amount of the deposit, the check looks suspicious, or it's a non-U.S. item. We do not accept cash deposits into a consumer deposit account through the night depository. Use of the night depository is for business deposits only. If we decline a deposit that you mailed to us, we may return it to you at your cost (including charging you for postage and handling to return foreign currency coin or paper), or retain any invalid checks or other documents included in the deposit without crediting your account, at our discretion. There are limits on the total dollar amount of checks that can be deposited at Wells Fargo ATMs per transaction. We may decline ATM check deposits that exceed $1 million. For security reasons there may also be limits on the dollar amount or frequency of cash deposits you can make at Wells Fargo ATMs.

If we cannot verify an endorsement, we can also decline to pay, cash, or send the item for collection. We can require that all endorsers be present and that you deposit the item instead of cashing it.

Non-account owners are not allowed to deposit cash into consumer accounts. For business accounts, any person wanting to make a cash deposit must provide an acceptable form of identification before we accept a cash deposit.

## Night Depository

(Business accounts only)

Use of the nightly depository is limited to business deposits only.

## Requirements for correct endorsement

An endorsement is a signature, stamp, or other mark on the back of a check to transfer, restrict payment, or make the signer responsible for the check. If you have not endorsed a check that you deposited to your account, we may endorse it for you or deem it endorsed by you without further action on our part. Any endorsement must be in the 1-1/2 inch area that starts on the top of the back of the check. Do not sign or write anywhere else on the back of the check.

## Restrictions on checks are not binding

We are not obligated to follow restrictions or notations written on a check such as, "void after six months," "void over $50," or "payment in full." You're responsible for any resulting loss or expense we incur.

## Substitute checks

A substitute check is created from an original check; under federal law, it's legally equivalent to the original check and can even be used as proof of payment. A substitute check contains an accurate copy of the front and back of the original and bears the legend: "This is a legal copy of your check. You can use it the same way you would use an original check." Any check may be returned to you in the form of a substitute check. You agree that you won't transfer a substitute check to us, by deposit or otherwise, if we would be the first financial institution to take the substitute check, unless we have expressly agreed in writing to take it.

## Our handling of non-U.S. items

A non-U.S. item is an item:

- Payable in a currency other than U.S. dollars or
- Drawn on a financial institution that isn't organized under U.S. law

We're not required to accept a non-U.S. item for deposit or collection, but we may accept it on a collection basis without your specific instruction to do so. We can reverse any amount we have credited to your account and send the non-U.S. item on a collection basis even if we have taken physical possession of the item.

If we accept a non-U.S. item, the U.S. dollar amount you receive for it will be determined by the applicable exchange rate that is in effect at the time of deposit or our receipt of final payment (less any associated fees) of the non-U.S. item. If the deposited non-U.S. item is returned for any reason, **we'll charge the amount against your account (or any other account you maintain with us)** at the applicable exchange rate in effect at the time of the return. For information on the applicable exchange rate, see "Applicable exchange rate" in the "Additional Terms and Services" section of this Agreement. Our availability of funds policy does not apply to a non-U.S. item.

## Cashed/Deposited items returned unpaid

If an item you deposited or cashed is returned to us unpaid, **we can deduct the amount from any account you have with us**. We can do this when we're notified that the item will be returned and don't need to receive the actual item. We can do this even if the balance in your account isn't sufficient to cover the amount we hold or deduct, causing an overdraft. In addition, we'll charge you all applicable fees and reverse all interest accrued on the item.

**We may place a hold on or charge your account for a deposit if a claim is made or we otherwise have reason to believe the deposited item was altered, forged, unauthorized, missing a signature or has a forged endorsement, or should not have been paid for any other reason.** When the claim is resolved, we'll either release the hold or deduct the amount of the item from your account. We're not responsible if we take, or fail to take, any action to recover payment of a returned deposited item.

## Breach of a warranty associated with an item

If you breach any warranty you make to us under the laws governing your account with respect to any item, you won't be released or discharged from any liability for the breach so long as we notify you of the breach within 120 days after we learn of the breach. If we fail to notify you within this 120 day period, you'll be released from liability and discharged only to the extent our failure to notify you within this time period caused a loss to you.

## Reversal of an electronic payment

If an electronic payment credited to your account, such as a direct deposit, is reversed, **we can deduct the amount from any account you have with us,** at any time, without notifying you. You agree to promptly repay any resulting overdrafts.

## Bank By Mail

To use our Bank By Mail services, you first need to request your deposit kit through Wells Fargo Phone Bank at 1-800-TO-WELLS (1-800-869-3557). We cannot accept cash or foreign checks by mail.

If you need to send deposits before your kit arrives, write on the back of the check "for deposit only, Wells Fargo" and include the account number to which the check should be deposited, and mail to:

Wells Fargo
PO Box 77200
Minneapolis, MN 55480-7720

For accounts located in **Alaska**, send deposits to:

Wells Fargo
PO Box 77040
Minneapolis, MN 55480-7740

## About Early Pay Day

(Consumer accounts only)

For certain direct deposits, we may make those funds available to you up to one to two business days before we receive the funds from the payor, which is typically your employer or its payroll service provider. Our ability to provide early access to these funds may be limited by many factors, such as when we receive notice of payment from your payor. Early Pay Day is not guaranteed, may vary between pay periods, and we may stop providing it at any time without advance notice to you. Early Pay Day funds will be reflected in your account's available balance. It is always your obligation to verify that the funds are available in your account before spending them.

**Deposits Available for Early Pay Day:** Not all direct deposits are eligible for Early Pay Day. Eligible direct deposits are generally limited to electronic direct deposits such as your payroll, pension, and government benefit payments that are made through the Automated Clearing House (ACH) network. Most other deposits or credits to your account, such as deposits of funds from person-to-person payments services (e.g., Zelle®, Venmo, or PayPal transfers), check or mobile deposits, instant payments processed through the RTP® network or FedNow℠ service, and other online transfers are not eligible for Early Pay Day.

**Early Pay Day and Interest on Your Account:** For interest-bearing accounts, interest on your incoming direct deposit will begin accruing on the business day we receive credit for the deposit from your payor's bank. For example, if we make funds available to you through Early Pay Day two days early on Wednesday, interest on those funds will not begin accruing until the day we receive the funds from your payor, in this example on Friday.

**How Early Pay Day Impacts Overdraft and Overdraft Fees:** Early Pay Day funds are reflected in your account's available balance. We use your account's available balance to determine if we will authorize and pay transactions and assess overdraft fees. Your account's ending daily balance will not reflect the funds made available to you through Early Pay Day until the day those funds are received from your payor. For example, Early Pay Day funds are added to your available balance on Wednesday, and you spend those funds while continuing to maintain a positive available balance. We will pay those transactions based on the positive available balance, and you will avoid any overdraft fees or returned items. In this example, the ending daily balance on your account will not reflect the Early Pay Day funds until Friday, when the deposit posts to your account.

**Other Terms and Conditions of Early Pay Day:** If a direct deposit is not made available early, it will be made available in accordance with our Availability of Funds Policy described in this Agreement. Except as expressly set forth herein, funds made available early are subject to the same terms and conditions as other deposits to your account.

If we've made funds available early and the payor reverses or requests a return of the deposit, or the funds are otherwise uncollected by the Bank, you understand and agree that we may debit your account up to the amount of the deposit that was previously made available — even if you have already withdrawn the funds or it creates an overdraft on your account. In this instance, you are responsible for any fees assessed — including those charged by merchants or third parties — as a result of the overdraft.

## Your Deposit Account Balances

Available Balance is our most current record of the amount of money in your account available for your use or withdrawal. Your available balance reflects pending deposits that are immediately available less any pending withdrawals and any funds that have been placed on hold. Your available balance can change throughout the day, for example as you withdraw, spend, or add funds, or we authorize your transactions.

We use available balance to authorize your transactions during the day and pay your transactions during nightly processing. These may appear as "pending" throughout the day as we receive them. Overdraft decisioning and assessment of overdraft fees is also based on available balance.

Ending daily balance/Posted balance reflects all posted deposits and withdrawals from the prior business day's nightly processing. Your ending daily balance is calculated once a day during nightly processing (posting) and is the starting point for your available balance the following day. We use ending daily balance to determine Monthly Service Fee waivers and your statements, where applicable, show ending daily balance.

Your account's available balance and your account's ending daily balance may sometimes be different as available balance changes with transactions presented on your account and ending daily balance updates during nightly processing.

# Availability of Funds Policy

## Your ability to withdraw funds

Our policy is to make funds from your check deposits to your checking or savings account (in this policy, each account) available to you on the first business day after the day we receive your deposits. Incoming wire transfers, electronic direct deposits, cash deposited at a teller window and at a Wells Fargo ATM, and the first $400 of a day's check deposits at a teller window, at a Wells Fargo ATM, and with the Wells Fargo Mobile Banking app will be available on the day we receive the deposits. Certain electronic credit transfers, such as those through card networks or funds transfer systems, will generally be available on the day we receive the funds transfer. Once they are available, you can withdraw the funds in cash and we will use the funds to pay checks and other items presented for payment and applicable fees that you have incurred.

**Analyzed business accounts only:** The first $400 of a business day's check deposits to an analyzed account are not available to you on the day we receive the deposits. Check deposits to an analyzed account are generally available on the first business day after we receive your deposits.

## Determining the day your deposit is received by the Bank

**For determining the day your deposit is received by the Bank**, every day is a business day, except Saturday, Sunday, and federal holidays. If you make a deposit before our established cutoff time on a business day that we are open, we will consider that day to be the day your deposit is received by the Bank. However, if you make a deposit after our cutoff time or on a day we are not open, we will consider the day your deposit is received by the Bank to be the next business day we are open.

Our deposit cutoff times are as follows:

| Type of Deposit | Cutoff time |
|---|---|
| In branch | when the branch closes for business; varies by location |
| At Wells Fargo ATMs | 9 p.m. local time (Alaska 8 p.m.) |
| Checks deposited with the Wells Fargo Mobile app | 9 p.m. Pacific Time |
| Electronic credits (such as direct deposits) | 8 p.m. Pacific Time |
| Original Credit Transactions (OCT) | 6 p.m. Pacific Time |

## Longer delays may apply

In some cases, we will not make the first $400 of a business day's check deposits available to you on the day we receive the deposits. Further, in some cases, we will not make all the funds that you deposit by check available to you on the first business day after the day of your deposit.

Depending on the type of check that you deposit, funds may not be available until the second business day after the day of your deposit. The first $275 of your deposit, however, may be available on the first business day after the day of your deposit.

Except as otherwise explained in this paragraph, if we are not going to make all funds from your deposit available on the business day of deposit or the first business day after the day of deposit, we will notify you at the time you make your deposit. We will also tell you when the funds will be available. If your deposit is not made directly to a Wells Fargo employee, or if we decide to take this action after you have left the premises, we will mail you the notice by the first business day after we receive your deposit.

If you need the funds from a deposit right away, you should ask us when the funds will be available.

In addition, funds you deposit by check may be delayed for a longer period under the following circumstances:

- We believe a check you deposit will not be paid
- You deposit checks totaling more than $6,725 on any one day
- You redeposit a check that has been returned unpaid
- You have overdrawn your account repeatedly in the last six months
- There is an emergency, such as failure of computer or communications equipment

We will notify you if we delay your ability to withdraw funds for any of these reasons, and we will tell you when the funds will be available. The funds will generally be available no later than the seventh business day after the day of your deposit.

## Special rules for new accounts

**If you are a new customer, the following special rules apply during the first 30 days your account is open.** Incoming wire transfers, electronic direct deposits, and cash deposited at a teller window and at a Wells Fargo ATM will be available on the day we receive the deposit. Funds from your check deposits will be available on the business day after the day we receive the deposits; no funds from a business day's check deposits are available on the day we receive the deposits.

If we delay the availability of your deposit the following special rules may apply:

- **The first $6,725** of a day's total deposits of cashier's, certified, teller's, traveler's, and federal, state, and local government checks, and U.S. Postal Service money orders made payable to you will be available on the first business day after the day of your deposit, if your deposit meets certain conditions. For example, the checks must be payable to you. If your deposit of these checks (other than U.S. Treasury checks) is not made in person to one of our employees, the first $6,725 may not be available until the second business day after the day of your deposit.
- **The excess over $6,725** and funds from all other check deposits will be available no later than the seventh business day after the day of your deposit. The first $275 of a day's total deposit of funds from all other check deposits, however, may be available on the first business day after the day of your deposit.

We will notify you if we delay your ability to withdraw funds and we will tell you when the funds will be available.

## Holds on other funds

**If we cash a check for you that is drawn on another bank**, we may withhold the availability of a corresponding amount of funds that are already in your account. Those funds will be available at the time funds from the check we cash would have been available if you had deposited it.

**If we accept a check for deposit that is drawn on another bank**, we may make funds from the deposit available for withdrawal immediately but delay your ability to withdraw a corresponding amount of funds that you have on deposit in another account with us. The funds in the other account would then not be available until the time periods that are described in this policy.

# Available Balance, Posting Transactions, and Overdraft

## Available balance

Your account's available balance is our most current record of the amount of money in your account available for your use or withdrawal. We use the available balance to authorize your transactions during the day (for example, debit card purchases and ATM withdrawals). We also use the available balance to pay your transactions during our nightly processing. **Your available balance is calculated as follows:**

| | |
|---|---|
| **Ending Daily Balance** | Ending daily balance from prior business day's nightly processing |
| **− Holds** | Subtract funds that have been placed on hold |
| **+ Deposits** | Add pending deposits that are immediately available (see "Availability of Funds Policy" in previous section) |
| **− Withdrawals** | Subtract pending withdrawals that we have either authorized or we know about but have not yet processed |
| **= Available Balance** | |

**The available balance may not include every transaction you have initiated or that we previously authorized.** For example, your available balance may not include the following:

- Outstanding checks and authorized withdrawals we have not received for payment (such as recurring debit card transactions and ACH transactions);
- The final amount of a debit card purchase. For example, we may authorize a purchase amount prior to a tip that you add;
- Debit card transactions that have been previously authorized but not sent to us for payment. In most cases, a transaction authorization hold will be released after three business days even though the transaction may be sent to us for payment from your account at a later date, which we must honor. For some types of purchases, we may place a hold for a longer period, which may be up to 30 business days for certain transactions, including car rental, hotel, cash disbursements, and international transactions.

## How we process and post transactions to your account

We process transactions each business day (not Saturdays, Sundays, or federal holidays) during a late night process that includes **three key steps**. We call this nightly processing. Once the transactions are processed, the results are posted to your account.

Step 1: **We calculate the available balance in your account that can be used to pay your transactions as described above.**

**Certain pending transactions can impact your available balance for purposes of determining whether we will pay other transactions during our nightly processing, including**:

- Cash deposits or transfers from another Wells Fargo account made AFTER the applicable cutoff time will be added to your available balance only if they are made before we start our nightly processing; and
- Pending withdrawals that reduce your available balance, such as debit card transactions we have authorized.

Step 2: **We sort your transactions into categories.**

+ **We credit deposits** received before the cutoff time.

− **We subtract withdrawals and payments we have previously authorized that we cannot return unpaid** such as debit card purchases, ATM withdrawals, account transfers, Bill Pay transactions, and teller-cashed checks. Transactions are generally sorted by date and time the transaction was conducted or, for some transactions, the day we receive it for payment, or the time assigned by our system. If date and time are the same, we post from lowest to highest dollar amount.

− **We pay your checks and preauthorized ACH payments**, such as electronic payments you have authorized a company to withdraw using your account and routing number. Transactions are generally sorted by date and time received by the Bank, and if date and time are the same, we post from lowest to highest dollar amount. Merchant-issued payment card transactions (e.g., an ACH payment associated with a purchase you made using a store-issued debit card) post after all other transactions in this category.

**Determining Date and Time**

- Cutoff time is based on the location where the deposit or transfer was made.
- For debit card transactions, if we do not have date and time information, we use the day we receive it for payment from the merchant.
- For some transactions, such as Bill Pay or teller-cashed checks, a different time may be assigned by our systems.

Step 3: If the available balance is **not enough to pay all of your transactions,** we:

- **Use Overdraft Protection** (if you have it) by transferring and/or advancing available funds from a linked savings and/or credit account.
- **Then, decide whether to pay your transactions presented to us for payment into overdraft, or return them unpaid**. Paying an item into overdraft means that we pay an item even though your available balance is not sufficient to cover that item, resulting in your account having a negative balance. Returning an item unpaid means that we do not pay your transaction. At our discretion, we may pay a check, other transactions using your account and routing number, or automatic bill payment into overdraft, rather than return it unpaid. This is our **standard overdraft coverage (see more information below)**. Debit card transactions presented to us for payment (whether previously authorized by us or not) **will be paid into overdraft and won't be returned unpaid**, even if you don't have sufficient funds available in your account.
    - For business accounts, any applicable overdraft fees are deducted from your account on the morning of the next business day.
    - For consumer accounts, overdraft fees for items paid into overdraft are subject to our Extra Day Grace Period (described below) and, if applicable, deducted from your account at the end of the next business day's nightly processing.

**Pending transactions can result in overdrafts.** If your available balance during the nightly processing is insufficient, the Bank may assess overdraft fees on transactions we pay into overdraft. Even if a pending transaction has been dropped from your account, we must pay it when we receive it for payment. Sometimes, previously authorized transactions may be paid into overdraft if other transactions have reduced your available balance before the pending transactions are sent to us for payment. In those cases, you may be charged an overdraft fee if the transaction is paid into overdraft.

**To minimize the number of overdraft fees you may be assessed**, we track transactions that reduced your available balance while pending and caused overdraft fees on other transactions. If the pending transactions are then presented for payment within 10 business days after they first appeared as pending, **we'll waive any overdraft fees on those transactions**. In rare circumstances, the merchant presents transactions for payment with a different identification code than was used when originally sent for authorization and we're unable to match them. In those cases, you may be charged an overdraft fee if the transaction is paid into overdraft.

**Sometimes, items that were previously returned unpaid may be re-presented to us for payment by the merchant.** If a re-presented item is paid into overdraft, we may assess an overdraft fee on that item.

## Standard overdraft coverage

The bank typically does not pay overdrafts if your account is overdrawn or you have had excessive overdrafts.

Except for Clear Access Banking, all checking accounts come with **standard overdraft coverage**. Under standard overdraft coverage:

- We **<u>may</u>** authorize and pay checks, other transactions using your account number, and automatic bill payments (such as recurring debit card and ACH transactions) into overdraft and charge an overdraft fee.
- We **<u>will not</u>** authorize ATM and everyday (one-time) debit card transactions into overdraft, unless your account is enrolled in Debit Card Overdraft Service as described below.

When you don't have a sufficient available balance in your account (or in accounts linked for Overdraft Protection as described below), the decision to authorize or pay a transaction into overdraft is made at our sole discretion, and we reserve the right to decline or return a transaction that would result in an overdraft. We reserve this discretion regardless of whether we've previously honored or dishonored overdrafts.

We base our decision to authorize or pay a transaction into overdraft on criteria that includes, but is not limited to, your account history, deposits you make, and transaction characteristics.

Standard Overdraft Coverage is a discretionary service that may be removed by the bank for a variety of reasons, including excessive overdrafts or returned items.

When you make or schedule payments to a merchant (including payments made through another service provider, such as a digital wallet or other payment platform), **it is important for you to understand your rights and responsibilities under any applicable agreement you may have with the merchant or service provider** — including the methods in which they process transactions and what occurs if the Bank declines your transaction or returns it unpaid. The Bank does not assess fees for declined or returned transactions, but the merchant or service provider may assess fees or other penalties. Even if a merchant or service provider has approved or processed your transaction, you should not assume that the transaction will be authorized or paid by us when we become aware of the transaction and you do not have sufficient available funds in your bank account.

**You can remove standard overdraft coverage from your account at any time.** If Standard Overdraft Coverage is removed, the following will happen if you don't have enough available money in your checking account or in accounts linked for Overdraft Protection to cover a transaction when it is presented to us for authorization or payment:

- We **will** return your checks and other returnable items, such as ACH payments, as unpaid.
- We **will not** authorize certain transactions such as checks cashed at Wells Fargo, recurring debit card transactions, or Bill Pay transactions into overdraft.
- We **will not** authorize ATM and everyday (one-time) debit card transactions (such as one-time debit card and ATM card purchases) into overdraft. If your account is enrolled in Debit Card Overdraft Service, the service will also be removed.

With or without Standard overdraft coverage, certain transactions (such as checks cashed at Wells Fargo) may be paid into overdraft during our nightly processing and charged an overdraft fee even if they were authorized when your account had a sufficient available balance.

You understand that the classification of a debit card transaction (except ATM transactions) as recurring or non-recurring (i.e., one-time) is determined by merchants, other institutions, or other third parties before the transaction is presented to us for authorization or payment. We will treat and process such debit card transactions in the manner they are presented to us, which may result in a one-time debit card transaction presented as recurring preauthorized transactions and vice versa. This third-party classification is outside of our control and could impact whether a transaction is paid into overdraft, depending on the transaction and your overdraft services selections.

**Important:** Standard overdraft coverage, including applicable overdraft fees, does not apply to Clear Access Banking accounts. For more information about Clear Access Banking, refer to your Consumer Schedule.

## Debit Card Overdraft Service

**If you choose to enroll in Debit Card Overdraft Service,** the transaction may be authorized into overdraft at the Bank's discretion **and an overdraft fee may apply** when it is presented to us for payment. For more information about our discretion to authorize or pay a transaction into overdraft, review the "Standard overdraft coverage" section above.

**How to Enroll and Unenroll:** Choose how you want Wells Fargo to handle everyday (one-time) debit card transactions (such as grocery store or restaurant transactions) when your available balance isn't sufficient to cover the transaction.

**Consumer Accounts:** Consumer account customers may choose to enroll in Debit Card Overdraft Services by following the steps below.

**Business Accounts:** Business accounts are automatically enrolled in Debit Card Overdraft Services. To unenroll follow the steps below.

- **If you choose not to enroll in Debit Card Overdraft Service**, the transaction will be declined and no fees apply.

You can add or remove the Debit Card Overdraft Service on eligible accounts at any time. It's important to understand that this service is unique from other optional services that may be less costly for you, such as Overdraft Protection described in the next section.

**How to Change Enrollment Status:**
Customers may choose to enroll or unenroll from Debit Card Overdraft Service anytime by calling us at 1-800-TO-WELLS (1-800-869-3557), signing on to Wells Fargo Online® Banking from a computer or tablet (search Overdraft Services), visiting a Wells Fargo ATM (select More Choices), or speaking to a banker at any Wells Fargo branch. Schedule a branch appointment at wellsfargo.com/locator.

Debit Card Overdraft Service **does not apply** to checks, other transactions using your account and routing number, and transactions you've established as recurring transactions (for example, ACH payments or recurring debit card transactions such as utilities, health club memberships, and subscription services). With or without Debit Card Overdraft Service, the Bank may continue to pay these other transaction types into overdraft, at our discretion, and our standard overdraft fees and policies will apply.

Debit Card Overdraft Service **isn't available for certain accounts**, such as Clear Access Banking accounts, IOLTA/RETA accounts, accounts for government entities, or savings accounts. Debit Card Overdraft Service is a discretionary service that may be removed by the Bank for a variety of reasons including excessive overdrafts or returned items.

## Overdraft Protection

This is an optional service you can add to your checking account by **linking up to two eligible Wells Fargo accounts (one savings, one credit) to authorize or pay your transactions if you don't have enough available money in your checking account**. Overdraft Protection transfers/advances may occur to cover pending transactions, even if these transactions are not subsequently presented for payment. When an Overdraft Protection transfer occurs from a linked savings account to cover the authorization or payment of a transaction, the available balance in that savings account will be reduced by the amount of money to be transferred. That amount of money will be unavailable for other use, and it will be applied to the checking account during nightly processing. If you link two accounts, you may tell us which account to use first to transfer/advance funds. If you don't specify an order, we'll first transfer funds from your linked savings account. If an account you've linked for Overdraft Protection is restricted by court order or any other reason, we may delink that account as a source for Overdraft Protection. If the restriction is subsequently removed, the prior linkage is not generally reapplied unless you request to re-establish the linkage.

Overdraft Protection isn't available for all accounts. Refer to the Consumer Schedule or the Business Schedule for account eligibility and additional details.

## Extra Day Grace Period

(Consumer accounts only)

With Extra Day Grace Period, if your account is overdrawn, you have an additional business day (extra day) to make covering deposits and/or transfers to avoid overdraft fees. If your available balance as of **11:59 p.m. Eastern Time** on your extra day is positive, the pending overdraft fees for the prior business day's overdraft items will be waived. If your available balance as of 11:59 p.m. Eastern Time is enough to cover some, but not all, of the prior business day's overdraft items, the available balance will be applied to the transactions in the order they posted to your account (based on our posting order practices described in this Agreement). Any overdraft items that are not fully covered by 11:59 p.m. Eastern Time on your extra day are subject to applicable overdraft fees. Note: deposits and transfers received by 9 a.m. local time on your extra day (based on where your account is located, as noted on your account statement) may also result in us reversing the prior business day's returned item decisions and paying the transaction(s).

Keep in mind that your available balance includes your deposits and transfers, less any pending withdrawals and debits. Deposits and transfers of funds are also subject to the Bank's Availability of Funds policy described in this Agreement, including any applicable deposit holds or cutoff times that may impact your available balance. If you're enrolled in Online Banking we will generally alert you on the morning of your extra day to any overdraft items that must be covered to avoid pending overdraft fees, so long as you have not opted out of receiving such alerts. Alerts are sent as a courtesy and may be delayed or prevented by factors affecting your internet/phone provider or other circumstances beyond the control of the Bank. The Bank has no liability arising from non-delivery, delayed delivery, or erroneous delivery of any alert. It is important for you to keep and rely on a personal record of your transactions to know when your account is overdrawn for purposes of making covering deposits or transfers during your extra day.

**Note on Extra Day Grace Period and Overdraft Protection:** If you have an account linked for Overdraft Protection and a transfer or advance of funds from the linked account covers your transactions for that business day, Extra Day Grace Period will not apply because there are no pending overdraft fees to avoid. However, if a transfer or advance of funds from a linked Overdraft Protection account is not sufficient to cover all of your transactions, Extra Day Grace Period will apply to any transaction that is paid into overdraft and that has a pending overdraft fee. Extra Day Grace Period does not reverse the transfer or advance of funds from your linked account and advances from linked credit accounts may accrue interest from the date of the advance in accordance with the terms of your applicable credit agreement.

## Returning your account to a positive balance

**If your account has an overdraft, you must promptly add money to return your account to a positive balance.** If you don't return your account to a positive balance or you have too many overdrafts, we may close your account. We will generally close and charge off an overdrawn account 60 days after it first became overdrawn, but reserve the right to close it at an earlier date, as permitted by law. In this event, it is important that you make arrangements to redirect recurring deposits and payments to another account. Also, we may report you to consumer reporting agencies and initiate collection efforts. You agree to reimburse us for the costs and expenses (including attorneys' fees and expenses) we incur to do so.

When funds are deposited or credited into an account with an overdraft, you authorize us to apply those funds to the overdraft and related fee(s) in the account. This applies and extends to the deposit of any federal or state benefit payments, including Social Security benefits. You understand and agree that if you don't want your benefits applied in this way, you can change your direct deposit instructions at any time with the person or organization paying the benefits. For information about our rights to apply funds from other accounts you hold with us to pay an overdraft and related fee(s), see the section of this Agreement titled Setoff and Security Interest.

# Debit Cards and ATM Cards

When you get a debit or ATM card from us, you'll receive, and be required to agree to, additional terms and conditions applicable to the card. In the event of a conflict between the terms and conditions and this Agreement, the terms and conditions will control. Additional disclosures applicable to these services are provided in the Consumer Schedule or Business Schedule, as applicable. When you use your debit or ATM card, you authorize us to act on your instructions that we receive through any ATM, merchant or network in which we participate.

## Issuance of a card and Personal Identification Number (PIN)

We may issue a card to each account owner to access your accounts. If you don't select a PIN when you request your card, we'll send a randomly selected PIN. If you don't request a card but would like a PIN for authentication purposes, we can provide a PIN for that purpose (a "cardless PIN"). A cardless PIN cannot be used for purchases or ATM access (see "Telephone banking services" section for more details).

You should securely protect your card and PIN from loss or theft. Each cardholder must have his or her own unique PIN and is responsible for keeping the PIN confidential. If the card or PIN is given to another person, the account owner will, to the extent allowed by applicable law, be responsible for all transactions made by that person or anyone else to whom that person gives the card or PIN.

## Using a card to access linked asset accounts

Non-Wells Fargo ATM operators may not support display of all linked accounts, and may not support all functions.

Linking lets you add asset accounts you own (for example, checking and savings) to a debit or ATM card, giving you the ability to perform transactions on multiple accounts with one card at Wells Fargo ATMs. The money for purchases and payments made with your card is deducted from the primary linked account. Using a card at a participating non-Wells Fargo ATM for cash withdrawals, balance inquiries, and funds transfers is generally available for the primary linked checking and savings accounts. We can restrict the number and type of asset accounts you can link to your card, as well as the frequency and availability of such linking.

Some Wells Fargo ATMs in branches can operate in "Assisted-Service mode" during branch hours. When in Assisted-Service mode, the ATM screen's main menu will display an "I need assistance" option. When using a Wells Fargo ATM in Assisted-Service mode, you may be able to use your consumer card to access and perform transactions on your consumer accounts that are not linked to your card.

If you link more than one asset account to the card, you may designate a primary linked account. If you don't designate a primary linked account, the first account linked to your card is considered the primary linked account. The primary linked account for a consumer debit card must be an eligible consumer checking account. The primary linked account for a business debit card must be an eligible business checking account.

If a primary linked account is closed or delinked for any reason, we'll generally designate a linked secondary account of the same account type, if you have one, as the new primary account. If you have a debit card and none of your other linked accounts are checking accounts, or you have no other linked accounts, your debit card will be closed and you can request an ATM card. You may link a new primary account of a different type (consumer, business, individual brokerage, or commercial brokerage) than the previous primary linked account, subject to our right to restrict changes to the primary account linked to your card. Depending on the new primary linked account, you may be issued a new card type.

When you use your card to access any asset account, the agreements and disclosures applicable to that asset account will apply to that card transaction. Additionally, the consumer protections described in the "Electronic Fund Transfer Services" section of this Agreement don't apply to transactions on business or commercial brokerage accounts.

## Using a card to access linked credit card and line of credit accounts at ATMs

If you link your Wells Fargo credit card account or eligible line of credit account (linked credit account) to your debit or ATM card, you may use the card to access the linked credit account at any Wells Fargo ATM. You can use the card to obtain cash or transfer funds from the linked credit account, as long as the linked credit account is in good standing and has available credit. Cash withdrawals and transfers of funds from your linked credit account are treated as cash advances. Each of these transactions is subject to the applicable credit card account agreement or line of credit account agreement, including daily limits and cash advance fees.

## Using your card

There are many ways to use your debit and ATM cards[1] — using the physical cards or via mobile devices. See the following descriptions.

**You can use your debit and ATM cards:**

- At merchants who accept payments through a network in which we participate
- To request cash back when making a physical card purchase with your PIN at merchants who offer this service

**In addition, with your debit card, you can also:**

- Pay for purchases, or pay bills directly with your card, or through a mobile device at participating merchants (see "Using your card through a mobile device" for more details)

**At any ATM with your debit or ATM card you can:**

- Withdraw cash, view account balances, and transfer funds between your accounts (fees may apply on any of these actions at a non-Wells Fargo ATM[2])

**At most Wells Fargo ATMs[3] you can:**

- Make deposits to your account (up to any deposit limits that may apply)[4]
- Transfer funds from your eligible Wells Fargo credit accounts to your checking or savings accounts[5]
- Make payments to your eligible Wells Fargo credit accounts
- Get a statement[6] of your account balances or the last 10 transactions
- Use your debit card through your mobile device to perform the ATM transactions listed above

**In addition, with your debit card but not your ATM card, you can:** Send and receive electronic credit transfers, such as those through card networks or funds transfer systems[7]

1. Purchases using an ATM card are only available at merchants who accept payments through networks in which we participate and require a PIN to authorize the purchase. A PIN is not required for debit card transactions that can be processed without a PIN.
2. Non-Wells Fargo ATMs are ATMs that are not owned or operated by Wells Fargo or are not prominently branded with the Wells Fargo name and logo. You can use your card at non-Wells Fargo ATMs that display the Plus® logo to withdraw cash, check balances, and transfer funds between the accounts linked to your card as primary checking and primary savings. Note: Some transactions may not be available at all ATMs, may be different from those available at Wells Fargo ATMs, or may be limited to any withdrawal limit(s) set by the non-Wells Fargo ATM.
3. While most Wells Fargo ATMs offer these additional features and services, some Wells Fargo ATMs are limited to cash withdrawals, balance inquiries, and fund transfers between accounts linked to your card as primary checking and primary savings. The features and services offered at a particular Wells Fargo ATM will be displayed on the ATM screen.
4. A business deposit card can be issued to an authorized signer on business accounts. It can also be issued to a non-authorized signer at the request of an authorized signer. At Wells Fargo ATMs, a business deposit card and associated PIN can only be used to make ATM deposits, and can only be linked to deposit accounts. When the card is used to make an ATM deposit, account balances are neither displayed on the ATM screen nor printed on the ATM receipt. The card PIN cannot be used for authentication for phone or online access.
5. Cash advance and ATM advance fees may apply. Refer to the applicable credit card account agreement or line of credit account agreement for more details.
6. Statements at Wells Fargo ATMs should not be used in place of the account statement for balancing or verifying the actual account balance.
7. If your debit card or debit card number is used to send and receive a credit transfer, the frequency and dollar amount of those transfers may be limited by the applicable card network.

## Using a digital version of your debit card

You can use the digital version of your debit card, if eligible, for card-not-present transactions like online and in-app purchases, or for payments over the phone. You will not be able to use the digital version of your debit card for in-store purchases or to access ATMs, unless you add the digital version of your debit card to a Mobile Device (see "Using your card through a mobile device" for more details). Note that the PIN for a digital version of your debit card will be the same as the PIN for your physical debit card.

## ATM and merchant terminal malfunctions

Generally, we're not responsible for damages resulting from an ATM or merchant terminal malfunction. However, for applicable accounts, see "In case of errors or questions about your electronic fund transfers" in the "Electronic Fund Transfer Services" section of this Agreement.

## Fees for use of card

Other applicable fees for use of your card, and details about certain fee waivers and reimbursements, are described in the Consumer Schedule and Business Schedule.

We may charge you a fee for making a transaction at a non-Wells Fargo ATM, including withdrawing cash. In addition, the non-Wells Fargo ATM operator or network may charge you a fee, which is included in the total amount withdrawn from your account and applies to your card's daily ATM withdrawal limit. We may waive our fee and/or reimburse the non-Wells Fargo ATM operator's fee, in whole or in part, if allowed by the terms of your account.

We'll charge a fee if you make a teller-assisted cash disbursement at a non-Wells Fargo bank that accepts Visa-branded cards. You may also be charged a fee by other banks and financial institutions for cash disbursements at their branches. That fee may be added to your total disbursement and will apply to your card's daily ATM withdrawal limit. Some merchants may assess a fee when you use your card for a purchase or for cash back. The merchant fee will be included in the total purchase amount and will apply to your card's daily purchase limit.

## Daily limits

Unless otherwise specified, a "day" is defined as the 24-hour period from midnight to midnight, Pacific Time. Transactions made in other time zones will be based on when received in Pacific Time. You may use your card subject to your daily purchase limit, daily ATM withdrawal limit, and the available balance in your account. The following rules apply:

**Limits on dollar amounts:** Your card's daily purchase limit is the maximum U.S. dollar amount of purchases (including cash back, if any) that can be authorized each day from your primary linked account, less merchant fees, if any. Note: If you use your card or card number to fund a digital wallet, brokerage, or other type of account, these Account Funding Transactions (AFTs) will count against your card's daily purchase limit. AFTs may also be limited by the applicable card network. If your daily purchase limit is more than $99,999, you may ask that the merchant process multiple transactions to complete a purchase above this amount.

Your card's daily ATM withdrawal limit is the maximum amount of cash you can withdraw each day from any combination of accessible accounts using your card, less any fees charged by the non-Wells Fargo ATM operator or third party, if applicable. When you use a Wells Fargo ATM in Assisted-Service mode, your card's daily ATM withdrawal limit may not apply.

You can confirm your card's daily limits through online banking, our mobile app, or by calling us.

**Limits for your card:** We provide you your daily ATM withdrawal and purchase limits when you receive your card or a digital version of your card. **Note:** For security reasons there may be additional limits on the amount, number, or type of transactions you can make using your card, including the geographic location of the ATM or merchant.

There's generally no limit on the number of times the card may be used each day as long as the applicable daily ATM withdrawal limit and daily purchase limit are not exceeded, and there's a sufficient available balance in accounts you access for the transactions. If an ATM transaction or purchase would create an overdraft on the account, we may, in our sole discretion, take any of the actions described in the "Available Balance, Posting Transactions, and Overdraft" section of this Agreement.

When we approve a transaction or purchase, we call that an authorization.

We may limit the number of authorizations we allow during a period of time or refuse to authorize a transaction when your card has been reported lost or stolen or when we notice out-of-pattern use of your card or suspect fraudulent, suspicious, or unlawful activity. For security reasons, we cannot explain the details of the authorization system. If you turn your card off, we will not authorize new everyday (one-time) card transactions, including those made through a mobile device and ATM withdrawals, but card transactions presented as recurring payments may still be authorized. If we don't authorize the transaction, we may notify the person who attempted the transaction that it has been refused. We will not be responsible for failing to give an authorization under these circumstances. In our discretion, we may allow or deny transactions or authorizations from merchants who are apparently engaged in or who are identified as engaged in the internet gambling business.

**Changes to your card limits:** We may, without telling you, increase your daily purchase or ATM withdrawal limit based on account history, activity, and other factors. If we decrease the limits of your card, we'll notify you in accordance with applicable law.

## Using your card through a mobile device

A mobile device means a smartphone, tablet, computer or any hand-held or wearable communication device and any third-party application within a device that allows you to electronically store or electronically present your debit card or debit card number, which is replaced with a unique "digital card number," to make debit card transactions.

When you use your debit card with your mobile device for transactions:

- Availability may be affected by your mobile carrier's coverage area, and your mobile carrier may charge you message and data rates, or other fees.
- Your debit card information is sent across wireless and computer networks.
- Information about your mobile device may be transmitted to us.
- You should secure the mobile device the same as you would cash, credit cards, and other valuable information. Password protect and lock it to help prevent unauthorized transactions and notify us promptly if it's lost or stolen.
- When you make a purchase or payment using your mobile device, the merchant won't provide an option for cash back.
- A physical card may be required for access to Wells Fargo ATMs within secure locations.
- You can access Wells Fargo ATMs and participating non-Wells Fargo ATMs by holding your mobile device close to the Contactless Symbol displayed on the ATM.
- When you access an ATM with your mobile device and card PIN, you can perform only one monetary transaction per visit, such as a cash withdrawal or funds transfer.
- If you're accessing a Wells Fargo ATM in Assisted-Service mode using your mobile device, your card's daily ATM withdrawal limit will apply and you won't be able to access accounts that are not linked to your card.
- We may automatically provide third-party digital wallet operators with updated digital card number information, such as when your card is replaced or reissued.
- In certain circumstances (such as when you set up recurring payments to a subscription service), another unique identifier may be generated from your digital card number to be used for card transactions.

Third parties, such as merchants, card association networks, mobile carriers, digital wallet operators, mobile device manufacturers, and software application providers may 1) use and receive your digital card number, and information about your card transactions as necessary to effect, administer, or enforce the card transaction, and 2) receive information about your mobile device. The third-party digital wallet operator may use this information to display it to you or for its own purposes according to the terms, conditions, and other agreements that the digital wallet operator may require you to accept. Please refer to the third-party digital wallet operator's privacy policy and terms and conditions for more detail about how the digital wallet operator

will use and retain your information, as well as to review any fees that the third-party digital wallet operator may charge. We are not responsible for a third party's privacy practices or level of security. If a third-party digital wallet operator displays a history of card transactions made through your mobile device, you understand that the third-party transaction history does not reflect complete information about your card transactions.

We may, at any time, partially or fully restrict your ability to make debit card transactions through a mobile device. We may also modify or terminate a debit card's eligibility to be added to a mobile device, as well as our participation with any third-party digital wallet operator. If you want to remove your digital card number from your mobile device, contact us using the information listed in the "Questions? We're here for you" section at the beginning of this Agreement.

## Card on file with merchants

If you give your debit card number to a merchant with authorization to bill that card for recurring payments, or to keep it on file for future purchases or payments, the merchant may receive updated card information to process such payments. However, since not all merchants receive updated card information, we recommend you notify each merchant of your new debit card number and/or expiration date to ensure your payments continue uninterrupted. If you have a card on file with a merchant and want to cancel the payment arrangement, be sure to cancel it directly with the merchant.

## Authorization holds for card transactions

For all card purchase transactions, we may place a temporary hold on some or all of the funds in the account linked to your card when we obtain an authorization request. **We refer to this temporary hold as an authorization hold. The funds subject to the hold will be subtracted from your available balance.** We generally release the hold within three business days from the time of authorization or until the transaction is paid from your account. Note, however that the hold can be longer for certain types of transactions, including up to 30 business days for car rental, hotel, cash disbursements, and international debit card transactions.

If the merchant does not submit the transaction for payment within the time allowed, we'll release the authorization hold. This means your available balance will increase until the transaction is submitted for payment by the merchant and posted to your account. If this happens, we must honor the prior authorization and will pay the transaction from your account. In some situations, the amount of the hold may differ from the actual transaction amount since the merchant may not know the total amount you'll spend. For example: A restaurant submits the authorization request for your meal before you add a tip.

**You might end up overdrawing your account even though the available balance appears to show there are sufficient funds to cover your transaction.** For example: A merchant does not submit a one-time debit card transaction for payment within three business days of authorization (or up to 30 business days); we must release the authorization hold even though we'll have to honor the transaction. When we receive it for payment, it's paid from the funds in the account and at that time it causes an overdraft.

You should record and track all of your transactions closely to confirm your available balance accurately reflects how you spend funds from the account linked to your card.

## Partial authorization for card transactions

If a debit card or ATM card purchase amount exceeds the current available balance in the primary linked account when you're making a purchase, you may be able to use your available balance to pay for a portion of the total purchase. The transaction will be subject to a partial authorization daily purchase limit set by the Bank and your card's daily purchase limit.

We'll first try to approve the full amount of the purchase with the available funds in your checking account, account(s) linked for Overdraft Protection, and, if enrolled, using Debit Card Overdraft Service. If we don't approve the full amount of the purchase, we may approve a portion of the purchase using the remaining available funds in your checking account. This is called a partial authorization. The remaining amount of the purchase total would need to be covered by another form of payment, such as cash or another card. If you're unable/unwilling to provide an additional form of payment, and the transaction does not occur, the partial authorization will be reversed by the merchant. Not all merchants are able to accept partial authorizations or process transactions using multiple forms of payment.

## Transactions outside the United States

If a card is used to make an ATM withdrawal or a purchase outside the United States, the network handling the transaction will convert the local currency amount of the transaction to U.S. dollars (or, in the case of a purchase only, the merchant handling the transaction may convert the currency). If the network converts the currency, it will use either a rate selected by the network from the range of rates available in wholesale currency markets for the applicable central processing date, which rate may vary from the rate the network itself receives, or the government-mandated rate in effect for the applicable central processing date. If the merchant handling the purchase converts the currency, the merchant will determine the currency conversion rate. For each purchase transaction completed outside the United States, we may also charge an international purchase transaction fee, which we base on the amount provided to us by the network (for example, Visa, MasterCard) in U.S. dollars.

## Ending your card use

Your card is our property.

We may cancel or suspend your card or card banking access at any time without notice to you (for example, if you fail to activate your card). We may decide not to issue a card to you or replace your card (for example, if the card has not been used for a prolonged period of time). You may cancel your card or card banking access at any time by calling the number on the back of your card. If the card is canceled, you must pay for any card transactions made before the card is canceled, and you will immediately destroy the card after it is canceled.

## Zero Liability protection

With Zero Liability protection, you'll have no liability for card transactions that you did not make or authorize, subject to certain conditions and so long as those transactions occurred before the end of the 60-day period described hereafter.

If your account statement shows card transactions that you did not make or authorize, tell us at once. If you don't notify us within 60 days after the statement was mailed or was otherwise made available to you, you'll be liable for any additional unauthorized card transactions that occurred after the 60-day period and before you provided notice to us (if we could have stopped those card transactions had you promptly notified us). This will apply even to unauthorized card transactions that occur shortly before you notify us. If a good reason (such as a long trip or hospital stay) kept you from telling us, we'll extend the time period.

Zero Liability protection does not apply if we determine, based on substantial evidence, that you were fraudulent or negligent in the handling of your card or account, or if your card transaction does not meet Regulation E's definition of an "unauthorized electronic fund transfer" (refer to the "Electronic Fund Transfer Services" section of this Agreement). Moreover, if you do not notify us about an unauthorized card transaction within 60 days from the time your statement was made available to you, Zero Liability protection does not apply; note, however, that this does not impact your rights under Regulation E if there is an unauthorized electronic fund transfer from your consumer account.

**For card transactions from consumer accounts:** Your card comes with Wells Fargo's Zero Liability protection, which provides you with more liability protection than what Regulation E requires for cards accessing consumer accounts (see "Liability for unauthorized electronic fund transfers according to Regulation E" in the "Electronic Fund Transfer Services" section of this Agreement).

**For card transactions from business accounts:** Your card comes with Wells Fargo's Zero Liability protection, but Regulation E does not apply.

# Fund Transfer Disclosures — General

The following provisions are in addition to, and not in place of, any other agreements you have with us regarding funds transfers to and from your account. The terms "funds transfer," "funds transfer system," "payment order," and "beneficiary" are used here as defined in Article 4A of the Uniform Commercial Code — Funds Transfers, as adopted by the state whose laws govern your account. As used in these provisions, a funds transfer does not include a transaction made using a Wells Fargo issued card. Examples of funds transfers covered by these provisions are ACH transactions, remittance transfers, and wire transfers (whether outgoing or incoming, foreign or domestic). Some consumer transfers referenced in this section may also be electronic fund transfers subject to Regulation E Subpart A as described below. If the transfer is governed by Reg E Subpart A, the provisions of the section of this Agreement titled "Electronic Fund Transfer Services" control in the event of conflict with this section.

## Rules of funds transfer systems

Funds transfers to or from your account will be governed by the rules of the funds transfer system(s) through which the transfers are made ("system rules"), including Fedwire, the National Automated Clearing House Association, the Electronic Check Clearing House Organization, any regional association (each an "ACH"), the Clearing House Interbank Payments System ("CHIPS"), the Society for Worldwide Interbank Financial Telecommunication ("SWIFT"), Real-Time Payments ("the RTP System"), FedNow service, or other funds transfer system. We're under no obligation to honor, in whole or in part, any payment order or other instruction that could result in our contravention of applicable law, including, without limitation, requirements of the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") and the Financial Crimes Enforcement Network ("FinCEN").

## Sending funds transfers/ Means of transmission

When acting upon your transfer instructions, we may use any means of transmission, funds transfer system, clearing house, or intermediary bank that we reasonably select.

## Notice of funds transfers

We'll notify you of funds electronically debited from or credited to your account through the account statement covering the period in which the transaction occurred. Unless required by law, we're under no obligation to provide you with any additional notice or receipt.

## Reliance on identification numbers

If an instruction or order to transfer funds describes the party to receive payment inconsistently by name and account number, we'll rely on the beneficiary account number even if the account number identifies a party different from the named recipient. If an instruction or order to transfer funds describes a participating financial institution inconsistently by name and identification number, the identification number may be relied on as the proper identification of the financial institution.

## Erroneous payment orders

You could lose funds if you provide incomplete or inaccurate information in your payment orders. We have no obligation to detect errors you make in payment orders (for example, paying the wrong person or the wrong amount). Just because we detect an error once, we won't be obligated to detect future errors. We'll rely on the beneficiary account number and beneficiary bank identification number (e.g., IBAN [International Bank Account Number], RTN [Routing Transit Number] or SWIFT BIC [Business Identifier Code]) you provide with an instruction or order.

## Your duty to report unauthorized or erroneous funds transfers

You'll exercise ordinary care to determine whether a funds transfer to or from your account was either not authorized or erroneous. Except for electronic fund transfers subject to Reg E Subpart A, you must notify us of the facts within a reasonable time, not exceeding 14 days after (i) you have received your account statement from us on which the funds transfer appears or (ii) you otherwise have notice of the funds transfer, whichever is earlier. If you don't notify us within 14 days, you are precluded from asserting we are not entitled to retain payment for the funds transfer.

## ACH transactions

These additional terms apply to payments to or from your account that you transmit through an ACH:

- Your rights as to payments to or from your account will be based on the laws governing your account.
- When we credit your account for an ACH payment, the payment is provisional until we receive final settlement through a Federal Reserve Bank or otherwise receive payment.
- If we don't receive final settlement or payment, we're entitled to a refund from you for the amount credited to your account and the sender of the payment will not be considered to have made the payment to you.
- For ACH debit entries that debit your non-Wells Fargo account and credit your Wells Fargo account, Wells Fargo Bank generally holds those funds for 3-4 business days to make sure that the funds will not be returned unpaid before we credit your Wells Fargo account. Longer holds may apply, or we may return the funds to the sending bank and not make the funds available to your Wells Fargo Account, if we – in our sole discretion – believe the transfer is irregular or suspicious.
- Any Originating Depository Financial Institution (ODFI) may initiate, pursuant to ACH Operating Rules, ACH debit entries to your account for presentment or re-presentment of items you write or authorize.

## Return of ACH debit entries

**Consumer accounts only:** Under the ACH Rules, the Bank can seek the return of an unauthorized consumer ACH debit entry until midnight of the 60th calendar day following the business day the Bank posted the ACH debit entry to your account. To ensure the Bank is able to meet this return deadline, you must notify us no later than 15 days after we send or otherwise make available to you the account statement that reflects the unauthorized transaction. This right of return is in addition to your rights described in the "Electronic Fund Transfer Services" section of this Agreement.

**Business accounts only:** Under the ACH Rules, the Bank can seek the return of an unauthorized non-consumer ACH debit entry until midnight of the business day following the business day the Bank posted

the ACH debit entry to your account. To ensure the Bank is able to meet this return deadline, you must notify us no later than 3:00 p.m. Central Time on the business day following the business day the Bank posted the ACH debit entry to your account. If you don't notify us in a timely manner of the unauthorized non-consumer ACH debit entry, we won't be able to return it without the cooperation and agreement of the originating bank and the originator of the debit entry. Any other effort to recover the funds must occur solely between you and the originator of the entry.

## Liability for transactions not covered by Regulation E

For purchases and other transactions in consumer accounts not governed by Regulation E, you're liable for all losses relating to unauthorized funds transfers that don't result solely from our negligence or intentional misconduct, unless the laws governing your account require lesser liability.

## Receiving instant payments

The following additional terms apply to any instant payments we receive for credit to your account through an instant payments network, which may be the RTP® network or FedNow service operated by a third party, The Clearing House, or another third party network. The terms "sender," "receiver," and "sending participant" are used here as defined in the system rules governing the RTP network and FedNow service. In addition to the rules of the instant payments network, instant payments will be governed by the laws of the state of New York, including New York's version of Article 4A of the Uniform Commercial Code, as applicable, without regard to its conflict of laws principles.

- Instant payments networks may be used only for eligible payments between a sender and receiver whose accounts are located in the United States. You may not send or receive instant payments on behalf of any person or entity not domiciled in the United States. Instant payments that are permitted under the rules of the instant payments network and our requirements are considered eligible payments for purposes of this Agreement.
- Instant payments cannot be cancelled or amended by the sender. If we receive a message from a sending participant requesting return of an instant payment received for credit to your account, we may notify you of that request. You're not obligated to comply with any such request for return of funds. Any dispute between you and the sender of an instant payment should be resolved between you and the sender.
- If you don't wish to accept an instant payment credit received to your account, you may request that we return such payment to the sender. We may, at our sole discretion, attempt to honor such request but will have no liability for our failure to do so.
- Instant payments are typically completed within thirty (30) seconds of transmission of the instant payment by the sender, unless the instant payment fails or is delayed due to a review by us or the sending participant, such as for fraud, regulatory, or compliance purposes. Transaction limits imposed by the instant payments network or sending participant may also prevent instant payments from being sent to your account.

We're under no obligation to honor, in whole or in part, any payment order or other instruction that could result in our contravention of applicable law, including, without limitation, requirements of the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") and the Financial Crimes Enforcement Network ("FinCEN").

## Remittance transfers

Remittance transfers are initiated by consumers primarily for personal, family, or household purposes, and are sent outside the United States and its territories. Each time you initiate a remittance transfer, you'll receive disclosures outlining additional rights provided by federal law. You also may obtain a copy of those rights on wellsfargo.com or in any branch.

## Incoming international wire transfers

Incoming wire transfers received in a foreign currency for payment into your account will be converted into U.S. dollars using the applicable exchange rate without prior notice to you. For more information, see the "Applicable Exchange Rate" section of this account agreement.

## Returned international wire transfers

If your outgoing international wire transfer is returned to Wells Fargo, you may be credited back a lesser amount than the amount that was originally debited for your initial outgoing wire transfer. Fee(s) may be charged by Wells Fargo or other financial institutions (for instance, by beneficiary and intermediary banks) when a wire is returned. As a result, the amount of your returned wire may be different than the amount you originally sent due to fees deducted. In addition, when a returned foreign currency wire is converted back to U.S. dollars, the U.S. dollar amount credited back to you may be less than the original amount we debited from your account due to fluctuation in the applicable exchange rate. You accept the risks of any unfavorable change in the applicable exchange rate. Wells Fargo will not be liable to you for a sum in excess of the amount that was originally debited for your initial outgoing wire transfer after it has been converted back to the original currency, even if there are favorable changes in the foreign exchange markets.

## Funds Transfer Security Procedure

You agree that we will follow a commercially reasonable security procedure of our choice to verify the authenticity of an instruction we receive to send a funds transfer from your account. The security procedure may vary depending on whether we receive the instruction in person, in writing, by phone, or via online or mobile. If we offer, but you decline, an optional security procedure that is commercially reasonable, then you agree that the security procedure chosen to verify the payment order is commercially reasonable for your transaction. You agree to be bound by any funds transfer request that Wells Fargo receives and verifies following a commercially reasonable security procedure, even if the payment order was not authorized by you. More details about the security procedures may be found in the applicable funds transfer agreement or Online Access Agreement.

**Consumer accounts only:** This provision applies to fund transfers governed by Article 4A of the Uniform Commercial Code and not electronic fund transfers governed by Regulation E, Subpart A (except for certain "instant payments" where both may apply). For more information about your rights and responsibilities related to electronic fund transfers as defined by Regulation E, please see the section of this Agreement titled "Electronic Fund Transfer Services."

### Rejecting a Funds Transfer Request

We may reject a funds transfer request without any liability to you. Some examples may include, if you don't have enough available funds in your account for the funds transfer and applicable fees, if we are unable to verify a payment order or person requesting the funds transfer, or if we are unable to complete the request for any other reason. If required by law, we will notify you of our decision to reject the request.

# Electronic Fund Transfer Services

**(Consumer accounts only)**

### General rules for electronic fund transfer services

The following provisions apply to electronic fund transfers to or from your consumer deposit account that are governed by Subpart A of Regulation E.

We offer a variety of electronic fund transfer services you can use to access funds in your account(s) and perform other transactions detailed in this section. Common examples of electronic fund transfers that are subject to this section include debit card, ATM, and Automated Clearing House (ACH) transactions, direct deposits, and certain online or mobile banking transactions. We describe some of these services in this section and also provide certain disclosures that apply to the use of electronic fund transfer services with your consumer account. Some of these services are also governed by separate agreements we give to you at the time your card is mailed or added to a mobile device or you sign up for the service (e.g., ATM and debit cards, online, and mobile banking).

**Note:** Among other things, these provisions don't apply to wire transfers or remittance transfers (e.g., ExpressSend® and consumer-initiated international wire transfers). Remittance transfers you send through us are governed by a separate agreement you enter into when you sign up for the service or send the remittance transfer. Refer to the "Funds Transfer Disclosures — General" section of this Agreement.

When you read this section, you'll see references to Regulation E or Reg E. Regulation E sets forth the basic rights, liabilities, and responsibilities of consumers who use electronic fund transfers and of the banks or other persons who offer these services. It includes the actions you need to take if you believe your card, your card number, your PIN, or other access device has been lost or stolen, or if you notice an error or unauthorized electronic fund transfer on your account and the rules regarding your potential liability for these transfers. Your responsibilities and protections under Regulation E are described in more detail below.

Where any words or terms used within this section are defined in Regulation E, they shall have the same meanings when used in this section. For example, the term "unauthorized electronic fund transfer" as used in this section shall mean an electronic fund transfer from your account that is initiated by a person other than you without actual authority to initiate the transfer and from which you receive no benefit.

The following table summarizes the types of transactions to which Regulation E applies.

| Electronic fund transfer | Description | Transaction covered by Reg E |
|---|---|---|
| **Card transactions** | | |
| **Debit and ATM cards** | Use your Debit or ATM card to make purchases, withdrawals, payments, transfers, and other transactions as described above in the "Debit Cards and ATM Cards" section of this Agreement. | ✓ |
| **Electronic transfers, payments, credits, and electronic check conversions** | | |
| **Transfers** | Send or receive transfers between your accounts or to other recipients at Wells Fargo or other financial institutions | ✓ |
| **Payments** | One-time or recurring payments from your account that you initiate or preauthorize for withdrawal from your account | ✓ |
| **Credits** | Manual or automatic electronic deposits to your account, such as payroll or benefits payments | ✓ |
| **Electronic check conversions** | Electronic fund transfer using information from a check (e.g., the Bank's routing number and your account number) | ✓ |
| **Phone Bank transactions** | | |
| **Phone Bank transactions** | **Not under a written agreement or plan:** A request to the Phone Bank to make a transaction to or from your account | |
| | **Under a written agreement or plan:** The Phone Bank, under an agreement, can make transactions to and from your account | ✓ |

## Liability for unauthorized electronic fund transfers according to Regulation E

**Tell us AT ONCE if you believe your card, card number, PIN, or other access device has been lost or stolen,** or if you believe that an electronic fund transfer has been made by someone other than you and without your permission. Telephoning is the best way of keeping your possible losses down. You could lose all the money in your account (plus funds in any line of credit, savings account, or credit card linked to your account or as part of an Overdraft Protection plan).

If you tell us within two business days after you learn of the loss or theft of your card, card number, PIN, or other access device, you can lose no more than $50 if someone used your credentials without your permission (however, see “Zero Liability protection” in the “Debit Cards and ATM Cards” section of this Agreement).

If you **do NOT** tell us within two business days after you learn of the loss or theft of your card, card number, PIN, or other access device, and we can prove we could have stopped someone from using your credentials without your permission if you had told us, you could lose up to $500 (however, see “Zero Liability protection” in the “Debit Cards and ATM Cards” section of this Agreement).

Also, if your account statement shows transfers that you did not make or authorize, including those made by your card, card number, PIN, other access device, or other means, tell us at once. If you do not notify us within 60 days after the statement was mailed or was otherwise made available to you, you will be liable for any additional unauthorized electronic fund transfers that occurred after the 60-day period and before you provided notice to us (if we can prove we could have stopped those transactions had you promptly notified us). This will apply even to unauthorized electronic fund transfers that occur shortly before you notify us. If a good reason (such as a long trip or hospital stay) kept you from telling us, we will extend the time periods.

## Contact in the event of unauthorized electronic fund transfers

If you believe your card, card number, PIN, or other access device, has been lost or stolen, call us at 1-800-869-3557 or the number listed on your statement, or write to us at Wells Fargo, Customer Correspondence, PO Box 6995, Portland, OR, 97228-6995.

You should also call the number or write to the address listed above if you believe a transfer has been made by someone other than you and without your permission.

## Preauthorized credits to your account

If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you can check your online or mobile banking, enroll in account alerts, or call us at 1-800-869-3557 to find out whether or not the deposit has been made.

## Handling preauthorized payments

**Right to stop payment:** If you have told us in advance to make regular (recurring) payments out of your account, you can stop any of these payments. Here’s how: Call us at 1-800-869-3557, or write to us at Wells Fargo, Customer Correspondence, PO Box 6995, Portland, OR, 97228-6995, in time for us to receive your request **three business days or more** before the payment is scheduled to be made. If you call, we may also require you to put your request in writing and get it to us within 14 days after you call.

**Notice of varying amounts:** If the amount of these regular (recurring) payments vary, the party you are going to pay should tell you, 10 days before each payment, when it will be made and how much it will be. (The party you are going to pay may allow you to choose to get this notice only when the payment would differ by more than a certain amount from the previous payment, or when the amount would fall outside certain limits that you set.)

**Liability for failure to stop payment:** If you order us to stop one of these payments three business days or more before the transfer is scheduled, and we do not do so, we will pay for your losses or damages.

**Note:** We cannot stop payment on a purchase transaction unless it is a preauthorized electronic fund transfer.

## Electronic check conversion

You may authorize a merchant or other payee to make a one-time electronic payment from your account using information from your check to 1) pay for purchases, or 2) pay bills.

## Account inquiry

You have the right to contact us to find out whether an electronic transfer has been credited or debited to your account. Call us at 1-800-869-3557, or write to us at Wells Fargo, Customer Correspondence, PO Box 6995, Portland, OR 97228-6995.

## Receipts

You can get a receipt at the time you make any transfer to or from your account using one of our ATMs or when you use your card at a merchant terminal.

## Our liability for failure to make transfers

If we do not complete a transfer to or from your account on time or in the correct amount according to our agreement with you, we will be liable for your losses or damages. However, there are some exceptions. For instance, we will not be liable if:

- Through no fault of ours, you do not have enough money in your account to make the transfer,
- The transfer would go over the credit limit on a credit account linked for Overdraft Protection,
- The ATM where you are making the transfer does not have enough cash,
- The terminal or system was not working properly and you knew about the breakdown when you started the transfer,
- Circumstances beyond our control (such as fire or flood) prevent the transfer, despite reasonable precautions we have taken, or
- There is some other exception stated in our Agreement with you.

## In case of errors or questions about your electronic fund transfers

If you see an error or have questions about your electronic transfers, think your deposit statement or receipt is wrong, or you need more information about a transfer listed on an account statement or receipt, call us at 1-800-869-3557 or the number listed on your account statement, or write to us at Wells Fargo, Customer Correspondence, PO Box 6995, Portland, OR, 97228-6995 as soon as you can. We must hear from you no later than 60 days after we send the FIRST account statement on which the problem or error appeared, and you should take the following actions:

- Tell us your name and account number (if any) and the dollar amount of the suspected error.
- Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error, or why you need more information.

If you tell us in person or by phone, we may require that you send us your complaint or question in writing within 10 business days.

## Investigations

We will determine whether an error occurred within 10 business days after we hear from you and will correct any error promptly. If we need more time, however, we may take up to 45 days to investigate your complaint or question. If we need more time, we will credit your account within 10 business days for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not credit your account.

For errors involving new accounts, point-of-sale transactions, or foreign-initiated transactions, we may take up to 90 days to investigate your complaint or question. For new accounts, we may take up to 20 business days to credit your account for the amount you think is in error.

We will tell you the results within three business days after completing our investigation. If we decide that there was no error, or an error occurred that is different from the one you described, we will send you a written explanation. You may ask for copies of the documents that we used in our investigation.

# Other Account Services and Restrictions

**Telephone banking services**

You may use our automated phone system to get account information, transfer funds between Wells Fargo accounts, or pay certain Wells Fargo credit bills. To access this service, you must have a valid PIN, either for your debit or ATM card, or a cardless PIN issued for authentication purposes. If you don't have a valid PIN, we'll ask you for information to verify your identity. We may cancel your cardless PIN at any time without notice, including after six months of non-use. We may comply with any request of a caller using Wells Fargo's telephone banking services, provided we authenticate the caller in compliance with one of the identity verification procedures described in this paragraph.

**Large cash withdrawals or deposits**

We may place reasonable restrictions on large cash withdrawals. These restrictions may include requiring you to provide reasonable advance notice to ensure we have sufficient cash on hand. We don't have any obligation to provide security if you make a large cash withdrawal. If you want to deposit a large amount of cash, we may require you to provide adequate security or exercise other options to mitigate possible risks.

**Checks with multiple signatures**

We may act on the instructions of any one authorized signer on your account and not require multiple signatures. If you have indicated that more than one signature is required to transact on your account, you acknowledge and agree that such requirements are for your own control purposes only, and we won't be liable if a check or other transaction is processed without multiple signatures. We're not responsible for reviewing your checks or other transactions for multiple signatures.

**Checks with dates and special instructions**

We may pay the amount encoded on your check in U.S. dollars, even if you wrote the check in a foreign currency or made a notation on the check's face to pay it in a foreign currency. If we, in our sole discretion, pay a check or other item in a foreign currency, the applicable exchange rate may apply. For information on the applicable exchange rate, see "Applicable exchange rate" in the "Additional Terms and Services" section of this Agreement. The encoded amount is in the line along the bottom edge of the front of the check where the account number is printed.

We may, without inquiry or liability, pay a check even if it:

- Has special written instructions indicating we should refuse payment (e.g., "void after 30 days" or "void over $100"),
- Is stale-dated (i.e., the check's date is more than six months in the past), even if we're aware of the check's date,
- Is post-dated (i.e., the check's date is in the future), or
- Isn't dated.

**Use of a facsimile or mechanical signature**

If you use any device or machine to provide a faxed, electronic, computer generated or other mechanical signature (including a stamp on a check) it will be treated as if you had actually signed it.

**ACH debit entries**
(Business accounts make note)

Under the ACH operating rules, certain types of ACH debit entries may only be presented on a consumer account. We'll have no obligation to pay, and no liability for paying, any consumer ACH debit entry on a business account.

**Acceptable form for checks**

Your checks must meet our standards, including paper stock and dimensions; we may refuse checks that don't or that cannot be processed by our equipment. Checks must include our name and address as provided by us. Certain check features, such as security features, may impair the quality of a check image. We're not responsible for losses that result from your failure to follow our check standards.

**Checks presented by a non-customer**

For these transactions, we require acceptable identification, which may include a fingerprint from the person presenting your check. We may not honor the check if the person refuses to provide us with requested identification. We may charge a fee for non-customers to cash a check.

**Electronic check indemnifications**

An "electronic check" and an "electronic returned check" means an electronic image of a paper check or paper returned check or the electronic information derived from it.

When we transfer or present an electronic check or electronic returned check, we provide the following warranties:

- **Image Quality Warranty.** We guarantee that the electronic image accurately represents all of the information on the front of the check as of the time that the original check is truncated, and the electronic information includes an accurate record of all MICR line information required for a substitute check and the amount of a check.
- **No Double Debit Warranty.** We guarantee that the warrantee won't receive a presentment of or otherwise be charged for an electronic check, an electronic returned check, the original check, a substitute check, or a paper or electronic representation of a paper substitute check, in a way that the warrantee will be asked to pay a check that it has already paid.

When we transfer an electronic check for collection or payment, we make the image quality warranty and the no double debit warranty to the transferee bank, any subsequent collecting bank, the paying bank, and the drawer. When we transfer an electronic returned check for return, we make the image quality warranty and the no double debit warranty to the transferee returning bank, the depository bank, and the owner.

**Indemnities applicable to electronic checks and electronic returned checks.** You will indemnify, defend, and hold us harmless from all liabilities, obligations, demands, and costs (including fees of legal counsel and accountants) awarded against or incurred by us (collectively, "losses and liabilities"), related to the transfer or return of an electronic check or an electronic returned check on your behalf. If we suffer any losses or liabilities related to a breach of the image quality warranty or the no double debit warranty, you will reimburse us and not hold us responsible or liable.

**Indemnities applicable to remote deposit capture services (including Wells Fargo Mobile Deposit)**. If a depository bank accepts the original check from which an electronic check is created and suffers losses due to the check having already been paid, we're required to indemnify and reimburse that bank. If we suffer any losses or liabilities related to that type of depository bank indemnity obligation, you will indemnify and reimburse us and not hold us responsible or liable.

**Indemnities applicable to electronically created items.** If we transfer or present an "electronically created item" and receive settlement or other consideration for it, we're required to indemnify and reimburse each transferee bank, any subsequent collecting bank, the paying bank, and any subsequent returning bank against losses that result from the fact that:

- The electronic image or electronic information is not derived from a paper check,
- The person on whose account the electronically created item is drawn didn't authorize its issuance or the payee stated on the item, or
- A person receives a transfer, presentment, or return of, or otherwise is charged for an electronically created item in such a way that the person is asked to make payment based on an item it has paid.

If we suffer any losses or liabilities related to that type of electronically created item indemnity obligation, you will indemnify and reimburse us and not hold us responsible or liable.

## Stop payment

Applicable fees are described in the Consumer Schedule and Business Schedule.

**Requesting stop payment on a check**
You may request a stop payment on a check if you allow us a reasonable amount of time to act on it; the same is true if you ask us to cancel a stop payment order. You can request a stop payment on wellsfargo.com, via our Mobile App, at a branch, or by calling us. We may review your account to see if the check has been presented, and if so, that may impact your stop payment request.

To issue a stop payment order on a check, we may request the following information:

- Your bank account number
- The check number or range of numbers
- The check amount or amounts
- The date on the check

We may, in our sole discretion, use only a portion of this information to identify the check.

We are not responsible for stopping payment on a check if you provide incorrect or incomplete information about the check.

**Effective period for a stop payment order on a check**

- **A stop payment order on a check is valid for six months.** We may pay a check once a stop payment order expires. You must request a new stop payment order if you don't want it to expire and we treat each renewal as a new order.
- **Your responsibility after we accept a stop payment on a check.** Even if we return a check unpaid due to a stop payment order, you may still be liable to the holder of the check (e.g., a check cashing business).

**Stop payment orders on ACH debit entries**
You may request a stop payment order for an ACH debit entry that has not already been paid from your account. You can request a stop payment on wellsfargo.com, via our Mobile App, at a branch, or by calling us. To be effective, a stop payment order must be received in a time and manner that gives the Bank a reasonable opportunity to act on the applicable ACH debit entry. If you provide verbal instructions, we may require confirmation in writing. If such written confirmation isn't received, we may remove the stop payment order after 14 days. An instruction to revoke a stop payment order must be received in a time and manner that gives us a reasonable opportunity to act on it.

To place a stop payment order on an ACH debit entry, we may require that you provide the following information: (i) your account number, (ii) amount of the ACH debit entry, (iii) effective date, and (iv) merchant name. We may request additional information and may, at our sole discretion, use only a portion of the required information in order to identify the ACH debit entry. ACH stop payment orders can be based on information which identifies the Merchant or an amount and will stop all transactions that match the applicable criteria.

If you provide information that is incorrect or subject to change (for example, if the merchant changes its merchant identification (company ID) number or individual identification number), it may result in payment of the ACH debit entry. You acknowledge this risk and agree that you're responsible for notifying the merchant of the ACH debit entry that your authorization has been revoked. Unless prohibited by

law, you agree to indemnify and hold us harmless from, and against, any loss we incur as a result of our paying an ACH debit entry, if any of the information relied on in the stop payment order is incorrect or incomplete (or as a result of our not paying an ACH debit entry for which a valid stop payment order is in effect).

**Stopping payment on a preauthorized electronic fund transfer**
If your account is a consumer account, you may stop payment on a preauthorized electronic fund transfer. See "Handling preauthorized payments" in the "Electronic Fund Transfer Services" section of this Agreement.

### Post-dated checks

A post-dated check is a check you issue with a date in the future. We're not responsible for waiting to honor the check unless you use a stop payment order for the check. You're responsible for notifying us to cancel the stop payment order when you're ready to have that check paid.

### Restricted transactions

You must not use your account or any relationship you may have with us for any illegal purpose, including "restricted transactions" as defined in the Unlawful Internet Gambling Enforcement Act of 2006 and its implementing regulation, Regulation GG. In our discretion, we may block or otherwise prevent those transactions and, further, we may close the account or end our relationship with you.

# Time Accounts (CDs)

CDs mature and are payable at the expiration of a specified term, which will be no less than ten calendar days after the date of deposit. The CD's maturity date is the last day of the term for the CD and is printed on your receipt.

For new Certificate of Deposit (CD) accounts that are not fully funded due to the source funds not being received or being returned unpaid, Wells Fargo may close the account. For existing Certificate of Deposit (CD) accounts where additional funds are added to the account but those incremental funds are not received or are returned unpaid, Wells Fargo may adjust the account balance and interest accrued accordingly.

We may refer to a Time Account as a CD or Certificate of Deposit, even though we don't issue a paper certificate when opening the account or require a paper certificate to close the account.

**You may withdraw funds from your CD on the maturity date without a penalty**. During the ten calendar days after the maturity date, which we refer to as the grace period, you can change the term, generally make withdrawals and additional deposits, or close the CD. No additional deposits to the CD are allowed outside this grace period. You may be charged a penalty if you make a withdrawal at any other time. See "Early withdrawal penalty and Regulation D penalty" in this section.

**Unless you withdraw the funds, your CD will automatically renew at maturity:**

- Typically for the same term unless we inform you at the time of account opening or prior to maturity of a different renewal term, and
- At our standard interest rate in effect on the maturity date for a new CD of the same term and amount, unless we have notified you otherwise.

At renewal, in addition to the interest rate and renewal term, we may change any other CD provision, subject to providing you notice as required by law. Wells Fargo may redeem and close your CD, at our option, if the balance falls below $1.00. This also applies to any CD that you may have within an IRA. We'll treat any interest that is deposited into your CD during the previous term as principal for your new term.

**IRA CDs and ESA CDs**
You may have multiple accounts within your Individual Retirement Account (IRA) or Education Savings Account (ESA) plan. We no longer offer new IRAs or new ESAs. IRA CDs are only available for current IRA customers, and ESA CDs are only available for current ESA customers.

Your IRA/ESA plan balance on December 31 of each year represents the fair market value of your account. We report the fair market value, distributions from and contributions to your IRA/ESA, to the Internal Revenue Service (IRS). If applicable, the IRS may impose penalties. Please consult your tax advisor.

**Interest on your CD**
The Annual Percentage Yield (APY) we disclose to you assumes the interest you earn will remain on deposit until your CD matures. If you withdraw your earned interest before maturity, your account will earn less interest over time and the actual APY will be less than the disclosed APY.

| Term | CD Interest payment options* | | | | |
|---|---|---|---|---|---|
| | Monthly | Quarterly | Semi-Annually | Annually | At maturity |
| Less than 12 months (365 days) | X | X | X | Not available | X |
| 12 months or more | X | X | X | X | Not available |

*Interest payments for IRA/ESA CDs redeposit monthly into your CD.

With the exception of IRA/ESA CDs, you may choose to have your interest payments re-deposited into your CD, transferred to a Wells Fargo checking or savings account, or paid by check if your CD has a minimum balance of $5,000.

## Early withdrawal penalty and Regulation D penalty

**Early withdrawal penalty (Fixed Rate CDs and Fixed Rate IRA/ESA CDs):** Other than the Regulation D penalty described below, any money you withdraw from your CD before the end of its term will be subject to an early withdrawal penalty based on the length of the CD term.

| CD Term | Penalty |
|---|---|
| less than 90 days (or less than 3 months*) | 1 month's interest |
| 90 through 365 days (or 3-12 months*) | 3 months' interest |
| Over 12 months through 24 months | 6 months' interest |
| Over 24 months | 12 months' interest |

* Some CD terms are based on days and others are based on months. Check your receipt for the term applicable to your CD.

We calculate the early withdrawal penalty using the amount of principal you withdraw at your CD's interest rate at the time of withdrawal. The penalty is calculated by multiplying the interest rate by the amount of principal withdrawn then dividing that total by 12 to arrive at one month's interest. We'll deduct your early withdrawal penalty from your earned interest. If the penalty is greater than your earned interest, then we'll deduct the difference from the principal amount of your CD.

**Regulation D Penalty**: The Regulation D penalty is seven days' simple interest on the amount withdrawn and applies to the following:

- Withdrawals made within seven days of account opening including the day the account was opened.
- Withdrawals made during the grace period, when additional deposits are made during the grace period and the withdrawal exceeds the amount of the matured CD balance.
- Withdrawals within seven days of any prior withdrawal where the Bank's early withdrawal penalty is not applied.

**Exceptions to the early withdrawal penalty and the Regulation D penalty (Fixed Rate CDs):**

- Death of the CD owner
- Death of the grantor of a revocable family/living trust
- Court determination that a CD owner is legally incompetent

**Exceptions to the early withdrawal penalty and the Regulation D penalty (Fixed Rate IRA/ESA CDs):**

- Death of the IRA CD or ESA CD owner
- Court determination that an IRA CD or ESA CD owner is legally incompetent
- IRA or ESA owner becomes disabled
- IRA owner is age 59 ½ or older
- IRA or ESA owner requests a revocation in writing within seven days of plan opening

# Protecting Your Account and Your Information

## Protection against unauthorized items

You acknowledge that there's a growing risk of losses resulting from fraud, including unauthorized items. To help prevent fraud on your account, you agree to take reasonable steps to ensure the integrity of your account and items drawn on your account or deposited to it. We recommend you take the following preventive measures (not an exhaustive list):

- Reconcile your account statements when received and promptly notify us of any problem.
- Promptly notify us if you don't receive an expected statement.
- Don't provide your account and routing numbers to unknown persons. Fraudsters may use this information to initiate fraudulent transactions against your account.
- Only write checks to people and businesses whom you know. Fraudsters may try to trick you by pretending to be friends and family, indicating you have won the lottery or sweepstakes, through online dating sites, or impersonating law enforcement.
- Don't deposit checks from people whom you don't know. Fraudsters often request that you deposit a fake check into your account, then request that you return some of the funds. After you return the funds, the check bounces, but you are still responsible to us for the full amount of the check you deposited.
- Write your checks in a manner to prevent others from adding words, numbers or making other changes without your authorization.
- Protect your checks from unauthorized use and theft by securing your supply of checks at all times (for example, never leave checks in an unlocked vehicle, or out in a visible location unattended), using tamper resistant checks, destroying checks you don't intend to use, and not signing blank checks. Check-related fraud is common. If you fail to take any of these preventive measures, we are not responsible for any losses that you may incur.

## Additional protections for business accounts

**Additional steps business customers should take to help reduce the risk of fraud on their accounts:**

- Assign responsibilities for your business account to multiple individuals and periodically reassign duties. Have different people reconcile statements and withdraw funds.
- Watch for checks cashed out of sequence or made out to cash as flags for embezzlement.
- Review activity for unexpected fluctuations such as the percentage of cash deposits to total deposit size. Most businesses will keep a constant average.
- Notify us immediately when an authorized signer's authority ends so that their name can be removed from account access.
- Obtain insurance coverage for bank account fraud risks.
- Watch out for imposters impersonating vendors or if an alleged vendor changes their payment instructions.
- Only send trusted employees to deliver checks or make deposits.

**Wells Fargo services to help prevent fraud on analyzed business accounts include:**

- Positive pay, positive pay with payee validation, or reverse positive pay
- ACH fraud filter, and
- Payment Authorization service.

In addition, we recommend you use certain industry best practices such as dual custody. With dual custody, when one user initiates an action like a payment or a change in the set-up of a service, the action does not take effect until a second user approves the action using a different computer or mobile device.

## Potential consequences if a business customer does not follow bank recommendations

**For analyzed business accounts:**
If we have expressly recommended that you use a fraud prevention service or industry best practice and you either (a) decide not to implement or use the recommended service or industry best practice or (b) fail to use it in accordance with the applicable service description or our other applicable documentation, then you are responsible for all losses that could have been prevented or mitigated by correct use of the recommended service or best practice.

**For non-analyzed business accounts:**
We may expressly recommend that you follow the established process for lost or stolen business checking or savings accounts. This may include (a) placement of an account restraint, (b) closure of your account to mitigate further loss, or (c) a combination of both of these practices.

You are responsible for future losses that could have been prevented or mitigated by correct use of the recommended process or best practice, unless the laws applicable to your account provide otherwise. We separately reserve the right to close your account at any time and in our sole discretion if you fail to implement the recommended process or best practice.

Nothing in this provision amends any other rights we may have under this Agreement, and you remain obligated to notify us of any unauthorized activity on your account in accordance with this Agreement and any other agreement you have with us.

## Verifying your identity with your mobile device and your wireless company

Wells Fargo may collect, use, and retain personal or other information about you or your mobile device to assist in verifying your identity. We may rely on such information provided to us by your wireless company, and you authorize them to disclose:

- Your mobile number, name, address, email;
- Network status, customer type, customer role, billing type, mobile device identifiers (IMSI and IMEI), and other subscriber and device details to Wells Fargo and our service providers for the duration of the account relationship.

Review our Privacy Notice for how we treat your data. You represent that you're the owner of the mobile phone number or have the delegated legal authority to act on behalf of the mobile subscriber to provide this consent.

# Closing Accounts

## If you close your account

You can request to close your account at any time. To close, the account must be in good standing (for example, it does not have a negative balance, or restrictions such as holds on funds, legal order holds, or court blocks). At closing, we'll assist you in withdrawing or transferring any remaining funds, bringing your account balance to zero. All outstanding items need to be processed and posted to your account and all deposits collected and posted to your account before it closes or items will be returned unpaid afterwards. You must redirect or cancel all scheduled deposits to and payments from (recurring or one-time, in each case) your account; otherwise, they may be returned unpaid after the account closes. We won't be liable for any loss or damage that may result from not honoring items or recurring deposits or payments that are presented or received after your account is closed (such as additional fees charged by a merchant or payee for a returned item).

During the process of closing your account:

- Interest-bearing accounts will stop earning interest.
- Overdraft Protection will be removed.
- All cards and linked accounts will be delinked.
- This Agreement continues to apply.

## When we can close your account

We may close your account at any time. If we close your account, we may send the remaining balance in your account by mail or credit it to another account you keep with us.

## Electronic banking privileges end when account is closed

All of your electronic banking privileges will be terminated if your account is closed, except that you can view account activity, download statements and tax documents, and perform limited maintenance functions for at least 90 days after closure unless your account has been closed due to the charge off of an overdrawn balance. If you're enrolled in online banking, refer to the Online Access Agreement for specific terms governing online access to your account.

## Closing your account if the balance is zero

**Accounts with a zero balance will continue to be charged applicable fees** (like the monthly service fee) until you request to close your account. We may close an account with a zero balance on the fee period ending date or at month end without prior notification to you. Once an account is closed (either by you or us), no fees will be assessed on the account.

- To prevent closure by us, an account with a zero balance must have a qualifying transaction posted within the last two months of the most recent fee period ending date. IOLTA and RETA accounts require a qualifying transaction within ten months of the most recent fee period ending date.
- Examples of qualifying transactions are deposits and withdrawals made at a branch, ATM, online, mobile, or via telephone; one-time and recurring transfers made at a branch, ATM, online, mobile, or via telephone; automatic or electronic deposits, such as from payroll or government benefits; automatic or electronic payments, including Bill Pay; one time and recurring purchases or payments made using a card or mobile device; and checks paid from the account. IOLTA and RETA accounts are not eligible for ATM cards or debit cards.
- Bank-originated transactions, like monthly service or other fees, are not considered qualifying transactions that will prevent closure of an account with a zero balance.

## Dormant accounts

Generally, an account with a positive balance becomes dormant if you do not initiate an account-related activity (as determined by the laws governing your account) for a specified period of time.

**Checking accounts, savings accounts, and CDs:** To avoid dormancy, initiate an account-related activity like depositing or withdrawing funds at a branch or ATM, or writing a check from the account. One-time and recurring automatic transactions such as pre-authorized transfers, payments and electronic deposits (including direct deposits), do not prevent the account from becoming dormant, unless otherwise specified by state law.

| **Generally, dormancy for:**<br>Checking account | Savings account | CD |
|---|---|---|
| 12 months | 34 months | 34 months after first renewal |

If any account linked to your Prime Checking or Premier Checking account becomes dormant, that account will be delinked and any benefits will no longer apply (including any fee discount or waiver or special interest rates).

**Individual Retirement Accounts (IRAs) and Education Savings Accounts (ESAs):** Generally, your IRA and ESA (Savings or CD) will become dormant if you don't initiate an account-related activity as follows:

- Traditional IRA becomes dormant if you don't initiate an account-related activity for 34 months or more after you reach the age of 70 ½ (if you reached that age prior to January 1, 2020) or 72 (if you reached that age prior to January 1, 2020), 72 (if you did not reach age 70 ½ prior to January 1, 2020 but reached age 72 prior to January 1, 2023), 73 (if you reach age 72 after December 31, 2022 and age 73 before January 1, 2033), or 75 (if you attain the age 74 after December 31, 2032).
- Roth IRA won't become dormant unless we receive notification of your death, unless otherwise specified by state law
- ESA becomes dormant after the beneficial owner reaches age 30, unless otherwise specified by state law.

**Safeguards for dormant accounts:** We put safeguards in place to protect a dormant account, which may include restricting the following transactions:

- Transfers between your Wells Fargo accounts using your ATM/debit card
- Transfers by phone using our automated banking service
- Transfers or payments through online, mobile, and text banking (including Bill Pay)
- Wire transfers (incoming and outgoing)
- Contributions or transfers to IRA or ESA savings through online and mobile banking.

Normal monthly service fees and other fees continue to apply throughout the dormancy period.

## When and how accounts escheat

If you do not contact us about your dormant account or initiate an account-related activity within the time period specified by applicable state unclaimed property laws (generally, three or five years), Wells Fargo will close your account and deliver your account funds to that state. This process is known as escheat. Account statements will no longer be accessible through online banking. To recover your account funds, you must file a claim with the state.

**Prime Checking and Premier Checking accounts only:** About two months before escheat of your checking account we'll delink all accounts, and any benefits associated with your Prime Checking or Premier Checking account will no longer apply. See the Consumer Schedule for benefits impacted. To reinstate your Prime Checking or Premier Checking account and associated benefits, you must contact us before your checking account escheats.

# Consumer Accounts Only: Resolving Disputes Through Arbitration

## Arbitration Agreement between you and Wells Fargo

If you have a dispute with us, we hope to resolve it as quickly and easily as possible. First, discuss your dispute with a banker. If your banker or another Wells Fargo employee is unable to resolve your dispute, you agree that either Wells Fargo or you can initiate arbitration as described in this section.

**Definition:** Arbitration means an impartial third party will hear the dispute between Wells Fargo and you and provide a decision. Binding arbitration means the decision of the arbitrator is final and enforceable. A dispute is any unresolved disagreement between Wells Fargo and you.

**Wells Fargo and you each agree to waive the right to a jury trial or a trial in front of a judge in a public court.** This Arbitration Agreement has only one exception: Either Wells Fargo or you may still take any dispute to small claims court. Any disagreement over whether a dispute qualifies for small claims court will be resolved by the small claims court in the first instance and otherwise by a court of competent jurisdiction and any arbitration shall be stayed pending such resolution.

Arbitration is beneficial because it provides a legally binding decision in a more streamlined, cost-effective manner than a typical court case. But, the benefit of arbitration is diminished if either Wells Fargo or you refuse to submit to arbitration following a lawful demand. Thus, the party that does not agree to submit to arbitration after a lawful demand must pay all of the other party's costs and expenses for compelling arbitration.

**Neither Wells Fargo nor you will be entitled to join or consolidate disputes by or against others as a representative or member of a class, to act in any arbitration in the interests of the general public, or to act as a private attorney general.** If any provision related to a class action, class arbitration, private attorney general action, other representative action, joinder, or consolidation is found to be illegal or unenforceable, the entire Arbitration Agreement will be unenforceable.

## Applicable rules

Wells Fargo and you each agree that:

- The American Arbitration Association (AAA) will administer each arbitration and the selection of arbitrators according to the AAA's Consumer Arbitration Rules (AAA Rules).
- If there are any differences between the AAA Rules and this Arbitration Agreement, this Arbitration Agreement applies.
- All issues are for the arbitrator to decide, except that issues relating to the scope and enforceability of the Arbitration Agreement or whether a dispute can or must be brought in arbitration are for a court of competent jurisdiction to decide.
- If the AAA is unavailable or unwilling to administer an arbitration consistent with this Arbitration Agreement, the parties shall agree on an alternative administrator that will do so. If the parties are unable to agree, they shall jointly petition a court of competent jurisdiction to appoint an administrator that will do so.
- Wells Fargo and you are participating in commercial transactions involving the movement of money or goods among states.
- The Federal Arbitration Act (Title 9 of the United States Code) governs this Arbitration Agreement and any arbitration between Wells Fargo and you. If the Act or any part of it is inapplicable, unenforceable or invalid, the state laws governing your relationship with Wells Fargo govern this Arbitration Agreement.

Either Wells Fargo or you may submit a dispute to binding arbitration at any time, regardless of whether a lawsuit or other proceeding has previously begun. For information on initiating arbitration, contact the AAA at 1-800-778-7879.

The party initiating arbitration must include in the arbitration demand all of the following information: (i) the claimant's name, address, telephone number, and email address; (ii) the applicable account holder's name (if different from the claimant) and account number; (iii) information sufficient to identify any transaction at issue including the date and location of any such transaction, if applicable; (iv) a detailed description of the nature and basis of the claims asserted; and (v) a detailed description of the nature and basis of the relief sought, including a calculation for it. The demand must be personally signed by the party initiating arbitration (and by counsel if the claimant is represented). By submitting an arbitration demand, the claimant (and, counsel, if the claimant is represented) represent that, as in court, they are complying with the requirements of Federal Rule of Civil Procedure 11(b). The arbitrator is authorized to

impose any sanctions available under Federal Rule of Civil Procedure 11 on represented parties and their counsel. If the arbitrator finds that either the substance of your or Wells Fargo's claim or the relief sought was frivolous or was brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)), then Wells Fargo or you may also seek applicable fee-shifting. Either Wells Fargo or you may request to have the arbitration conducted by a video or in-person hearing, or through written submissions, except any dispute seeking $10,000 or more, or injunctive relief, shall have a video or in-person hearing unless the parties agree otherwise. You and a Wells Fargo representative will personally appear at any hearing (with counsel, if represented).

Each arbitrator must be a licensed attorney with expertise in the laws applicable to the dispute's subject matter. The arbitrator will make a decision regarding the dispute based on applicable law, including any statutes of limitations. The arbitrator may award to either Wells Fargo or you any award or relief provided for by law.

## Fees and expenses

- **Setting the fees/expenses:** We will pay any costs that are required to be paid by us under the arbitration administrator's rules and procedures, and subject to applicable law. If the arbitrator rules in your favor on any claim presented, we will reimburse you for arbitration filing fees you have paid up to $700.00. Please check with the arbitration administrator to determine the fees applicable to any arbitration you file.
- **Applying state law:** The laws governing your account may limit the amount of fees and expenses you are required to pay in arbitration. Your arbitration fees and expenses will not exceed any applicable limits.
- **Paying for attorney/expert/witness fees:** Unless applicable laws state otherwise, each party will pay its own attorney, expert, and witness fees. This rule applies no matter which party wins arbitration

## Additional dispute resolution

Wells Fargo or you each can exercise any lawful rights or use other available remedies to:

- Preserve or obtain possession of property,
- Exercise self-help remedies, including setoff rights, or
- Obtain provisional or ancillary remedies such as injunctive relief, attachment, garnishment, or appointment of a receiver by a court of competent jurisdiction.
- An arbitration will be held in the state whose laws govern your account.

# Business Accounts Only: Resolving Disputes Through Arbitration

## Arbitration Agreement between you and Wells Fargo

If you have a dispute with us, we hope to resolve it as quickly and easily as possible. First, discuss your dispute with a banker. If your banker or another Wells Fargo employee is unable to resolve your dispute, you agree that either Wells Fargo or you can initiate arbitration as described in this section.

**Definition:** Arbitration means an impartial third party will hear the dispute between Wells Fargo and you and provide a decision. Binding arbitration means the decision of the arbitrator is final and enforceable. A “dispute” is any unresolved disagreement between Wells Fargo and you. A “dispute” may also include a disagreement about this Arbitration Agreement’s meaning, application, or enforcement.

Except as stated in “No waiver of self-help or provisional remedies” below, Wells Fargo and you agree, at Wells Fargo’s or your request, to submit to binding arbitration all claims, disputes, and controversies between or among Wells Fargo and you (and their respective employees, officers, directors, attorneys, and other agents), whether in tort, contract or otherwise arising out of or relating in any way to your account(s) and/or service(s), and their negotiation, execution, administration, modification, substitution, formation, inducement, enforcement, default, or termination (each, a “dispute”). **DISPUTES SUBMITTED TO ARBITRATION ARE NOT RESOLVED IN COURT BY A JUDGE OR JURY. TO THE EXTENT ALLOWED BY APPLICABLE LAW, WELLS FARGO AND YOU EACH IRREVOCABLY AND VOLUNTARILY WAIVE THE RIGHT EACH MAY HAVE TO A TRIAL BY JURY FOR ANY DISPUTE ARBITRATED UNDER THIS AGREEMENT.**

Aside from self-help remedies, this Arbitration Agreement has only one exception: Either Wells Fargo or you may still take any dispute to small claims court. Arbitration is beneficial because it provides a legally binding decision in a more streamlined, cost-effective manner than a typical court case. But, the benefit of arbitration is diminished if either Wells Fargo or you refuse to submit to arbitration following a lawful demand. Thus, the party that does not agree to submit to arbitration after a lawful demand by the other party must pay all of the other party’s costs and expenses for compelling arbitration.

## Class action or representative suit not permitted

Wells Fargo and you agree that the resolution of any dispute arising pursuant to the terms of this Agreement will be resolved by a separate arbitration proceeding and will not be consolidated with other disputes or treated as a class. Neither Wells Fargo nor you will be entitled to join or consolidate disputes by or against others as a representative or member of a class, to act in any arbitration in the interests of the general public, or to act as a private attorney general. If any provision related to a class action, class arbitration, private attorney general action, other representative action, joinder, or consolidation is found to be illegal or unenforceable, the entire Arbitration Agreement will be unenforceable.

## Applicable rules

Wells Fargo and you each agree that the arbitration will:

- Proceed in a location mutually agreeable to Wells Fargo and you, or if the parties cannot agree, in a location selected by the American Arbitration Association (AAA) in the state whose laws govern your account
- Be governed by the Federal Arbitration Act (Title 9 of the United States Code), notwithstanding any conflicting choice of law provision in any of the documents between Wells Fargo and you
- Be conducted by the AAA, or such other administrator as Wells Fargo and you will mutually agree upon, in accordance with the AAA’s commercial dispute resolution procedures, unless the claim or counterclaim is at least $1,000,000 exclusive of claimed interest, arbitration fees and costs in which case the arbitration will be conducted in accordance with the AAA’s optional procedures for large, complex commercial disputes (the commercial dispute resolution procedures or the optional procedures for large, complex commercial disputes to be referred to, as applicable, as the “rules”).

If there is any inconsistency between the terms hereof and any such rules, the terms and procedures set forth herein will control. Any party who fails or refuses to submit to arbitration following a lawful demand by any other party will bear all costs and expenses incurred by such other party in compelling arbitration of any dispute. Nothing contained herein will be deemed to be a waiver by Wells Fargo of the protections afforded to it under 12 U.S.C. Section 91 or any similar applicable state law.

## No waiver of self-help or provisional remedies

This arbitration requirement does not limit the right of Wells Fargo or you to:

1. Exercise self-help remedies, including setoff or
2. Obtain provisional or ancillary remedies such as injunctive relief or attachment, before, during, or after the pendency of any arbitration proceeding. This exclusion does not constitute a waiver of the right or obligation of either party to submit any dispute to arbitration or reference hereunder, including those arising from the exercise of the actions detailed in (1) and (2) above.

### Arbitrator's qualifications and power

Any dispute in which the amount in controversy is $5,000,000 or less will be decided by a single arbitrator selected according to the rules, and who will not render an award of greater than $5,000,000. Any dispute in which the amount in controversy exceeds $5,000,000 will be decided by majority vote of a panel of three arbitrators; provided however, that all three arbitrators must actively participate in all hearings and deliberations. Each arbitrator will be a neutral attorney licensed in the state whose laws govern your account, or a neutral, retired judge in such state, in either case with a minimum of ten years' experience in the substantive law applicable to the subject matter of the dispute to be arbitrated. The arbitrator(s) will determine whether or not an issue is arbitratable and will give effect to the statutes of limitation in determining any claim.

In any arbitration proceeding the arbitrator(s) will decide (by documents only or with a hearing at the discretion of the arbitrator(s)) any pre-hearing motions which are similar to motions to dismiss for failure to state a claim or motions for summary adjudication. The arbitrator(s) will resolve all disputes in accordance with the substantive law of the state whose laws govern your account and may grant any remedy or relief that a court of such state could order or grant within the scope hereof and such ancillary relief as is necessary to make effective any award. The arbitrator(s) will also have the power to award recovery of all costs and fees, to impose sanctions, and to take such other action as deemed necessary to the same extent a judge could pursuant to the federal rules of civil procedure, the state rules of civil procedure for the state whose laws govern your account, or other applicable law. Judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction. The institution and maintenance of an action for judicial relief or pursuit of a provisional or ancillary remedy will not constitute a waiver of the right of any party, including the plaintiff, to submit the controversy or claim to arbitration if any other party contests such action for judicial relief.

### Discovery

In any arbitration proceeding, discovery will be permitted in accordance with the rules. All discovery will be expressly limited to matters directly relevant to the dispute being arbitrated and must be completed no later than 20 days before the hearing date. Any requests for an extension of the discovery periods, or any discovery disputes, will be subject to final determination by the arbitrator upon a showing that the request for discovery is essential for the party's presentation and that no alternative means for obtaining information is available.

### Fees and expenses

The arbitrator will award all costs and expenses of the arbitration proceeding.

### Additional rules for an arbitration proceeding

To the maximum extent practicable, the AAA, the arbitrator(s), Wells Fargo and you will take all action required to conclude any arbitration proceeding within 180 days of the filing of the dispute with the AAA. The arbitrator(s), Wells Fargo or you may not disclose the existence, content, or results thereof, except for disclosures of information by Wells Fargo or you required in the ordinary course of business, by applicable law or regulation, or to the extent necessary to exercise any judicial review rights set forth herein. If more than one agreement for arbitration by or between Wells Fargo and you potentially applies to a dispute, the arbitration agreement most directly related to your account or the subject matter of the dispute will control. This arbitration agreement will survive the closing of your account or termination of any service or the relationship between Wells Fargo and you.

### The right to pursue claims in small claims court

Notwithstanding anything to the contrary, Wells Fargo and you each retains the right to pursue in small claims court a dispute within that court's jurisdiction. Further, this arbitration agreement will apply only to disputes in which either party seeks to recover an amount of money (excluding attorneys' fees and costs) that exceeds the jurisdictional limit of the small claims court.

# Additional Terms and Services

## Laws governing your account

This Agreement, your accounts, services and any related disputes are governed by United States law and (when not superseded by United States law) the laws of the state where your account is located (without regard to conflict of laws principles). We may move your account to a different state, and will notify you if we do so.

Where your account is located:

- If you apply through one of our branches, then the account is located in the state where the branch is located.
- If you apply online, phone or by mail, then the account is located in the state associated with your home ZIP code at the time of account opening if we have a branch in that state when the account is opened.
- In all other cases, your account will be located in California.

For consumer and business accounts (except analyzed business accounts), your account statement identifies which state's terms and conditions apply.

## Controlling language

English is the controlling language of our relationship with you, including the terms of this Agreement. Items you write such as checks or withdrawal slips must be written in English. For your convenience, we may, but are not obligated to (unless required by law), translate some forms, disclosures, and advertisements into another language, but if there's a discrepancy, the English version prevails over the translation.

## Legal process

Legal process includes any levy, garnishment or attachment, tax levy or withholding order, injunction, restraining order, subpoena, search warrant, government agency request for information, forfeiture or seizure, and other legal process relating to your account.

We may accept and act on any legal process we believe to be valid regardless of how and where it is served, including if process is served in locations, states, or jurisdictions other than where the account was opened or where the account, property, or records are located.

We may, but are not required to, provide notice of legal process relating to your accounts. We may comply with legal process even though it affects the interests of only one owner or authorized signer of a joint account. Regardless of any action we take, we are not waiving any rights of exemption you may have under any federal or state laws. You are responsible for invoking any exemption rights not otherwise asserted on your behalf.

Any fees, expenses (including attorneys' fees and expenses), or losses we incur as a result of responding to legal process related to your account are your responsibility. We may charge these costs to any account you maintain with us.

If legal process relates to an account or accounts that appear on a combined statement, we may release the entire combined statement, even if that means that we release information related to accounts not otherwise governed by this Agreement.

## Changes to this Agreement

We may change the terms of this Agreement, including account fees and features, at any time by adding new terms or conditions, or by modifying or deleting existing ones. If we're required to notify you of a change to this Agreement, we'll describe the change and its effective date in a message within your account statement or by any other appropriate means. We may agree in writing to waive a term of this Agreement, including a fee, and we may revoke any waiver.

## Modification of invalid terms

Any term of this Agreement that is inconsistent with the laws governing your account will be excluded to the extent of such invalidity. The invalid term will be considered modified by us and applied in a manner consistent with such laws. Such modification won't affect the enforceability or validity of the remaining terms of this Agreement.

## Timing of notices

Any notice you send us is effective once we receive it and have a reasonable opportunity to act on it.

## Responsibilities and liabilities between Wells Fargo and you

We're responsible for exercising ordinary care and complying with this Agreement.

When we take an item for processing by automated means, ordinary care does not require us to examine the item. In all other cases, ordinary care requires only that we follow standards that don't vary unreasonably from the general standards followed by similarly situated banks.

Except to the extent we fail to exercise ordinary care or to comply with this Agreement, and to the extent permitted by applicable federal or state laws, you agree to indemnify and hold us harmless from all claims, demands, losses, liabilities, judgments, and expenses (including attorneys' fees and expenses) arising out of or in any way connected with our performance under this Agreement. This indemnification will survive termination of this Agreement.

We won't be liable for anything we do when following your instructions. In addition, we won't be liable if we don't follow your instructions if we reasonably believe that your instructions would expose us to potential loss or civil or criminal liability, or conflict with customary banking practices. In no event will either Wells Fargo or you be liable to the other for any special, consequential, indirect, or punitive damages. The limitation doesn't apply where the laws governing your account prohibit it. We won't have any liability to you if your account does not have sufficient available funds to pay your items due to actions we have taken in accordance with this Agreement.

Circumstances beyond your control or ours may arise and make it impossible for us to provide services to you or for you to perform your duties under this Agreement. If this happens, neither Wells Fargo nor you will be in breach of this Agreement. If we waive a right with respect to your account on one or more occasions, it does not mean we're obligated to waive the same right on any other occasion.

## Your obligation to pay our fees

We're permitted to either directly debit your account or bill you for our fees, expenses and taxes incurred in connection with your account and any service. If the available funds in your account are not sufficient to cover the debit, we may create an overdraft on your account.

## Setoff and security interest

**Our setoff rights:** If you owe us any money, we have the right to apply funds in any of your accounts to pay your debt. This is known as setoff. When we exercise this right, we reduce the funds in your account(s) by the amount of the debt that is due or past due as allowed by the laws governing your account. Unless required by law, we do not need to give you any prior notice to exercise our right of setoff.

A debt includes any amount you owe individually or together with someone else both now or in the future. It includes any overdrafts and our fees. If your account is a joint account, we may setoff funds in it to pay the debt of any joint owner.

If your account is an unmatured CD, then we may deduct an early withdrawal penalty. This may be due as a result of our having exercised our right of setoff. See "Early withdrawal penalty and Regulation D penalty" in the "Time Accounts (CDs)" section of this Agreement.

**Consumer accounts only:** Our right to setoff extends to any federal or state benefit payments (including Social Security benefits) deposited to your account, subject to applicable law. If we're obligated to return any federal or state benefits deposited to your accounts after you're no longer eligible to receive them, we may setoff against any of your accounts to recover the payments you were ineligible to receive. Our right of setoff won't apply if it would invalidate the tax-deferred status of any tax-deferred retirement account (e.g., a SEP or an IRA) you keep with us.

**Security interest:** In addition to granting us the right of setoff, and to ensure you pay us all amounts you owe us under this Agreement (e.g., overdrafts and fees), you grant us a security interest in each account you keep with us. By opening and keeping each account with us, you consent to our asserting our security interest should the laws governing this Agreement require your consent. Our rights under this security interest are in addition to and apart from any other rights under any other security interest you may have granted to us.

You may not grant a security interest in, transfer, or assign your accounts to anyone other than us without our written agreement.

## Tax identification number certification requirements

U.S. Treasury regulations require us to determine the tax residency of all customers and payees who could receive income that is reportable to the IRS. We accomplish this by obtaining a Form W-9 from all U.S. taxpayers and a type of Form W-8 from all foreign customers.

- We use Form W-9 to document U.S. tax residency and obtain a Taxpayer Identification Number ("TIN") from the primary owner of each account. Until we have received the Form W-9 and TIN, we're required to apply backup withholding to any income earned.
- Foreign individuals (also referred to as nonresident aliens) and foreign entities document their tax residency outside the U.S. on the applicable type of Form W-8. That form also allows us to apply the correct withholding rate or exemption to your income earned in the U.S. If you don't provide a valid type of Form W-8, we're required to apply the 30% withholding rate, or in some cases, presume you're an uncertified U.S. taxpayer subject to backup withholding on all income and gross proceeds regardless of whether or not it's U.S. sourced.

- Accounts jointly owned by at least one foreign individual or entity must provide a Form W-8 or Form W-9, as applicable, for all of the joint owners.
- Foreign individuals provide a Form W-8BEN. Foreign entities that are the beneficial owner of the income provide a Form W-8BEN-E unless they can make a special withholding exemption claim and instead provide either a Form W-8EXP or Form W-8ECI.
- Entities that act as intermediaries or flow-through entities receiving income on behalf of someone else provide a Form W-8IMY. In some cases, that Form W-8IMY must also include a withholding statement that allocates the income to each of the beneficial owners and copies of the tax certification documentation for those underlying beneficial owners.

If you own your account as an individual or sole proprietor, upon your death, we must be provided with the estate's or successor's IRS Form W-9 or Form W-8. If these are not provided, we may either refuse to pay interest earned on your account from the date of your death or apply backup withholding on the income earned after the date of your death.

## Your tax responsibility

You're responsible for paying applicable state and local sales taxes on your account fees. These taxes vary by location. You also agree to pay an amount equal to any other applicable taxes, including backup withholding tax. We will charge you for all the foregoing taxes and amounts. You also agree to pay an amount equal to any other applicable taxes, including backup withholding tax.

## Applicable exchange rate

In addition to any applicable fees, we make money when we convert one currency to another currency for you. The exchange rate used when we convert one currency to another is set at our sole discretion, and it includes a markup. The markup is designed to compensate us for several considerations including, without limitation, costs incurred, market risks, and our desired return. The applicable exchange rate does not include, and is separate from, any applicable fees. The exchange rate we provide to you may be different from exchange rates you see elsewhere. Different customers may receive different rates for transactions that are the same or similar. The applicable exchange rate may vary based on such factors including, but not limited to, currency pair, transaction size, payment channel and product type, such as foreign currency cash, checks, remittances, and wire transfers. Foreign exchange markets are dynamic, and rates fluctuate over time based on market conditions, liquidity, and risks. We're your arms-length counterparty on foreign exchange transactions. We may refuse to process any request for a foreign exchange transaction.

## Communications about your account

**Contacting you for servicing and collection:** We may contact you by phone, text, email, or mail to service your account or collect amounts you owe us. You will provide us accurate and current contact information. We can contact you at any address, phone number, or email address you provide.

When you give us a phone number, you expressly consent that we (and any party acting on our behalf) may contact you by phone call or text message at that number. When we call you, you agree that we may leave prerecorded or artificial voice messages. You also agree that we may use automatic telephone dialing systems in connection with calls or text messages sent to any phone number you give us, even if the receiving number is a mobile phone or other service for which the party called may be charged.

**Monitoring communications:** We can monitor, record, and retain your communications with us at any time without further notice to anyone, unless the laws governing your account require further notice. Monitored and recorded communications include phone conversations, electronic messages and records, and other data transmissions.

**Communicating with authorized signers:** We may provide you or an authorized signer with information about your account. When we receive information from an authorized signer, we treat it as a communication from you. You agree to notify us promptly in writing if an authorized signer no longer has authority on your account.

## Adverse claims against your account

An adverse claim occurs when
- Any person or entity makes a claim against your account or funds in your account,
- We believe a conflict exists between or among your account's owners, or
- We believe a dispute exists over who has account ownership or authority to withdraw funds from your account.

In these situations, we may take any of the following actions without any responsibility or liability to you:
- Continue to rely on the documents we have on file for your account.
- Honor the claim against your account funds if we're satisfied the claim is valid.
- Freeze all or a part of the funds in your account until we believe the dispute is resolved to our satisfaction.
- Close your account and send a check or other item for the available balance in your account payable to you or to you and each person or entity who claimed the funds.
- Pay the funds into an appropriate court and/or petition the court to resolve the dispute.

We also may charge any account you keep with us for our fees and expenses in taking these actions (including attorneys' fees and expenses, and court costs).

In addition, if we believe, in our sole discretion, that you may lack the capacity to act on your account, we may request a court take action to preserve or protect assets in your account(s). In such cases, we may charge any account you keep with us for our fees and expenses in taking these actions (including attorneys' fees and expenses, and court costs).

## If you carry special insurance for employee fraud/embezzlement

(Business accounts only)

If you have special insurance for employee fraud/embezzlement, we may require you to file your claim with your insurance company before making any claim against us. In such event, we'll consider your claim only after we have reviewed your insurance company's decision, and our liability to you, if any, will be reduced by the amount your insurance company pays you.

## Restricting access to your account

If we suspect any suspicious, irregular, fraudulent, unauthorized or unlawful activities ("Questionable Activities"), we may, in our sole discretion: prevent, delay or decline transactions account activities; freeze all or some of the funds in any account with us that you keep or control; and/or otherwise restrict access to your account(s).

- If a state or federal agency requests us to restrict funds in your accounts, we will comply with their request as permitted under state or federal law, and notify you, unless otherwise prohibited by applicable law.
- If we suspect an owner is a victim of elder or vulnerable adult exploitation, we may file a report with the appropriate investigative agency, under applicable state law. In addition, we may notify any or all owners or authorized signers on your account, and, unless otherwise prohibited by applicable law, any third party you designate as a contact for your account. We may also notify certain third parties who we believe are closely associated with you about our concerns regarding the Questionable Activities.

With respect to Questionable Activities, we may continue to prevent, delay, or decline transactions and/or account activities, freeze funds, or otherwise restrict access to your account, until the earlier of when (i) our concerns about the Questionable Activities are resolved to our satisfaction, (ii) the time frame set forth in applicable law, or (iii) we receive a Court order that provides us direction. Unless otherwise required by applicable law to take any of the above actions, we may take these actions in our sole discretion and without liability to you.

## Converting accounts

We can convert your account to another type of deposit account (by giving you any required notice) if:
- You use it inappropriately or fail to meet or maintain the account's requirements, including minimum balance requirements, or
- We determine an account is inappropriate for you based on your use, or
- We stop offering the type of account you have.

## Terminating or suspending services

We can terminate or suspend specific services (for example, wire transfers) without closing your account and without prior notice to you. You can discontinue using a service at any time.

## Obtaining credit reports or other reports about you

We can obtain a credit or other report about you and/or your co-owners and authorized signers to help us determine whether to open or keep an account. We can also obtain information from motor vehicle departments, other state agencies, and public records.

## Sharing information about your account with others

Generally, if we don't have your consent, we won't share information about your account. However, we may share information about your account in accordance with our separately provided Privacy Notice.

## Use of funds in customers' non-interest-bearing accounts

We may benefit from having the use of funds in customers' non-interest-bearing accounts. We may use these funds to reduce our borrowing from other sources, such as the Fed Funds market, or invest them in short-term investments, such as our Federal Reserve Account. Our use of funds as described in this paragraph has no effect or impact on your use of and access to funds in your account.

# Glossary

**Access device:** a card, code, or other means of access to a consumer's account, or any combination thereof, that may be used by you to initiate electronic fund transfers.

**ACH transaction:** a deposit or payment transferred through the Automated Clearing House (ACH) network, an electronic network used for financial transactions. ACH transfers are a type of Electronic Fund Transfer (EFT).

**Analyzed business account:** a checking account for which fees are billed through account analysis. Some analyzed accounts offer an earnings allowance to offset eligible fees. Examples of analyzed business accounts include the following: Optimize Business Checking℠, Analyzed Business Checking, and Analyzed Interest on Lawyers Trust Account (IOLTA).

**Authorized signer:** a person who has authority to use your account even if they have not signed the account application.

**Available balance:** our most current record of the amount of money available for your use or withdrawal. For more information, see the "Available Balance, Posting Transactions, and Overdraft" section in this Agreement.

**Business account:** any deposit account, other than one of Wells Fargo's commercial deposit accounts, which isn't established and kept for personal, family, or household purposes. Common examples of ownership include an individual acting as a sole proprietor, a partnership, a limited partnership, a limited liability partnership, a limited liability company, a corporation, a joint venture, a nonprofit corporation, an employee benefit plan, or a governmental unit including an American Indian tribal entity.

**Business day:** every day except Saturday, Sunday, and federal holidays.

**Card:** every type of debit card and ATM card we may issue, except any prepaid cards or the business deposit card.

**Collected balance:** the ending daily balance in your account after all credits and debits have posted, minus deposited items that have not yet been collected from the originating financial institution. The collected balance is the balance on which interest is calculated for all interest-bearing checking accounts and for all savings accounts.

**Consumer account:** any deposit account which is established and kept for personal, family, or household purposes and isn't intended for business use. A consumer account can be owned by one or more individuals.

**Digital wallet:** a digital wallet is a way to carry your credit and debit card information in a secure digital form on your mobile device (smartphone, smartwatch, tablet). Instead of using your physical plastic card to make purchases, a digital wallet allows you to pay in stores, in apps, or online.

**Direct deposit:** an automatic electronic deposit of your salary, pension, Social Security, or other regular income deposited through the ACH network to your Wells Fargo deposit account by your employer or an outside agency.

**Endorsement:** a signature, stamp, or other mark on the back of a check to transfer, restrict payment, or make the signer responsible for the check.

**Fee period:** is the period used to calculate the monthly service fee. The fee period details are provided on the Monthly Service Fee Summary located in your account statement.

**Item:** any order, instruction, or authorization to withdraw or pay funds or money from or to an account. Examples include a check, draft, money order, ACH, wire transfer, Bill Pay, other electronic transfer, ATM withdrawal, teller withdrawal, debit card purchase, and fee.

**Overdraft:** an available balance of less than $0.00 in your account.

**Returned item / Non-sufficient funds (NSF):** a term used to indicate when an item presented for payment is returned unpaid because the available balance in your deposit account is less than the amount of the item when presented.

Deposit products offered by Wells Fargo Bank, N.A. Member FDIC.
© 2025 Wells Fargo Bank, N.A.